1  **LAW OFFICES OF ROBERT V. CORNISH, JR., PC**
2  Keren E. Gesund (SBN 253242)
   Robert V. Cornish, Jr. (*pro hac vice*)
3  680 South Cache Street, Suite 100, P.O. Box 12200
   Jackson, WY 83001
4  Tel: (307) 264-0385
   Email: keren@rcornishlaw.com
5  Email: rcornish@rcornishlaw.com
6
   *Attorneys for Plaintiffs*
7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11  Shi Bai, Jing Cai, Yikun Cai, Yang Cao,          Case No. 2:24-cv-00807-DJC-DB
    Gongyi Chen, Huan Chen, Mei Chen, Peng
12  Chen, Teck Fook Choong, Xinjing Dai,             **SECOND AMENDED COMPLAINT**
    Jinlian Deng, Jiangwei Dong, Ailian Du, Yu
13  Duan, Chunlei Fan, Qingqi Fan, Xiaozhen
    Fei, Yihui Feng, Lu Gan, Xiaohua Gao, Zhi
14  Geng, Zhaoxia Gong, Ding Gu, Xiaoxuan
    Gu, Peihe Guo, Caiying He, Xiao Hong,
15  Yilun Hu, Jing Huang, Qiuwei Huang, Xiao
    Huang, Chunxia Jiang, Chuan Jin,
16  Wenying Jin, Lili Kong, Florent Lepvreau,
    Fang Li, Lanhua Li, Min Li, Yang Li,
17  Yuetong Li, Yuping Li, Zehao Li, Fang Lin,
    Hai Lin, Zhichun Lin, Zhishan Lin, Guishu
18  Liu, Hongqin Liu, Huayu Liu, Xiaohong Liu,
    Xiaomin Liu, Caiyuan Lu, Jian Lu, Danni
19  Ma, Zhuo Mao, Vijay Vyas Mohan, Pengfei
    Pan, Haijian Pang, Zipeng Qi, Qing Qian,
20  Liqun Ren, Haoran Shan, Shengxuan
    Shao, Xinyi Shen, Yang Shi, Ce Song, Jing
21  Sun, Jingwei Sun, Ling Sun, Xiaoling Sun,
    Weigang Chen, Mingji Tan, Ao Tang, Yang
22  Tang, Ziwen Tao, Yezhou Tong, Ying Wan,
    Cuiwei Wang, Fang Wang, Shanwen
23  Wang, Ying Wang, Yuntao Wang, Zhiyong
    Wang, Ziyi Wang, Yanfei Wu, Hao Xian,
24  Feng Xin, Yinghua Xing, Yingjie Xing, Yu
    Xing, Tianjing Xu, Shouxin Yang, Shuwen
25  Yang, Yaqi Yang, Hong Ye, Siyu Ye, Li Yu,
    Meiying Yu, Xiaoman Yu, Xiwen Yu, Lei
26  Zeng, Chi Zhang, Haoliang Zhang, Hong
27
28

                              1

Zhang, Jing Zhang, Mei Zhang, Shengwu Zhang, Wenxi Zhang, Xiane Zhang, XiaoJiang Zhang, Xin Zhang, Yong Zhang 1, Yong Zhang 2, Zhaoqian Zhang, Zhenhu Zhang, Chunhui Zhao, Donghui Zhao, Fang Zhao, Jing Zhao, Lu Zhao, Xin Zhao, Yefan Zhao, Jiehan Zheng, Jiankun Zhu, Jing Zhu, Jie Zou, Mohammad Aslam Khan, Yongsong Li, Yajun Ren, Yidong Ren, Lixun Su, Da Wei, Xufeng Wu, Hao Deng, Jie Gao, Yu Hu, Tao Ma, Yaying Wang, Min Yu, Hong Zeng, Zhiyu Chen, Long Ma, Shanshan Peng, Binyu Shen, Tianli Yu, Jianping Hao, Henry Huang, Shixin Liu, Fan Shi, Yang Yang, Yali Chen, Hongjing Yin, Bei Zhu, Yilong Zhang, Lemeng Nie, Ye Tian, Jingxuan Zhu, Zhiqi Lei, Siufan Wong, Ling Zhang, Chuan Qin, Youwei Chen, He Jiang, Jiacheng Wang, Ting Wang, Wenhua Wang, Yichi Zhang, Yiming Hu, Wei Liu, Zhe Yuan, Di Zhang, Siyuan Liu, Tan Zhang, Jiaoyue Zhao, Yuanbo Li, Ming Qu, Hang Yu, Yitao Yu, Di Ouyang, Yuxiao Wang, Min Zhou, Yafei Yan, Caihuan Fang, Sen Chi Fong, James Tomlinson, Luis Gustavo Grubert Valensuela a/k/a Gustavo Valensuela, Yan Xu, Volker Schauz, Farnoosh Azmoodeh, Antonio Duarte, Aristoteles Rodopoulos, Kaled Naser, and Valéry-Paul Guichon,

*Plaintiffs,*

v.

CMB Export Infrastructure Investment Group 48, LP, a Delaware limited partnership; CMB Export LLC, California limited liability company; NK Immigration Services, LLC, an Illinois limited liability company; Neal Lee, an individual; Patrick Hogan, an individual; and LEWIS BRISBOIS BISGAARD & SMITH LLP, a California Limited Liability Partnership,

*Defendants.*

Plaintiffs Shi Bai, Jing Cai, Yikun Cai, Yang Cao, Gongyi Chen, Huan Chen, Mei Chen, Peng Chen, Teck Fook Choong, Xinjing Dai, Jinlian Deng, Jiangwei Dong, Ailian Du, Yu Duan, Chunlei Fan, Qingqi Fan, Xiaozhen Fei, Yihui Feng, Lu Gan, Xiaohua Gao, Zhi Geng, Zhaoxia Gong, Ding Gu, Xiaoxuan Gu, Peihe Guo, Caiying He, Xiao Hong, Yilun Hu, Jing Huang, Qiuwei Huang, Xiao Huang, Chunxia Jiang, Chuan Jin, Wenying Jin, Lili Kong, Florent Lepvreau, Fang Li, Lanhua Li, Min Li, Yang Li, Yuetong Li, Yuping Li, Zehao Li, Fang Lin, Hai Lin, Zhichun Lin, Zhishan Lin, Guishu Liu, Hongqin Liu, Huayu Liu, Xiaohong Liu, Xiaomin Liu, Caiyuan Lu, Jian Lu, Danni Ma, Zhuo Mao, Vijay Vyas Mohan, Pengfei Pan, Haijian Pang, Zipeng Qi, Qing Qian, Liqun Ren, Haoran Shan, Shengxuan Shao, Xinyi Shen, Yang Shi, Ce Song, Jing Sun, Jingwei Sun, Ling Sun, Xiaoling Sun, Weigang Chen, Mingji Tan, Ao Tang, Yang Tang, Ziwen Tao, Yezhou Tong, Ying Wan, Cuiwei Wang, Fang Wang, Shanwen Wang, Ying Wang, Yuntao Wang, Zhiyong Wang, Ziyi Wang, Yanfei Wu, Hao Xian, Feng Xin, Yinghua Xing, Yingjie Xing, Yu Xing, Tianjing Xu, Shouxin Yang, Shuwen Yang, Yaqi Yang, Hong Ye, Siyu Ye, Li Yu, Meiying Yu, Xiaoman Yu, Xiwen Yu, Lei Zeng, Chi Zhang, Haoliang Zhang, Hong Zhang, Jing Zhang, Mei Zhang, Shengwu Zhang, Wenxi Zhang, Xiane Zhang, XiaoJiang Zhang, Xin Zhang, Yong Zhang 1, Yong Zhang 2, Zhaoqian Zhang, Zhenhu Zhang, Chunhui Zhao, Donghui Zhao, Fang Zhao, Jing Zhao, Lu Zhao, Xin Zhao, Yefan Zhao, Jiehan Zheng, Jiankun Zhu, Jing Zhu, Jie Zou, Mohammad Aslam Khan, Yongsong Li, Yajun Ren, Yidong Ren, Lixun Su, Da Wei, Xufeng Wu, Hao Deng, Jie Gao, Yu Hu, Tao Ma, Yaying Wang, Min Yu, Hong Zeng, Zhiyu Chen, Long Ma, Shanshan Peng, Binyu Shen, Tianli Yu, Jianping Hao, Henry Huang, Shixin Liu, Fan Shi, Yang Yang, Yali Chen, Hongjing Yin, Bei Zhu, Yilong Zhang, Lemeng Nie, Ye Tian, Jingxuan Zhu, Zhiqi Lei, Siufan Wong, Ling Zhang, Chuan Qin, Youwei Chen, He Jiang, Jiacheng Wang, Ting Wang, Wenhua Wang, Yichi Zhang, Yiming Hu, Wei Liu, Zhe Yuan, Di Zhang, Siyuan Liu, Tan Zhang, Jiaoyue Zhao, Yuanbo Li, Ming Qu, Hang Yu, Yitao Yu, Di Ouyang, Yuxiao Wang, Min Zhou, Yafei Yan, Caihuan Fang, Sen Chi Fong, James Tomlinson, Luis Gustavo Grubert Valensuela a/k/a Gustavo Valensuela, Yan Xu, Volker Schauz,

Farnoosh Azmoodeh, Antonio Duarte, Aristoteles Rodopoulos, Kaled Naser, and Valéry-Paul Guichon ("Plaintiffs") by and through their counsel of record, as and for their Complaint against CMB Export Infrastructure Investment Group 48, LP ("CMB"), a Delaware Limited Partnership; CMB Export LLC ("CMB Export"), a California limited liability company; NK Immigration Services, LLC ("NK"), an Illinois limited liability company; Neal Lee, an individual; Patrick Hogan, an individual; and LEWIS BRISBOIS BISGAARD & SMITH LLP ("LB"), a California limited liability partnership, allege as follows:

## I.    INTRODUCTION

1.    In managing and counseling others on a mezzanine portion of a $1 billion development project bordering Beverly Hills, each of the Defendants realized after the fact that crucial communications from a senior lender—revealed to be vultures with a global reputation for engaging in defaulting and plundering commercial real estate—had entered the picture and that Defendants failed to act.

2.    Upon this realization, the Defendants had two choices. They could either (a) come clean at the risk of ruin or (b) cover up their conduct so that enough time would pass by so Plaintiffs and other EB-5 investors could do nothing about it. Defendants chose the latter. That is what this case is about.

3.    Beginning in July of 2021, after the borrower defaulted, Defendants conspired to coordinate a cover-up to hide their own malfeasance and shift the blame to others. To preserve their reputations at the expense of Plaintiffs, Defendants misled and defrauded Plaintiffs using a concerted enterprise that utilized intentionally misleading investor notices, sham litigation, fraudulent objections, and dilatory conduct for one overall objective: running out the clock so none of the EB-5 investors would sue them for failing to act once the vulture senior lender appeared .

4.    Plaintiffs relied on Defendants' fiduciary duties and professional competence to safeguard their investments and immigration goals. Instead, Defendants' collective misconduct wiped out Plaintiffs' investment, squandered partnership assets on

sham litigation, and jeopardized their EB-5 visa prospects.

5.    Plaintiffs are 194 foreign nationals (of which at least 38 are residents of California) who invested $97 million in the $2.5 billion luxury hotel, condominium, and retail project in Century City, Los Angeles known as Century Plaza ("the "Project") through the investment vehicle CMB. Plaintiffs are limited partners of CMB (hereinafter "Limited Partners"). CMB Export and NK are the co-general partners of CMB.

6.    CMB is associated with CMB Regional Centers, which provides investment opportunities to foreign nationals seeking to qualify for EB-5 visas under the federal EB-5 visa program (the "Program") operated by the United States Citizenship and Immigration Service ("USCIS").

7.    LB is the outside counsel for CMB. LB drafted CMB's partnership agreement and negotiated the subsequent loan documents to protect Plaintiffs' investment and ensure compliance with all federal EB-5 visa requirements.

8.    In 2016, Next Century Partners, LLC ("Next Century"), the project's developer, raised $1.016 billion in construction financing for the Project, comprised of three separate tranches of debt: (1) $446 million through a senior syndicated construction loan (the "Senior Loan") from J.P. Morgan Chase ("JPM"); (2) $120 million through a senior mezzanine loan (the "Senior Mezzanine Loan") from Colony Distressed Credit and Special Situations Fund IV, L.P. a/k/a CDCF IV Century Mezz, LLC ("CDCF IV"); and (3)  $450 million in junior mezzanine financing (the "Junior Mezzanine Loan") from CMB. These tranches of debt are hereinafter referred to as the "stack." CMB's Junior Mezzanine Loan was at the bottom of the Project's capital stack.

9.    From the beginning of the Project, CMB should have, but failed to, negotiate rights of refusal and/or unilateral rights to buy up or purchase a partial stake in the Senior Loan and/or Senior Mezzanine Loan to protect its interest in the Project. This became an issue when JPM declared its senior loan out of balance. When a CMB affiliate attempted to purchase up the stack, it was turned away.

10.    Instead, in March of 2020, Next Century sought additional funding from

British billionaires and globally-known vultures David and Simon Reuben, through their wholly-owned and controlled business entities, Reuben Brothers, Ltd., and its administrative agent Montcomb Estates Ltd. (collectively, the "Lender"). The terms of the new Senior Mezzanine Loan and Participation Agreement, further described below, between the Lender, Borrower and CDCF IV ultimately resulted in the loss of CMB's entire Junior Mezzanine Loan interest and thus Plaintiffs' $97 million investment in the Project.

11.     On September 1, 2020, the Lender executed a series of agreements: (1) a Third Amended and Restated Mezzanine Loan and Security Agreement ("Third Amended Mezzanine Loan") to provide the Borrower (NCPMB, LLC) with up to another $275 million dollars in funding to the project, (2) a Participation Agreement with CDCF IV to become the Administrative Agent for the Senior Mezzanine Loan and establish priority over CDCF IV's interest in the loan (the "Participation Agreement"), and (3) the Fourth Amendment to Intercreditor Agreement with CMB in which CMB consented to the terms of the Third Amended Mezzanine Loan.

12.     LB and CMB would later assert the Participation Agreement was concealed from them because it introduced predatory terms that would lead to the complete loss of funds at the Junior Mezzanine level. According to LB and CMB, had they known of the "secret" Participation Agreement, they never would have executed the Fourth Amendment to Intercreditor Agreement and admitted the Lender into the stack.

13.     However, on July 14, 2020, approximately 2 months *prior* to executing the Fourth Amendment to Intercreditor Agreement, both CMB and LB received a Term Sheet (the "Term Sheet") which was the predecessor to the September 1, 2020 Participation Agreement between the Lender and CDCF IV.

14.     What did CMB and LB do between July 14, 2020 and September 1, 2020 to protect the Junior Mezzanine investors? They did **nothing**. CMB and LB never requested the final Participation Agreement before executing the Fourth Amendment to Intercreditor Agreement with CMB on September 1, 2020. They also failed to address what they considered to be an unfeasible July 9, 2021 loan maturity date in the Third

Amended Mezzanine Loan or include greater protections to purchase up the stack in the Fourth Amendment to the Intercreditor Agreement.

15.    In other words,  through its own inaction in concert with LB, CMB approved of the Lender's to entry into the capital stack without reasonably protecting the CMB's Junior Mezzanine Loan interest in which the Limited Partners invested.

16.    The Borrower was unable to meet the July 9, 2021 loan maturity date.

17.    The Lender provided LB and CMB notice of CMB's one-time option to purchase the Senior Loan.

18.    Inexplicably, the Limited Partners were not informed of CMB's opportunity to purchase the senior loan.

19.    Instead, CMB provided updates to the Limited Partners lulling them into believing that each of the lenders were working together to ensure completion of the Project when in fact they were not.

20.    In August of 2022, the Lender delivered to CMB notice of their intent to foreclose on the Senior Mezzanine Loan collateral (NCPMB's 100% ownership of Next Century and, thus, the Project itself) and election to sell the property under the deed of trust pertaining to the Senior Loan.

21.    At or about this time, CMB, its manager and controlling person Patrick Hogan ("Hogan"), and its Vice President of Finance Neal Lee ("Lee"), met with LB to address the pending foreclosure and sale. Their facade regarding the state of the Project and their previous inaction could no longer conceal the truth from EB-5 investors. During this meeting, Defendants together decided that, rather than come clean and face the risk of ruin, they would instead scheme to blame the Lender's bad acts for the loss of investor funds on others and hide their own indefensible actions during the loan negotiations. The success of this clandestine enterprise was dependent on keeping a secret, or actually a "non-secret," within their collective orb of influence at least until potential tsunamis of investor litigation could be nothing but stale.

22.    As part of this scheme, on October 10, 2022, Hogan, after consultation with

LB, sent a notice to the Limited Partners addressing the pending foreclosure and sale and reassuring the Limited Partners that CMB was in discussions with it counsel (LB) as to the best way "to achieve a return of your investment capital." A true and correct copy of the October 10, 2022 notice is attached hereto as **Exhibit 1**.

23.    As part of this scheme, four days later and upon Hogan's instruction, CMB and LB filed two lawsuits against the Lender.  One of these lawsuits was filed by LB on behalf of CMB in the Superior Court of California for the County of Los Angeles (Case No. 22SMCV01852) (the "California State Action"). The other lawsuit was filed by LB on behalf of CMB in the Supreme Court of New York, County of New York (Index No. 653821/2022) (the "New York State Action"). As proof that CMB and LB were taking proactive steps to protect the Limited Partners' investment, Hogan, after consultation with LB, provided copies of the lawsuits to the Limited Partners. True and correct copies of the complaints filed in the California State Action and New York State Action are attached hereto as **Exhibits 2** and **3**, respectively.

24.    As part of this scheme, in both lawsuits, CMB and LB intentionally misrepresented that the Lender tricked them into signing the Fourth Amendment to the Intercreditor Agreement by hiding the "secret" Participation Agreement from them.

25.    These lawsuits were and continue to be financed by the Limited Partners, as legal fees in connection with these lawsuits were, are, and likely continue to be deducted from the capital accounts of Plaintiffs and other EB-5 investors in CMB.[1]

26.    CMB, through Hogan and his express insistence, then intentionally sent multiple false and misleading updates to the Limited Partners misrepresenting the factual

---

[1] On June 19, 2020, Defendant Hogan wrote to the Limited Partners that due to complications related to COVID-19, "the general partner has decided it is in the best interest of the Partnership to maintain sufficient funds in the Partnership's account to pay for any possible future legal expenses to enforce the loan agreement or other extraordinary expenses that may result due to the COVID-19 pandemic's effect on the Project. Although there has been profit to the Partnership, at this time Group-48 will not make any distribution of those profits from the 2019 income." A true and correct copy of this June 19, 2020 correspondence is attached hereto as **Exhibit 4**.

strength of the lawsuits. On information and belief, LB reviewed and/or approved these partnership notices for accuracy as the CMB/LB litigation enterprise could not succeed unless each of its participants was in lockstep. In these updates, Hogan misled the Limited Partners into believing that the Partnership commenced legal proceedings through its counsel (LB) to ostensibly protect the Partnership's rights under its Junior Mezzanine Loan because the Lender had been and continued "acting in a predatory manner" and had executed a "secret" Participation Agreement to block CMB from protecting its position.

27.     On February 6, 2023, Hogan and Lee testified in the New York State Action under oath that neither of them were aware of the "secret" Participation Agreement and it was that "secret" Participation Agreement that prevented CMB from protecting its interest, and thus that of the Limited Partners, in the capital stack. A true and correct copy of the transcript of the February 6, 2023 proceedings are attached hereto as **Exhibit 5**.

28.     In March of 2023, the scheme unraveled. In the middle of discovery in the California State Action, CMB unexpectedly produced the "secret" Term Sheet that Hogan and Lee stated—under oath and while represented by LB—that they had never seen. The Term Sheet had been e-mailed to both Lee and LB's corporate attorneys (and thus CMB) on July 14, 2020, approximately *2 months* prior to executing the September 1, 2020 Fourth Amendment to Intercreditor Agreement. A true and correct copy of the Term Sheet is attached hereto as **Exhibit 6**.

29.     None of the Defendants ever told the Limited Partners that any one of them received the Term Sheet prior to pursuing legal claims against the Lender because they needed to lull the Limited Partners into inaction, as doing otherwise would have triggered a cavalcade of litigation that would have exposed Hogan, CMB to financial ruin.

30.     Ultimately, the California and New York courts held it was LB and CMB's *inaction* rather than the Lender's alleged fraudulent actions that resulted in the loss of Plaintiffs' investment.

31.     In the New York State Action, the Appellate Court dismissed all of CMB's

claims. The Lender is now in the process of making a claim for costs in defending the case LB filed against it against a $5 million bond CMB posted.

32.    Likewise, the Lender has now moved for a judgment on the pleadings in its favor and against CMB in the California State Action.

33.    Defendants must be held liable for their wrongful conduct which foreseeably injured innocent victims to the tune of over $97 million.

## II.    THE PARTIES

34.    Plaintiffs are EB-5 investors who each contributed $500,000 in capital contributions to the Project to qualify for a visa.

35.    Defendant CMB is a Delaware limited partnership that serves as the investment vehicle through which the EB-5 investors in the Project participated. CMB is associated with Rock Island, Illinois-based CMB Regional Centers. CMB is controlled by Hogan.

36.    Defendant CMB Export is a California limited liability company. CMB Export served and continues to serve as co-general partner of CMB. CMB Export is controlled by Hogan.

37.    Defendant NK is an Illinois limited liability company. NK was co-general partner on CMB. NK is controlled by Hogan.

38.    Defendant LB is a national law firm headquartered in Los Angeles, California with senior litigators in its offices in Sacramento, California. LB prepared the offering documents distributed to the EB-5 Investors for the Project and other EB-5 deals offered by CMB. LB also served as transaction counsel for CMB in its dealings in the Project and continues to serve as the primary counsel for CMB in the lawsuits based upon the not-so-secret, "secret" Participation Agreement. CMB and CMB Export, each under the ultimate control and direction of Hogan, were clients of LB at all times relevant to this proceeding.

39.    Defendant Neal Lee is an individual who resides in Dallas, Texas. At all relevant times, Lee was the Vice President of Finance for CMB Export, the co-general

partner for CMB 48. In that role, Lee was actively involved in negotiating and financing CMB's loan to the Borrower to construct the Project. Lee had numerous communications with the various lenders and borrowers, their respective counsel, and CMB's counsel LB. Lee also communicated with Michael Rosenfeld ("Rosenfeld"), the developer for the Project and personal guarantor of CMB's loan. Mr. Rosenfeld resides in California. Lee approved the unreasonably short maturity date and failed to ensure CMB had an opportunity to purchase up the stack, while Hogan signed the loan documents. On July 14, 2020, Lee received a copy of the Term Sheet, the predecessor for the Participation Agreement. Lee then coordinated with Hogan and LB to conceal receipt of the Term Sheet and other adverse Loan terms through the sham law suits filed by LB against the Lender in California and New York, with Lee disclaiming knowledge of the "secret" Participation Agreement.

40.    Defendant Patrick Hogan is an individual who resides in Illinois. At all relevant times, he was the Chief Executive Officer, founder, manager, and controlling person of CMB Regional Centers, CMB Export, CMB, and NK. Hogan signed all loan documents on behalf of CMB and provided investor updates to the Limited Partners.

41.    The chart below reflects the parties' relationships:

### III.    RELEVANT NON-PARTIES

42.    Next Century Partners, LLC ("Next Century") was at all relevant times the developer of the Project. Next Century was formed and continues to be operated by Rosenfeld.

43.    NCPMB, LLC ("NCPMB") was at all relevant times the sole member of Next Century.

44.    NCMB, LLC ("NCMB") is the 100% owner/member of NCPMB.

45.    CPMB, LLC ("CPMB") is the 100% owner/member of NCMB.

46.    Motcomb Estates, Ltd. is a United Kingdom limited company with its principal place of business in London, England. On information and belief, Motcomb is an investment advisory firm that serves the property interests of British billionaire brothers David and Simon Reuben. Motcomb is owned by, and works exclusively for, the Reubens as their investment vehicle. Motcomb is also an indirect competitor of CMB Regional Centers by way of EB-5 offerings through its U.S. affiliate.

47.    Reuben Brothers, Ltd. is a Bermuda limited company with offices outside of the United States. On information and belief, Reuben Bros. is owned and operated by David and Simon Reuben and owns a substantial portfolio of real estate and other assets across the globe. On information and belief, the Reuben brothers, with an estimated combined net worth of $12 billion, control one of the world's largest portfolios of retail, office and residential properties. In particular, they are globally recognized as aggressive investors in distressed commercial properties.

### IV.    JURISDICTION AND VENUE

48.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

49.    Venue is proper in the Eastern District of California because a substantial part of the acts or omissions giving rise to the claim occurred in this district. To wit, the Sacramento, California office of Defendant LB participated and ultimately supervised the litigation scheme which is the gravamen of this action, communicated with Defendants and those acting on their behalf from Sacramento, California and met with them either by

video or in person in Sacramento, California.

### V.    FACTUAL BACKGROUND

**A.    The EB-5 Program**

50.    The Plaintiffs invested pursuant to the federal EB-5 Program, which is administered by USCIS. The EB-5 Program provides an opportunity for a foreign national to obtain legal permanent residency in the U.S. by investing, at all relevant times, $500,000 or $1,000,000 in a commercial enterprise that creates at least ten qualified full-time U.S. positions based on that investment.

51.    The EB-5 Program does not permit investments by EB-5 investors in the form of direct loans. Regional Centers are organizations designated by USCIS to promote economic growth in a particular geographic region. When a foreign national invests in an EB-5 project through a regional center, the job-creation requirement can be satisfied through a showing of indirect jobs created.

52.    Regional centers collect the investments of hundreds of EB-5 investors into a pooled entity, which loans the funds directly to the intended party developing an EB-5 project.  These pooled entities are typically structured as limited partnerships, with the general partner being an entity created by the regional center and each of the EB-5 investors being limited partners. This structure provides the legal patina required to comply with the EB-5 Program's requirements while facilitating indirect investment by EB-5 investors into qualifying projects.

53.    After approval of the I-526 petition, immigrant investors receive conditional permanent residence status for a period of two years. Before the filing of Form I-829, known as Petition by Entrepreneur to Remove Conditions on Permanent Resident Status, the EB-5 Regional Center is required to invest the immigrant's capital contribution in a job-creating commercial enterprise that creates at least ten qualified full-time positions in the United States.

54.    After an immigrant investor demonstrates to USCIS that his or her capital contribution was invested into a job-creating entity that produced at least ten qualified full-

time jobs for U.S. workers based on the investment, the investor (and his or her immediate family) is granted U.S. lawful permanent residency through the filing and approval of an I-829 petition.

55.    The Project consists of the redevelopment of the historic Century Plaza Hotel together with the construction of two, 44-story residential condominium towers, approximately 96,524 rentable square feet of retail space and related amenities and outdoor public spaces located at 2025 Avenue of the Stars, Los Angeles, California, bordering Beverly Hills.

56.    Plaintiffs and the other Limited Partners made personal and financial sacrifices to collect their $500,000 investments for what they believed at the time was a reputable EB-5 Regional Center with hopes that they and their immediate families would qualify for EB-5 visas and have their money returned to them. The perceived probabilities of the receipt of both the timely return of capital and immigration benefits differentiates EB-5 investments in the global marketplace.

**B.    The CMB Partnership Agreement**

57.    CMB executed a limited partnership agreement ("LP Agreement") on or about March 28, 2015 between the co-general partners (CMB Export and NK) and the Limited Partners. A true and correct copy of the LP Agreement is attached hereto as **Exhibit 7**.

58.    Convinced that CMB would both provide immigration benefits with a return of capital, each Plaintiff paid a $500,000 capital contribution and a $50,000 syndication price to CMB in exchange for a limited partnership interest in CMB. Funds for the Project began to flow from the Limited Partners of CMB then in the People's Republic of China ("PRC") and elsewhere into an escrow account CMB and Hogan controlled.

59.    Under Article III of the LP Agreement, the "intended business of the Partnership" was, to: (a) generate revenue for the Partnership; and (b) "structure the Partnership such that each Limited Partner, who is not a permanent resident of the United States, is able to apply for a visa pursuant the EB-5 Immigrant Investor Program."

60.     Under Article IV of the LP Agreement, if the General Partner determines "that the reasonable needs of the Partnership require that a certain amount of additional capital be contributed to the Partnership," the first step the General Partner must take is to "[a]dvise each of the Limited Partners of the need for Additional Required Capital." Further, "[t]he Partnership shall use commercially reasonable efforts to advance and accomplish the Partnership's business and purpose as set forth in Article III."

61.     Also under Article VI, the General Partner "shall not be liable to the Partnership or to any Partner for any loss or damage sustained by the Partnership or any Partner . . . unless the loss or damage shall have been the result of the General Partner's material breach of this Agreement causing a Material Adverse Effect to the Partnership, gross negligence, or willful or wanton misconduct." The General Partner "shall perform its duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and its Partners, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."

62.     Under Article VIII, a limited partner "may sell, transfer, or otherwise assign its Partnership Interest . . . by a duly executed written instrument of assignment, provided that the terms of such instrument are first approved by the General Partner, which approval may be withheld in the General Partner's sole discretion, and are not in contravention of any of the provisions of this Agreement."

63.     The General Partners did not make any capital contribution to the Partnership and thus to the Project. **Exhibit 7** at 18, Article IV.

64.     Rather, the General Partner used the $50,000 syndication fee from each investor (such as Plaintiffs) and profits to manage the Partnership.

**C.    LB and CMB's Negotiation of the Loan Documents**

65.     The loan between CMB and CPMB was structured by LB as a Junior Mezzanine Loan, repayment of which was secured by, among other collateral, the pledge of a 100% control and ownership interest in the Project. This meant that the Limited Partners of CMB were third in line to receive a return of capital.

66. According to Hogan in the New York State Action, CMB "enter[ed] into a mezzanine loan of this position so that we could then show job creation that [the Project] was going to do." **Exhibit 5** at 51:22-52:4.

67. Thus, LB, at Hogan's ultimate instruction, was tasked with structuring the loan documents for the Project to comply with the federal EB-5 requirements and applicable securities laws. For example, the loan agreement between CPMB, LLC and CMB 48, a true and correct copy of which is attached hereto as **Exhibit 8**, affirms that the "Loan structure must be in conformity with the requirements of the EB-5 Program in order to create jobs within the pre-approved targeted employment area, as defined by the USCIS and approved by the State of California." *Id.* at 8.

68. "Lender will use reasonable best efforts to raise funds from EB-5 Investors" and the "Borrower will submit to Lender the EB-5 Documentation, which evidences the use of the proceeds of the Loan in the amounts set forth in Section 4.1 (kk) hereof and for the purposes required by this Agreement." *Id.* at 11-12.

69. Upon repayment of the loaned funds to CMB, CMB was to repay each of the EB-5 Investors their capital contributions. Further, under the LP Agreement that LB prepared, each EB-5 Investor stood to receive a portion of any profit earned by CMB on the loan.

70. In 2016, the project's developers raised $1.016 billion in construction financing for the Project, comprised of three separate tranches of debt: (1) $446 million from the Senior Loan; (2) $120 million through the Senior Mezzanine Loan; and (3) $450 million through the Junior Mezzanine Loan through CMB. Thus, over 50% of the funding of the Project was subordinated to the Senior Loan.

71. CMB's Junior Mezzanine Loan was memorialized in a separate loan agreement between CMB and borrower CPMB, the sole member of NCMB. CPMB is an indirect 100% owner of Next Century and thus the Project, subject to NCPMB's repayment of the Senior Mezzanine Loan. Repayment of the Junior Mezzanine Loan was secured by, among other collateral, the pledge of a 100% control and ownership interest

in CPMB.

72.     On July 5, 2016, JPM, administrative agent for the Senior Loan and Senior Mezzanine Loan, entered into an Intercreditor Agreement with CMB, which provided that the Senior Lender and Senior Mezzanine Lender were prohibited from entering into certain loan modifications that would materially increase the monetary obligations of the Senior Loan Borrower (Next Century) or the Senior Mezzanine Loan Borrower (NCPMB) without CMB's prior written consent.

73.     CMB failed to include in the Intercreditor Agreement any rights of first refusal to provide needed funds before the parties could entertain outside investors. CMB further failed to include an absolute right to purchase up the stack (other than its one-time right to purchase the Senior Loan and the Senior Mezzanine Loan) to prevent a default. Instead, CMB proceeded to enter into a three-tiered mezzanine financing structure through the lowest financing tier and as the junior-most mezzanine lender for that lowest financing tier, without *any* protections in place for its investors. LB attorneys were responsible for negotiating provisions of and advising CMB on the Intercreditor Agreement.

74.     The Intercreditor Agreement was amended four times, most recently by the Fourth Amendment to Intercreditor Agreement dated September 1, 2020. LB attorneys were responsible for negotiating the provisions of and advising CMB on the Fourth Amendment to the Intercreditor Agreement.

75.     In March, 2020, the same month that COVID-19 shelter-in-place orders were issued, JPM called its Senior Loan out of balance, which halted the developer's ability to draw from the Senior Loan. Thus, JPM forced the developer to seek additional funding in March, 2020 to complete the Project.

76.     When JPM called the Senior Loan out of balance, the estimated amount to complete the Project was approximately $100-150 million. CMB offered to assist in the additional funding through CMB or an affiliate, to be repaid prior to the Senior Mezzanine Loan, to prevent a predatory new lender from being brought in and squeezing out any

junior lenders (what ultimately occurred). Lenders senior to CMB would not consent to such additional funding because they did not want CMB to "leapfrog" ahead of them in terms of priority.

77.     Because CMB failed to negotiate any rights of first refusal, either directly or through its corporate attorneys at LB, the senior lenders were permitted to reject CMB's offer and find a funding source unconcerned with or detrimental to the interests of Plaintiffs and other Limited Partners.

**D.     The Term Sheet and Participation Agreement Contain the Same Terms**

78.     On or about July 14, 2020, Defendant Lee and LB partners Michael Platner and Wade Houser *together* received an e-mail from Rosenfeld sending a draft Term Sheet for the additional funding from the new Lender. The Term Sheet detailed the creation of a Participation Agreement. *See* **Exhibit 6**.

79.     The Term Sheet informed LB and CMB that (i) Reuben Bros. agreed to fund a $275 million increase in the Senior Mezzanine Loan; (ii) Motcomb would replace CDCF IV as the administrative agent for the Senior Mezzanine Lender(s); and (iii) CDCF IV would be the new junior participation interest holder.

80.     The Term Sheet specified that $135 million of the $275 million increase into the Project would be utilized to reimburse the prior mezzanine lender for prior protective advances, closing costs, and project costs. Further, $65 million would be used to fund an interest reserve/credit reserve, and the remaining $75 million could be available to be drawn down to pay construction costs for the Project.

81.     The Term Sheet further disclosed a 15% interest rate with waterfall principal payments where CMB was relegated from third to *fifth* in line for payment.

82.     Notably, the Term Sheet expressly discussed a future participation agreement between the Lender and CDCF IV. *See* **Exhibit 6** at 8 ("Mezzanine Lender shall simultaneously grant Junior Participation Holder a new subordinate participation interest in the Mezzanine Loan in an amount equal to the Existing Mezzanine Loan which shall be evidenced by a *participation agreement*.") (italics added).

83.     In the section of the Term Sheet entitled *Participation Agreement*, "[t]he participation terms will provide that the Mezzanine Lender shall be in charge of the day-to-day administration of the Mezzanine Loan in accordance with and subject to the terms of the Agreement and shall serve as the 'administrative agent.'" *Id*.

84.     The "Participation Agreement shall set forth reporting requirements of the Administrative Agent, *transfer restrictions*…" *Id*. at 10 (italics added).

85.     While the July 14, 2020 Term Sheet was not an operative document, it notified both CMB and its attorneys at LB as to (a) how the funds would be spent and (b) the forthcoming Participation Agreement. Sophisticated investors and attorneys would not have sat idly when presented with material and predatory changes to a billion-dollar project. Here, the Defendants stood idly by at least until September 20, 2020.

86.     On September 20, 2020, the Lender and CDCF IV entered into the Participation Agreement. As expected from the Term Sheet, the Participation Agreement prioritized the Lender's interest in the Senior Mezzanine Loan over that of CDCF IV. In the event of a default of the Third Amended Mezzanine Loan, the Lender would seize indirect 100% control of the Project and its profits. A true and correct copy of that Participation Agreement is attached hereto as **Exhibit 9**.

87.     The Participation Agreement also allowed the Lender to charge CDCF IV interest in the amount of 30% per annum on protective advances that CDCF IV did not fund to the Project under the Senior Mezzanine Loan (in addition to the 20% per annum being charged to NCPMB for protective advances under the Senior Mezzanine Loan documents), which, according to CMB, prevented it from being able to "protect its Junior Mezzanine Loan interest by purchasing CDCF IV's position in the Senior Mezzanine Loan." *See* **Exhibit 9** at 22; **Exhibit 2** at ¶ 14.

88.     In addition, Section 14.3 of the Participation Agreement made it nearly impossible for CMB to buy CDCF IV's participation interest in the Senior Mezzanine Loan because such a purchase required approval from both CDCF IV and now also the Lender.

89.     Neither CMB nor LB ever requested a copy of the Participation Agreement

before signing the Fourth Amendment to the Intercreditor Agreement.

**E.    Execution of the Fourth Amendment to Intercreditor Agreement and Subsequent Default**

90.    On September 1, 2020, JPM, Motcomb, CDCF IV, and CMB entered into a Fourth Amendment to Intercreditor Agreement.

91.    By signing the Fourth Amendment to the Intercreditor Agreement, CMB and LB not only willfully ignored harmful terms in the Participation Agreement, but also failed to remedy harmful terms in the document they did review, the Third Amended Mezzanine Loan.

92.    As set forth above, CMB and LB failed to modify what they would later identify as the Third Amended Mezzanine Loan's "arbitrarily short maturity date of July 9, 2021." *See* **Exhibit 2** at ¶ 88.

93.    According to CMB, "unrealistic conditions [] had to be met to extend the Initial Maturity Date, including, but not limited to . . . [selling] for a minimum price of $395 million prior to the Initial Maturity Date." *Id.* at ¶ 91.

94.    Rather than insist on an extension of the maturity date in the Third Amended Mezzanine Loan, CMB and LB instead naively hoped for a voluntary extension to avoid foreclosure.

95.    As the Court in the California State Action asked counsel:

> [W]hy didn't somebody build the extension into the loan? . . . we're sophisticated people. We have sophisticated lawyers. Let's build in – let's change the second extension clause. So that instead of X percent of the units sold - I don't know if they're condos or hotel, but X percent of units sold, and, you know, Y percent of the completion done. We're going to relax those a little bit . . . **[b]ut where is that in the contract . . . ?**

*See* Transcript of Oral Argument held March 27, 2023 in the California State Action, at 30:22-31:13 (emphasis added). A copy of the transcript of the March 27, 2023 proceedings is attached hereto as **Exhibit 10**.

96.    As expected with such onerous terms, the Lender's funding made the Project more insolvent and assured that the Project's borrowers would default on or

before the July 9, 2021 maturity date under the Senior Loan and Senior Mezzanine Loan.

97. On July 12, 2021, JPM notified CMB of a "Purchase Option Event" under the Intercreditor Agreement, which provided CMB with a one-time right to purchase the Senior Loan, as a result of Next Century's failure to repay the Senior Loan Liabilities on or before the Senior Loan maturity date.

98. CMB did not notify its investors of this one-time opportunity to purchase the Senior Loan.

99. Instead, on September 14, 2021, after consultation with LB, Hogan—on behalf of CMB—intentionally sent a misleading update to the Limited Partners that JPM and the Lender were in discussions to extend the maturity date and that "the lenders collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel." A true and correct copy of the September 14, 2021 update is attached hereto as **Exhibit 11**. One may surmise that the reason this update was sent was because notifying the Plaintiffs and other Limited Partners in the Project would have led to either (a) a "run on the bank" of investor redemptions that CMB could not fund or would not honor, or (b) removal of CMB's co-general partners and thus LB from involvement in the Project altogether.

100. In October of 2021, the Lender purchased the entirety of the Senior Loan from JPM.

101. On July 27, 2022, after consultation with LB, Hogan on behalf of CMB, sent an update to the Limited Partners explaining that CMB and its counsel (LB) had discussed purchase of Colony's position in the Senior Mezzanine Loan, with Colony and the Lender. The Lender notified CMB that it "would only entertain an offer from the Partnership that resolved the existing senior loan default." A true and correct copy of the July 27, 2022 update is attached hereto as **Exhibit 12**.

102. CMB never sought to raise the funds needed to resolve the existing senior loan default because they did not want to reveal to the Limited Partners the onerous interest and fees the Lender was permitted to charge, as a natural consequence of CMB's

abysmal negotiation and leveraging skills.

103.    The Lender and Colony would later testify that despite communicating with Michael Platner from LB, Hogan and Lee, regarding purchase of the Colony interest, neither CMB nor its affiliates under Hogan's control ever made an offer. **Exhibit 5** at 118:7-18 and 127:22-128:23.

104.    On August 25, 2022, the Lender delivered to CMB notice of their planned Uniform Commercial Code ("UCC") foreclosure sale against the Senior Mezzanine Loan collateral (NCPMB's 100% ownership of Next Century and, thus, the Project itself).

105.    On August 31, 2022, the Lender delivered to CMB a Notice of Default and Election to Sell Under Deed of Trust pertaining to the Senior Loan.

106.    While the hotel portion of Century Plaza opened in October of 2021, Century Plaza was foreclosed upon in May 2023 by the Lender via a credit bid by the Lender. The foreclosure sale essentially wiped out any financial benefits that EB-5 investors in the Project could or would have had, as well as CMB's own monetary interests in the Project.

107.    Despite Hogan's numerous updates to the Limited Partners, CMB never provided the terms of the Term Sheet, Third Amended Mezzanine Loan and Fourth Amendment to the Intercreditor Agreement to Plaintiffs or other Limited Partners.

108.    Had Plaintiffs been informed that the Lender sought what CMB admits was an arbitrarily short loan maturity deadline, funding of the project through onerous protective advances, and further restrictions of CMB's right to purchase up the stack, Plaintiffs would have at least had the opportunity to undertake protective corporate action or litigation to protect their interests in the Project.

109.    Had Plaintiffs been provided with accurate and contemporaneous notice of such risks, they would have demanded that CMB reject further upsizing the Loan and requested either changes to the Third Amended Mezzanine Loan and Fourth Amendment to the Intercreditor Agreement or a new lender—to protect their interests and immigration benefits before the Lender seized control of the Project.

**F.    The Sham Lawsuits**

110.    Facing the risk of ruin, LB and CMB desperately sought to conceal their collective failure to protect Plaintiffs' assets. To effectuate this concealment, CMB agreed to pay LB lucrative, revenue-generating legal services by engaging LB to initiate litigation that pinned the blame on the Lender while extinguishing statutes of limitation on potential legal actions by the Limited Partners.

111.    On October 14, 2022, CMB (represented by LB) filed the California State Action against the Lender; First American Title Insurance Co., and Next Century Partners, LLC alleging "a scheme of collusion, fraud, and bad faith" in their collective extinguishing of CMB's interest in the Project, arising from the not-so-secret, "secret" Participation Agreement. *See* **Exhibit 2** at ¶ 1.

112.    According to CMB's pleadings, it would never have "executed the *Fourth Amendment to Intercreditor Agreement* had Reuben Bros., Motcomb and CDCF IV, or any of them, disclosed the existence of the then supposedly "secret" Participation Agreement and its terms to CMB on or before September 1, 2020." *Id*. at ¶ 18.

113.    CMB also initiated a parallel case in New York state court against the Reuben entities based on the same feigned wrongful conduct alleged in the California State Action. *See* **Exhibit 3**.

114.    At the same time, rather than coming clean and disclosing their joint failures to negotiate on behalf of CMB and its Limited Partners effectively, CMB, through Hogan, with review and approval from LB, sent various notices to the Limited Partners informing them of the factual strength of their claims against the Lender. Again, LB's review and approval of, and acquiescence to the investor communications was crucial as the success of the litigation scheme depended on both CMB and LB communicating and acting in lockstep.

115.    On October 15, 2022, Hogan on behalf of CMB and with review, approval and acquiescence by LB, sent an update to the Limited Partners advising that the Partnership commenced legal proceedings to protect the Partnership's rights under the

Junior Mezzanine Loan because the Lender was "acting in a predatory manner." A true and correct copy of the October 15, 2022 notice is attached hereto as **Exhibit 13**. As part of the update, Hogan provided to the Limited Partners copies of the California and New York lawsuits. *Id*.

116. On October 28, 2022, Hogan, after consultation with LB over how to best hide their failures, wrote that he personally learned of a "Participation Agreement that was secretly signed between Reuben Brothers and Colony Capital" that shows the Lender "conspired to block any real means of the Partnership protecting its position." That the "**secretive Participation Agreement** is therefore one of the centerpieces of the Partnership's causes of actions" against the Lender. A true and correct copy of the October 28, 2022 FAQ Sheet Answer to Question No. 20, is attached hereto as **Exhibit 14** (emphasis added).

117. On February 6, 2023, Hogan and Lee both testified in the New York State Action. Both Hogan and Lee testified under oath that neither of them was aware of the "secret" Participation Agreement and it was the "secret" Participation Agreement that prevented CMB from buying up the capital stack to protect its interest.

118. Hogan testified that the Participation Agreement "was completely hid [sic] from us. They hid it from me so that I wouldn't know that Reuben had worked on a deal with Colony to knock me out if I wanted to buy the Colony note." **Exhibit 5** at 26:13-16. "I signed the Fourth Amendment because they hid and they defrauded me." *Id.* at 27: 9-10.

119. Lee testified that "[a] Participation Agreement was not disclosed to CMB." *Id.* at 73:11-2.

120. Hogan also testified that when the Lender and Colony "executed the Participation Agreement, they stripped CMB of its right to purchase the senior loan." *Id.* at 18:19-22.

121. By virtue of LB's receipt of the July 14, 2020 e-mail, LB knew this testimony was inaccurate and had an ethical duty under the New York Rules of Professional Conduct to correct it after it was presented to the tribunal. Yet LB sat back and did nothing

sustaining the scheme to defraud Plaintiffs.

122.    On March 27, 2023, in the middle of discovery in the California State Action, CMB unexpectedly produced a Term Sheet, the predecessor to the Participation Agreement, that had been e-mailed to *both Lee and LB's corporate attorneys* on July 14, 2020, approximately *2 months prior* to executing the September 1, 2020 Fourth Amendment to Intercreditor Agreement. *See* **Exhibit 6**. Defendants' scheme was thus revealed.

123.    Thereafter, on January 18, 2024, the New York Appellate Court dismissed all of CMB's claims, ruling that CMB "expressly consented to the terms of the relevant agreements, and expressly agreed to subordinate its rights to repayment and to pursue its remedies in the event of a default." A true and correct copy of the New York Appellate Court's order dismissing CMB's claims is attached hereto as **Exhibit 15** at 4.

124.    The court further emphasized that CMB could not claim fraudulent concealment when the "Term Sheet shared with [CMB] disclosed that there would be a participation agreement with unspecified 'transfer restrictions,' yet [CMB], a sophisticated party, neither asked to see this agreement nor requested more information." The Term Sheet directly belied CMB's fraud claims and exposed the falsity of numerous statements made under oath by CMB's representatives at an evidentiary hearing that the Participation Agreement was never disclosed. Not only was it disclosed to CMB, but also to LB. *Id.* at 5.

125.    Even though this appellate record would be visible to the public and Plaintiffs⸺finally exposing LB and CMB's scheme to defraud and deceive the Limited Partners⸺CMB and LB refused to give up. They sought reconsideration of the Appellate Court's dismissal and continue to pursue the California State Court Action.

126.    On June 19, 2024, Hogan advised that fees and costs associated with the California and New York State Court Actions underlying CMB's litigation scheme with LB had exceeded $3.8 million and issued a Capital Call Notice to the Group 48 Limited Partners seeking to raise an additional $3,250,000 to pay LB to continue its work. A true

and correct copy of the June 19, 2024 correspondence is attached hereto as **Exhibit 16**.

127.    Upon information and belief, Hogan, on behalf of CMB, communicated with LB for an estimate of future litigation costs, to pass on to the Limited Partners, along with information to explain what that litigation would entail if pressed further, as evidenced by fact-specific recitations that would only be known between LB and its client. Again, LB reviewed and approved such estimates of legal costs, knowing they would be sent to the Limited Partners by Hogan in the same manner as the misleading investor communications in the past.

128.    The Lender is also seeking to recover the $5 million bond in the New York Action that CMB posted as partial compensation for the damages the Lender sustained as a result of the preliminary injunction.

129.    On February 17, 2025, the New York Court ruled that the Lender's motion to recover the $5 million bond was granted to the extent that the Lender would be entitled to recover its fees and costs. A copy of the Order is attached hereto as **Exhibit 18**.

130.    CMB and LBs' crusade of meritless litigation continues in the California State Action and the $3.8 million figure has surely grown since June 2024.

### FIRST CAUSE OF ACTION
**Federal RICO 18 U.S.C. § 1962(c) (By Plaintiffs against Defendants CMB, CMB Export, NK, and LB)**

131.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

132.    To the extent necessary, this cause of action is pled in the alternative.

133.    Plaintiffs are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

134.    Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(c), and 1962(d).

135.    Defendants constitute an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Enterprise"). The CMB entities (including NK), Lee, Hogan and LB formed the Enterprise

and operated as an association-in-fact with the common purpose of concealing critical information about the prior loan negotiations (including but not limited to the Fourth Amendment to Intercreditor Agreement, Term Sheet, Participation Agreement) and subsequent events (including but not limited to the purchase option events) that resulted in the complete loss of Plaintiffs' investments. By misrepresenting the cause of the loss as a "secret" Participation Agreement, CMB and LB sought to preserve their reputations, avoid the risk of ruin, and maintain control of partnership funds. CMB referred millions of dollars in legal services to LB to initiate and perpetuate litigation that publicly marketed and portrayed CMB as an innocent, duped victim to purposely deflect the attention of the Limited Partners into inaction.

136.    The Enterprise, distinct from their respective individual business operated beyond LB's standard role as counsel by orchestrating a scheme to fabricate facts in litigation narratives, not to serve any legitimate interests, but rather to shield both LB and CMB from liability and extract fees from Plaintiffs.

137.    The Enterprise's activities, including emails sent to Plaintiffs across states and lawsuits filed in California and New York, affected interstate commerce. The Enterprise's purpose was to misrepresent Plaintiffs' loss as caused by a "secret" Participation Agreement, to preserve CMB and LB's reputations, maintain control of partnership funds, run the statute of limitations on any claims Plaintiffs would have against LB and CMB for their wrongful conduct, and enrich LB's pockets through payment for legal services.

138.    On September 20, 2020, Hogan, on behalf of CMB (and after consultation with LB), executed the Fourth Amendment to Intercreditor Agreement, admitting the Lender into the capital stack as a Senior Mezzanine Lender without ever requesting a copy of the Participation Agreement.

139.    On July 9, 2021, the unreasonably short maturity date expired and the Borrower defaulted. Three days later, on July 12, 2021, JPM notified CMB and LB of CMB's one-time right to purchase the Senior Loan.

140.    CMB and LB did nothing.

141.    In October of 2021, with the Borrower still in default, the Lender purchased the entirety of the Senior Loan from JPM, increasing the risk of the Lender foreclosing on the Project.

142.    Rather than contact the Limited Partners to request assistance (in the way of a capital call or raise additional funds), at risk of litigation or removal from the Project altogether, CMB, through Hogan, issued misleading investor updates to downplay the threat of foreclosure and lull the Limited Partners from discovering the malfeasance of CMB and LB.  Upon information and belief, given the legal ramifications of CMB's actions, Hogan communicated with LB before sending each of the investor notices referenced in this Complaint.

143.    For example, instead of notifying the Limited Partners of the notice of default in July, 2021 and their one-time opportunity to purchase the Senior Loan, on September 14, 2021, Hogan sent a misleading email to the Limited Partners explaining the Lenders were discussing amendment of the loan maturity date and "collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel," with the intent of preventing Plaintiffs from realizing Defendants' error in not negotiating a more reasonable maturity date or obtaining any meaningful protections in the event of default.

144.    In or about April of 2022, after the Lender purchased the Senior Loan, and perhaps realizing the potential danger of foreclosure and/or believing they could pick up Colony's interest for pennies on the dollar (due to an ongoing lawsuit between the Lender and Colony), Hogan, Lee and Michael Platner from CMB contacted Colony and the Lender about purchasing Colony's interest in the Senior Mezzanine Loan.

145.    According to the July 27, 2022, investor update that Hogan sent to Plaintiffs, the Lender notified CMB that it "would only entertain an offer from the Partnership that resolved the existing senior loan default."

146.    Hogan downplayed the need to purchase the existing senior loan default noting that "[w]hile any loan foreclosure would undoubtedly present a large threat to the

Partnership, neither Reuben Brothers nor Colony Capital have initiated foreclosure actions to date, and Reuben Brothers has continued to fund the Borrower for construction draws and working capital as protective advances." **Exhibit 12** at 2. Hogan went on to promote the success of the Project writing, "[f]ortunately, the Project has recently turned a corner," and that "since January [2022], the hotel is back on track to ramp up." *Id.* at 3.

147.    CMB did not want to issue a capital call because it did not want the Limited Partners to know the amount of onerous interest the Lender was permitted to charge, as doing so would cause either (a) a "run on the bank" that CMB could not countenance or (b) a tsunami of litigation that would have sought to, among other things, remove CMB's co-general partners with those more closely aligned to the interests of the Limited Partners and sufficient capital on hand to fight off any foreclosure. More likely than not, LB advised CMB through Hogan to not issue a capital call.

148.    On August 25, 2022, the Lender delivered to CMB notice of their planned UCC foreclosure sale against the Senior Mezzanine Loan collateral (NCPMB's 100% ownership of Next Century and, thus, the Project itself).

149.    On August 31, 2022, the Lender delivered to CMB a Notice of Default and Election to Sell Under Deed of Trust pertaining to the Senior Loan.

150.    On October 15, 2022, Hogan sent an email to Plaintiffs misrepresenting that the Lender engaged in predatory lending practices by concealing a Participation Agreement that (1) authorized the Lender to incur high fees and (2) prevented CMB from taking protective action (e.g., purchasing up the capital stack). Hogan falsely claimed that pursuing legal action related to the "secret" Participation Agreement "is in the Partnership's best interest." *See* **Exhibit 13**. Hogan, with CMB's permission, provided to the Limited Partners copies of the California and New York State Complaints. On information and belief, CMB sent this correspondence after review, approval and acquiescence from LB.

151.    Hogan's notice, sent via interstate wires, misled Plaintiffs into funding baseless litigation.

152.    For its part, LB filed baseless lawsuits in California and New York, at Hogan's instruction, misrepresenting that the Lender concealed a Participation Agreement to mislead Plaintiffs and the Courts. LB also misrepresented to the courts in California and New York that the Lender prohibited CMB's ability to purchase up the capital stack, despite the Lender's offer to allow CMB to cure the senior loan default.

153.    During the litigation, LB, Hogan and Lee all misrepresented that they were unaware of the Participation Agreement. They further misrepresented that had they known of the Participation Agreement, they never would have agreed to the Fourth Amendment to Intercreditor Agreement and allowed the Lender into the capital stack.

154.    On February 6, 2023, Hogan and Lee both testified in the New York State Action. Both Hogan and Lee testified under oath that neither of them was aware of the "secret" Participation Agreement and it was the "secret" Participation Agreement that prevented CMB from buying up the capital stack to protect its interest.

155.    Hogan testified that the Participation Agreement "was completely hid [sic] from us. They hid it from me so that I wouldn't know that Reuben had worked on a deal with Colony to knock me out if I wanted to buy the Colony note." **Exhibit 5** at 26:13-16. "I signed the Fourth Amendment because they hid and they defrauded me." *Id.* at 27: 9-10.

156.    Lee testified that "[a] Participation Agreement was not disclosed to CMB." *Id.* at 73:11-2.

157.    LB and Hogan also asserted that the Participation Agreement prohibited CMB's ability to purchase up the capital stack.

158.    Hogan testified that when the Lender and Colony "executed the Participation Agreement, they stripped CMB of its right to purchase the senior loan." *Id.* at 18:19-22.

159.    But the reality is that LB and CMB never tried. The Lender and Colony testified that despite communicating with Michael Platner from LB, Hogan and Lee, regarding purchase of the Colony interest, CMB never made an offer. **Exhibit 10** at 118:7-18 and 127:22-128:23.

160.    By virtue of LB's receipt of the July 14, 2020 e-mail, LB knew this testimony was inaccurate and had an ethical duty under the New York Rules of Professional Conduct to correct it after it was presented to the tribunal. Yet LB sat back and did nothing, sustaining their scheme to defraud Plaintiffs.

161.    Even after revelation of the Term Sheet and dismissal of the New York Action, Hogan emailed Plaintiffs, on June 19, 2024, a Capital Call Notice to continue the baseless litigation. On information and belief, LB advised Hogan on how to explain the financial and procedural history and solicit funds from the Limited Partners, as evidenced by fact-specific recitations that only LB and its client would know.

162.    Had Plaintiffs been informed that the Lender sought what CMB admits was an arbitrarily short loan maturity deadline, funding of the project through onerous protective advances, and further restrictions of CMB's right to purchase up the stack, they would have demanded CMB reject further upsizing the Loan and request either changes to the Third Amended Mezzanine Loan and Fourth Amendment to the Intercreditor Agreement or a new lender—to protect their $500,0000 EB-5 investments and immigration benefits before the Lender seized control of the Project.

163.    Defendants' concealment of the loan documents and misrepresentations about the cause of the loss harmed Plaintiffs. By withholding critical information about the loan negotiations, Defendants prevented Plaintiffs from demanding protective actions, like rejecting the Fourth Amendment to Intercreditor Agreement. The lawsuits and false updates lulled Plaintiffs into believing that Defendants were completely blindsided by the destruction of CMB's interest in the Project and had legitimate bases for expending the limited partnership assets left to pursue litigation against the Reuben entities. But for the Defendants' concealment of the Term Sheet and Purchase Option Event, Plaintiffs would have demanded or undertaken action by July 2021 and averting the August 2022 foreclosure.

164.    Plaintiffs had a reasonable, good-faith belief that counsel hired by CMB would perform under a reasonable duty of care in the loan negotiations and not pursue

frivolous legal claims, lie in the pleadings, or present false testimony to a tribunal to protect CMB at Plaintiffs' expense.

165.    As part of the Enterprise, each of the Defendants was and is associated with the Enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the Enterprise in relation to Plaintiffs and other limited partners, through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(B), including but not limited to multiple and continuous acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

166.    Defendants, each members of the Enterprise, have caused Plaintiffs economic harm and harm to their property by depleting Partnership assets to the tune of $3.8 million by pursuing the lawsuits. This figure continues to grow. Defendants obliterated any chance Plaintiffs had at repayment of their investments by depleting the Partnership of all available assets and prohibiting Plaintiffs from selling their partnership interests before they were essentially worthless. This is a direct harm to Plaintiffs because the General Partners of CMB did not contribute any funding to the Partnership and thus did not lose any investment.

167.    The Lender is also seeking to recover the $5 million bond in the New York Action that CMB posted as partial compensation for the damages the Lender sustained as a result of the preliminary injunction. *See* **Exhibit 17**. This is a foreseeable consequence of pursuing the sham lawsuit and represents another $5 million that could have gone back to Plaintiffs to repaid at least a portion of their original investments.

168.    LB influenced Lee and Hogan to falsely testify at the preliminary injunction hearing to impede the Court, in violation of 18 U.S.C. §§ 1503 and 1512(b)(1).

169.    LB also fraudulently obtained fees from the Limited Partners (through CMB) based on their misrepresentation of a "secret" Participation Agreement, in violation of 18 U.S.C. § 2314.

**SECOND CAUSE OF ACTION**
**Violation of Federal RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c) (Against Defendants CMB, CMB Export, NK, and LB)**

170.   Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

171.   To the extent necessary, this cause of action is pled in the alternative.

172.   Using the threat of injury to Plaintiffs and CMB, Defendants have conspired to conceal their wrongdoing through the institution of sham legal proceedings, making false statements under oath, concealing of material information in the Term Sheet/Participation Agreement and failure to act on same, and continued requests to fund frivolous litigation each knows or has reason to know is baseless. LB has gone as far as suggesting that Plaintiffs' claims against it are malicious when they are clearly not.

173.   Defendants' activities described herein were taken knowingly, wantonly and willfully and have obstructed, delayed, or otherwise affected commerce and caused a material adverse effect to the Partnership.

174.   Defendants' conduct was designed to, and has in fact, injured Plaintiffs in their business and property. As a direct result of Defendants' unlawful and ongoing fraudulent litigation in violation of, *inter alia*, 18 U.S.C. §§ 1341 and 1343, Plaintiffs have lost both their initial investments in the Partnership and any opportunity to sell or dispose of their interests in the Partnership before they became worthless.

**THIRD CAUSE OF ACTION FOR LEGAL MALPRACTICE**
**(By Plaintiffs Against LB)**

175.   Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

176.   Law firms may be held accountable for their malpractice to third party beneficiaries.

177.   Law firms may also be held accountable for their malpractice to foreseeable third-parties where such malpractice specifically relates to matters of fact.

178.   LB, a national law firm, served as outside counsel for CMB in developing

33

the Partnership and structuring and negotiating the loan documents for the Project. LB's representation was critical to ensuring the Partnership and the Project complied with the federal EB-5 Immigrant Investor Program. Plaintiffs were the sole financial contributors to CMB and the $450 million Junior Mezzanine Loan. They were the intended beneficiaries of the Project's success, both financially and for purposes of their EB-5 visa applications.

179.    For purposes of the Partnership, LB wrote in Article III of the LP Agreement that the "**intended business of the Partnership**" was, to: (a) generate revenue for the Partnership; and (b) "**structure the Partnership such that each Limited Partner, who is not a permanent resident of the United States, is able to apply for a visa pursuant the EB-5 Immigrant Investor Program**." (bold added).

180.    LB knew the Partnership was limited to *only* foreign investors seeking EB-5 visas and that the Limited Partners were the *sole* financial contributors of CMB ($500,000 each plus a $50,000 syndication fee) making them primary beneficiaries unlike typical limited partners. The Limited Partner's individual interests were aligned with the Partnership's interest: generate a return to repay their investment and provide the elements needed to apply for a visa.

181.    To comply with the EB-5 Program requirements, LB incorporated specific provisions into the loan agreement between CMB and CPMB. For example, the agreement mandated that the "Loan structure must be in conformity with the requirements of the EB-5 Program in order to create jobs within the pre-approved targeted employment area, as defined by the USCIS and approved by the State of California." **Exhibit 8** at 8.

182.    It further required the "Borrower [] submit to Lender the EB-5 Documentation, which evidences the use of the proceeds of the Loan in the amounts set forth in Section 4.1 (kk) hereof and for the purposes required by this Agreement." **Exhibit 8** at 11-12.

183.    These provisions directly tied LB's legal work to Plaintiffs' immigration objectives, as the EB-5 Program requires each investor's $500,000 contribution create at least ten full-time U.S. jobs to qualify for a visa.

184.    LB knew or should have known that Plaintiffs, as the sole limited partners and financial contributors to CMB, were the primary beneficiaries of its legal services. Under the LP Agreement, upon repayment of the Junior Mezzanine Loan, CMB was obligated to repay each Plaintiff their $500,000 capital contribution, plus a pro-rata share of any profits earned on the loan. Plaintiffs were wholly dependent on LB's legal work in negotiating and securing the loan. LB's role extended beyond advising CMB, it crafted the legal framework that governed Plaintiffs' investments and visa eligibility.

185.    In the New York Action, CMB, through Hogan, testified that CMB "enter[ed] into a mezzanine loan of this position so that we could then show job creation that this project was going to do," to comply with the Federal EB-5 laws. **Exhibit 5** at 52:1-4. LB's knowledge of this purpose is further evidenced by its preparation of offering documents distributed to Plaintiffs, which detailed the Project's EB-5 compliance and induced Plaintiffs to invest based on the expectation that LB's legal work would protect their capital and visa prospects.

186.    LB was involved from the beginning, starting in July of 2016 when LB negotiated the initial Intercreditor Agreement between CMB and JPM, the administrative agent for the Senior Loan and Senior Mezzanine Loan. Even then, LB failed to include certain safeguards like a right of first refusal to purchase up the capital stack (beyond a one-time option to purchase the Senior Loan).

187.    LB's representation continued through the four amendments to the Intercreditor Agreement, with the last executed on September 1, 2020. LB was responsible for negotiating and advising CMB on these amendments. In March of 2020, when JPM declared the Senior Loan out of balance and halting further draws, CMB offered to provide funding to prevent a predatory new lender from entering the capital stack. The senior lenders rejected CMB's offer, as CMB lacked a right of first refusal—a critical protection LB failed to negotiate. This failure allowed the Lender to enter the capital stack, whose terms ultimately led to the foreclosure of the Project and loss of Plaintiff's entire investment.

188.   LB further failed to reasonably address the following critical issues:

a.   The predatory terms contained in the Term Sheet and subsequent Participation Agreement.

b.   The unreasonably short maturity date in the Third Amended Mezzanine Loan. *See* **Exhibit 2** [CMB's Complaint in the California State Action] at ¶¶ 88, 91 (referring to the "arbitrarily short maturity date of July 9, 2021" and to "unrealistic conditions that had to be met to extend the Initial Maturity Date.")

c.   The ability to purchase up the stack. CMB did not have a guaranteed way to purchase up the new stack to protect its investment, which LB acknowledged is *essential* to protecting the junior interest. *See* **Exhibit 2** at ¶ 16 ("[a] junior lender's freedom to negotiate the purchase of a senior lender's interest is an essential means of protecting the junior loan from being wiped-out by senior debt, particularly in circumstances such as those described herein.").

189.   LB did nothing to rectify these issues. LB either missed their importance or was so desperate to obtain new financing for the Project that it was willing to push forward despite the risks.

190.   Upon information and belief, LB, to cover up its own malpractice, coordinated with Hogan on what to include in the investor notices sent to the Limited Partners, to obfuscate their failure to protect the Partnership's assets. LB then sat idly by and allowed CMB, via Hogan and Lee, to present false testimony to the tribunal in the New York State Action.

191.   When the Lender finally indicated its intent to foreclose on the Project, LB, to cover up its own malpractice, subsequently advised CMB to knowingly institute two factually defective lawsuits and a related appeal against the Lender and testify falsely under oath to rake in over $3.8 million in legal fees in a failed attempt to conceal their shortcomings.

192.    The sham litigation undertaken by LB has been directly funded with the capital contributions of EB-5 Investors, including Plaintiffs, in the Project at the instruction of Hogan and CMB.

193.    More recently, on June 19, 2024, Hogan advised that fees and costs associated with the California and New York State Court Actions underlying CMB's litigation scheme with LB had exceeded $3.8 million and issued a Capital Call Notice to the Group 48 Limited Partners seeking to raise an additional $3,250,000 to pay LB to continue its work. *See* **Exhibit 16.**

194.    Upon information and belief, Hogan communicated with LB for an estimate of future litigation costs, to pass on to the Limited Partners, and information to explain what that litigation would entail if pressed further, as evidenced by fact-specific recitations that would only be known between LB and its client. LB approved this estimate of future expenses for litigation known to be factually defective and misrepresentations regarding the suitability of litigation going forward with the understanding that it would be distributed to Plaintiffs.

195.    CMB and LB undertook this campaign to lull EB-5 Investors like Plaintiffs from taking any actions against CMB to protect their interests before they became worthless by blaming the Lender for Plaintiffs' loss and running the clock on the statute of limitations for any claims Plaintiffs would have against Defendants.

196.    LB is further liable to Plaintiffs for malpractice due to its continuous and intentional misrepresentations, in that the terms of the new loan were concealed from CMB through its allegations in the sham legal proceedings. That is, the Term Sheet detailing a "secret" Participation Agreement and change in the repayment structure of the Loans was in fact *disclosed* to both LB and CMB back in July of 2020 and known as such by them. LB should not have undertaken *any* efforts to conceal or aid in the concealment of the July 14, 2020 email from Plaintiffs. The only thing "secret" about the Participation Agreement was that CMB and LB secretly concealed its existence from EB-5 Investors, including Plaintiffs, until at least March 2023.

197.    As a direct and proximate result of LB's malpractice, Plaintiffs lost the entirety of their investment and any profits made therefrom that were used to pay LB's legal fees and the $5 million bond in the New York State Action.

198.    The conduct of LB in these instances constitutes legal malpractice for which Plaintiffs may seek relief from this Court, as such malpractice was and continues to be the direct and proximate cause of the damages to Plaintiffs.

### FOURTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY
### (By Plaintiffs Against CMB, CMB Export, NK, Lee, Hogan)

199.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

200.    To the extent necessary, this cause of action is pled in the alternative.

201.    Since receipt of the Term Sheet, Defendants have sought to hide from Plaintiffs their malfeasance in approving and executing the Fourth Amendment to Intercreditor Agreement, including the amount the Lender could charge in protective advances and what CMB admits was an unreasonably short maturity date.

202.    CMB Export, NK, Lee, and Hogan each had fiduciary duties to Plaintiffs as co-general partners and control persons of CMB to operate CMB and manage Plaintiffs' investments with reasonable diligence, in good faith, and in accordance with representations it made to Plaintiffs regarding the partnership's intended business and purpose as articulated in the Partnership Agreement. Defendants also owed Plaintiffs a duty of care, loyalty, and not to engage in corporate waste.

203.    Similarly, CMB (who acts through its general partners) has a fiduciary duty to their members to discharge its duties in good faith with the care that an ordinarily prudent manager in a like position would exercise, including avoiding engaging in conduct that involved conflicts of interest or self-dealing and to act in good faith and exercise loyalty to Plaintiffs.

204.    Instead, Defendants were either grossly negligent or intentionally breached their fiduciary duties to Plaintiffs by executing the Fourth Amendment to Intercreditor

Agreement on September 1, 2020 without: (i) leveraging its approval rights over any loan upsizing to bargain for a right to buy up or invest extra in the stack to protect its interest in the Project; (ii) investigating the Participation Agreement first; (iii) defending against the harmful terms of the Participation Agreement, including but not limited to, the imposition of onerous interest rates and further restricting CMB's ability to buy up the stack; (iv) including a right of first refusal provision; (v) negotiating a written provision for an extension of the Senior Loan and Senior Mezzanine Loan maturity date to prevent default and/or foreclosure; and (vi) exercising CMB's right to purchase the entire Senior Loan following the Purchase Option Event in July of 2021 and later in or about April of 2022 when CMB was negotiating with Colony and the Lender.

205.    Despite his role as the Chief Financial Officer for CMB, Lee personally elected not to request the Participation Agreement, breaching his duty.

206.    Despite his role as manager of CMB, Hogan elected not to insist on protective measures in the Fourth Amendment to Intercreditor Agreement before signing it.

207.    Lee, Hogan and Platner from LB also elected not to negotiate with Colony and the Lender in April of 2022 to cure the senior loan default.

208.    Instead, Hogan authorized sham lawsuits of "fraudulent concealment" of the "secret" Participation Agreement against the Lender, knowingly wasting Plaintiffs funds, which at last count totaled $3.8 million in legal fees and claim against a $5 million bond. Hogan knew there was no fraudulent concealment.

209.    For example, Hogan testified that the Participation Agreement "was completely hid [sic] from us. They hid it from me so that I wouldn't know that Reuben had worked on a deal with Colony to knock me out if I wanted to buy the Colony note." **Exhibit 5** at 26:13-16. "I signed the Fourth Amendment because they hid and they defrauded me." *Id.* at 27: 9-10.

210.    In tandem, Lee testified that "[a] Participation Agreement was not disclosed to CMB." *Id.* at 73:11-2.

211.  LB and Hogan also asserted that the Participation Agreement prohibited CMB's ability to purchase up the capital stack.

212.  Hogan testified that when the Lender and Colony "executed the Participation Agreement, they stripped CMB of its right to purchase the senior loan." *Id.* at 18:19-22.

213.  In reality, they never tried.

214.  Plaintiffs, who had not been provided copies of the Fourth Amendment to Intercreditor Agreement, Third Amended Mezzanine Loan, Participation Agreement or Term Sheet, and who relied upon CMB to act in their best interest, were unaware of CMB's inaction until the documents were placed in the record in the State Court Actions on or about March 27, 2023.

215.  Defendants NK, CMB Export, Hogan, and Lee each meaningfully participated in the wrongs personally and/or authorized and/or directed them by, among other things, failing to inform Plaintiffs and signing the various loan, security, and intercreditor agreements that memorialized CMB's consent to the materially adverse original Loan terms and conditions and their subsequent amendments.

216.  Plaintiffs did not learn of Defendants' wrongs until the California and New York State Actions, filed on October 14, 2022, detailed the loan negotiations and subsequent events.  Plaintiffs learned of the Term Sheet on March 27, 2023, when CMB through LB revealed in discovery that they had received a copy of the Term Sheet, at which point the various courts began denying Defendants claims against the Lender.

217.  Plaintiffs have been harmed by Defendants' grossly negligent and/or willful and wanton conduct in an amount no less than $97 million plus the attorneys' fees and costs expended on the sham lawsuits. Such breaches constitute a material adverse effect on the Partnership.

218.  In addition to the monetary damages that the Plaintiffs have suffered, the acts of the Defendants were and continue to be wrongful, dishonest, malicious, and oppressive, and cannot reasonably claim any protections whatsoever under Delaware's

business judgment rule. Thus, Plaintiffs seek an award of punitive damages in an amount to punish the Defendants and each of them and to make an example to others that such conduct should not be awarded, in an amount to be proven at the time of trial.

**FIFTH CAUSE OF ACTION FOR**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(By Plaintiffs Against Defendant LB)**

219.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

220.    To the extent necessary, this cause of action is pled in the alternative.

221.    As specifically described above, Defendants CMB, CMB Export, NK, Lee, and Hogan's grossly negligent and/or intentional bad acts were a breach of their fiduciary duties owed to Plaintiffs.

222.    Corporate and litigation partners of LB, at least one of whom is within this District, had knowledge that a breach of fiduciary duty had been committed upon Plaintiffs.

223.    Unless the CMB Defendants expressly instructed LB not to do so, it was LB's duty to review and provide advice as to every page, line, and phrase in the Term Sheet, Participation Agreement, Third Amended Senior Mezzanine Loan, and Fourth Amendment to the Intercreditor Agreement to protect CMB's interests in the EB-5 Loan and conduct any necessary due diligence on the information revealed therein.

224.    LB knowingly aided and abetted breaches of fiduciary duties owed to Plaintiffs, by, among other things counseling the CMB defendants not to (i) inquire further upon receipt of the Term Sheet; (ii) advise Plaintiffs of the Term Sheet or CMB's failure to take action against it; (iii) request a copy of the Participation Agreement; (iv) insist on a right of first refusal or ability to purchase up the stack in the Fourth Amendment to Intercreditor Agreement; (v) request an extension of the Project's loan maturity date; (vi) object to construction financing through protective advances; and (vii) exercise its one time right under the Intercreditor Agreement to purchase the entire Senior Mezzanine

Loan following a Purchase Option Event notice in July, 2021.

225. LB further knowingly aided and abetted the breach of fiduciary duty against Plaintiffs by filing the California and New York State Actions, to further conceal their misconduct.

226. LB substantially assisted or encouraged Defendants CMB, CMB Export, NK, Lee, and Hogan to commit a breach of fiduciary duty as alleged herein and profited therefrom. Such aiding and abetting was carried out for LB's own financial advantage, as LB accumulated, at last count, $3.8 million in legal fees in instituting a baseless litigation campaign based on feigned allegations of fraudulent concealment against the Reuben entities each of LB, CMB, CMB Export, Hogan and Lee knew to be untrue.

227. LB failed to correct factually inaccurate testimony and affidavits it allowed its client CMB to present to the tribunal in the New York State Action.

228. LB pursued litigation for its own financial gain, against the interest of Plaintiffs and other Limited Partners, as evidenced by LB continuing the lawsuits long after the Term Sheet was produced in discovery.

229. Plaintiffs, who had not been provided copies of the Fourth Amendment to Intercreditor Agreement, Third Amended Mezzanine Loan, Participation Agreement or Term Sheet, and who relied upon CMB to act in their best interest, were instead fed baseless representations about a "secret" Participation Agreement to lull them into inaction. Plaintiffs were unaware of CMB's inaction until the documents were placed in the public record in the State Court Actions.

230. Plaintiffs did not learn of Defendants' wrongs until the State Court Actions were filed and Plaintiffs learned of the issues with the loan documents and receipt of the Term Sheet.

231. LB aided and abetted CMB's breach of fiduciary duty by, on information and belief, providing an estimate of $3.2 million for future, baseless litigation that CMB could present to the Limited Partners to continue their quest to conceal their wrongdoing from the Limited Partners.

232.    Plaintiffs were damaged by the actions of LB in the form of any chance of repayment of their $97 million investment in the Project and attorneys' fees and costs for their respective share of the cost of the sham litigation proceedings.

## SIXTH CAUSE OF ACTION FOR CIVIL CONSPIRACY
### (By Plaintiffs Against All Defendants)

233.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

234.    To the extent necessary, this cause of action is pled in the alternative.

235.    Defendant LB, through its partners conspired with Defendants CMB, CMB Export, NK, Lee, and Hogan to breach CMB, CMB Export, NK, Lee, and Hogan's fiduciary duties owed to Plaintiff by committing one or more overt acts pursuant to a common design. Each of the Defendants were united by a common interest in hiding their wrongful conduct in failing to act reasonably to protect Plaintiffs' investment in order to prevent an onslaught of litigation from Limited Partners and decimation of their reputation in the EB-5 industry. LB, through its partners within this District and elsewhere, did not want to lose CMB as a valuable client, whose EB-5 industry business generated substantial legal fees for LB over the years and $3.8 million in legal fees for the frivolous California and New York state actions alone.

236.    Defendants, in furtherance of the common design, committed one or more overt acts to conceal their inaction by failing to inform Plaintiffs and/or commencing the California and New York State Actions to shift the blame for CMB's (and thus Plaintiffs') loss of equity in the Project solely to the Lender. In the California State Action, Defendants continue to attempt to shift blame on the Lender instead of acknowledging their failure to react to the disclosure of the Term Sheet and Participation Agreement.

237.    Defendants CMB, CMB Export, NK, Lee, and Hogan further committed additional intentional and overt acts in furtherance of the conspiracy by providing false statements under oath in the above legal actions and requesting additional capital from Plaintiffs to fund the factually baseless litigation against the Lender they each knew had

no basis in fact.

238.    Upon information and belief, LB and CMB agreed in a July 2020 meeting to conceal the Term Sheet, as evidenced by their joint silence until 2023.

239.    Each of the aforementioned acts are wrongful acts taken with the intention and effect of depriving Plaintiffs of legal rights to timely seek intervention, sell their partnership interests, and protect any remaining interest in the Project and thus their investment funds and to conceal counsel's malpractice in its representation of CMB. There was a meeting of the minds between and among Defendants to commit the unlawful acts alleged herein.

240.    Plaintiffs have been damaged in an amount not less than $97 million, as a direct and proximate result of the conspiracy.

### SEVENTH CAUSE OF ACTION FOR BREACH OF CONTRACT
### (By Plaintiffs Against NK, CMB Export)

241.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

242.    According to the LP Agreement, Defendants were to "use commercially reasonable efforts" to meet the objectives of the Partnership." **Exhibit 7** [LP Agreement] at 27.

243.    Defendants breached the LP Agreement by failing to "use commercially reasonable efforts" in negotiating the Loan Documents.

244.    Defendants acted unreasonably in failing to address the following critical issues:

    **a.**  The predatory terms contained in the Term Sheet and subsequent Participation Agreement.

    **b.**  The unreasonably short maturity date in the Third Amended Mezzanine Loan. *See* **Exhibit 2** [CMB's Complaint in the California State Action] at ¶¶ 88, 91 (referring to the "arbitrarily short maturity date of July 9, 2021" and to "unrealistic conditions that had to be met to extend the Initial Maturity Date.")

**c.** CMB's ability to purchase up the stack. CMB did not have a guaranteed way to purchase up the stack to protect its investment, which it knew was *essential* to protecting the junior interest. *See* **Exhibit 2** at ¶ 16 ("[a] junior lender's freedom to negotiate the purchase of a senior lender's interest is an essential means of protecting the junior loan from being wiped-out by senior debt, particularly in circumstances such as those described herein.").

245. Pursuant to Article IV, subsection A.6, of the Limited Partnership Agreement, entitled Additional Capital, "[i]f and at such time or times as the General Partner determines that the reasonable needs of the Partnership require that a certain amount of additional capital be contributed to the Partnership ("Additional Required Capital"), the General Partner shall engage in the following in the order set forth below:

a. Advise each of the Limited Partners of the need for Additional Required Capital. Each Limited Partner will have the option, but not the obligation, to invest additional equity capital in the Partnership, which in turn may have the effect of reducing, pro rata, each Limited Partner's Percentage Interest;

b. Arrange for financing from a third party to the Partnership for the amount of the Additional Required Capital not so contributed by the Limited Partners on commercially reasonable terms, as determined by the General Partner, in its sole discretion; and

**c.** Admit other Persons (which may include Affiliates of one of the Partners, or any other Person as permitted by this Agreement) as Additional Partners in exchange for a cash Capital Contribution on such terms acceptable to the General Partner in its sole discretion, which in turn shall have the effect of reducing, pro rata, each Limited Partner's Percentage Interest.

*See* **Exhibit 7.**

246. The Borrower, Next Century, was unable to repay the loan by the unreasonably short July 9, 2021 maturity date and unable to meet the conditions for the extension.

247.    On July 12, 2021, JP Morgan Chase notified CMB of a "Purchase Option Event" as a result of Next Century's default, providing CMB a one-time right to purchase the Senior Loan.

248.    The Project was nearing default and CMB was at risk of losing everything.

249.    Defendants CMB, CMB Export, NK and Hogan did nothing to try to raise the capital needed to purchase the Senior Loan, nor did they have any intention of doing so.

250.    Defendants never notified the Plaintiffs of the need for additional capital or took any other steps to obtain additional financing.

251.    In April of 2022, the Lender and Colony gave CMB a second opportunity to cure the senior loan default.

252.    Defendants CMB, CMB Export, NK and Hogan did nothing to try to raise the capital needed to purchase the Senior Loan, nor did they have any intention of doing so.

253.    Defendants never notified the Plaintiffs of the need for additional capital or took any other steps to obtain additional financing.

254.    As a result, the Lender foreclosed on the Senior Loan and Senior Mezzanine Loan wiping out CMB's interest in the project.

**EIGHTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**
**(By Plaintiffs Against CMB, NK, CMB Export, Hogan, and Lee)**

255.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

256.    To the extent necessary, this cause of action is pled in the alternative.

257.    Plaintiffs' investments in CMB as part of their EB-5 visa applications constitute securities. *SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019).

258.    Defendants CMB, CMB Export, NK, Lee, and Hogan knowingly, or with reckless disregard for the truth, made misrepresentations of material facts to Plaintiffs in connection with their limited partnership interests.

259.    Defendants misrepresented several material facts, including, but not limited to, that Defendants did not have any notice of the not-so secret "secret" Term

Sheet/Participation Agreement prior to executing the Fourth Amendment to Intercreditor Agreement.

260.    Defendants also misrepresented the threat of default despite the Borrower's July 9, 2021 default and Lender's purchase of the Senior Loan in October 2021.

261.    For example, instead of notifying the Limited Partners of the notice of default in July of 2021 and their one-time opportunity to purchase the Senior Loan, on September 14, 2021, Hogan sent a misleading email to the Limited Partners explaining the Lenders were discussing amendment of the loan maturity date and "collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel," with the intent of preventing Plaintiffs from realizing Defendants' error in not negotiating a more reasonable maturity date or protections in the event of default and taking legal action regarding same.

262.    In or about April of 2022, after the Lender purchased the Senior Loan, and perhaps realizing the potential danger of foreclosure and/or believing they could pick up Colony's interest for pennies on the dollar (due to an ongoing lawsuit between the Lender and Colony), Hogan, Lee and from CMB and LB attorney Platner contacted Colony and the Lender about purchasing Colony's interest in the Senior Mezzanine Loan.

263.    According to the July 27, 2022, investor update that Hogan sent to Plaintiffs, the Lender notified CMB that it "would only entertain an offer from the Partnership that resolved the existing senior loan default."

264.    Hogan downplayed the need to purchase the existing senior loan default noting that "[w]hile any loan foreclosure would undoubtedly present a large threat to the Partnership, neither Reuben Brothers nor Colony Capital have initiated foreclosure actions to date, and Reuben Brothers has continued to fund the Borrower for construction draws and working capital as protective advances." Hogan went on to promote the success of the Project writing, "[f]ortunately, the Project has recently turned a corner," and that "since January, the hotel is back on track to ramp up." *See* **Exhibit 12**.

265.    The Defendants did not want to issue a capital call because they did not

want the Limited Partners to know the amount of onerous interest the Lender was permitted to charge because of their egregious failures to protect CMB's interests.

266.    On August 25, 2022, the Lender delivered to CMB notice of their planned UCC foreclosure sale against the Senior Mezzanine Loan collateral (NCPMB's 100% ownership of Next Century and, thus, the Project itself).

267.    On August 31, 2022, the Lender delivered to CMB a Notice of Default and Election to Sell Under Deed of Trust pertaining to the Senior Loan.

268.    On October 15, 2022, Hogan sent an email to Plaintiffs misrepresenting that the Lender engaged in predatory lending practices by concealing a Participation Agreement that (1) authorized the Lender to incur high fees and (2) prevented CMB from taking protective action (e.g., purchasing up the capital stack). Hogan falsely claimed that pursuing legal action related to the "secret" Participation Agreement "is in the Partnership's best interest." *See* **Exhibit 13.** Hogan on behalf of CMB provided to the Limited Partners copies of the California and New York State Complaints. On information and belief, CMB sent this correspondence after review, approval and acquiescence by LB.

269.    Defendants were under a duty to disclose to Plaintiffs certain facts, but failed to disclose the following material facts:

    a.    The July 14, 2020 e-mail provided CMB with notice of the Term Sheet/Participation Agreement that would impose onerous interest, essentially guaranteeing the impossibility of repayment of Plaintiff's investments;

    b.    The Borrower was in default; and

    c.    Defendants had no good faith basis for commencing legal proceedings against the Lender.

270.    This conduct and lack of action continued throughout the terms of the commitment of funds to the Project by the EB-5 investors and took place through the financial interests of Plaintiffs being wiped out by the foreclosure on the Project by the

Lender, and continue to this day as Defendants continue to request additional funds to fund litigation based on meritless claims of fraudulent concealment against the Reuben entities.

271.   Defendants intended that Plaintiffs rely on these misrepresentations to prevent an onslaught of litigation against them and any disposition of partnership interests.

272.   Defendants knew or should have known of the misrepresentations and/or omissions of material fact detailed herein.

273.   Plaintiffs refrained from acting (selling their interests, demanding further litigation, instituting legal proceedings against Defendants for their egregious failings in managing the Partnership) based upon the misrepresentations or omissions of material fact.

274.   Plaintiffs reasonably relied on Defendants' misrepresentations and omissions of material fact and held, as opposed to disposing of or selling, partnership interests with CMB that they could have terminated, pursuant to the terms of the Partnership Agreement. Defendants owed Plaintiffs fiduciary duties of loyalty and care under the Partnership Agreement and had no reason to believe that Defendants would withhold material information from them.

275.   Had Plaintiffs known the true information misrepresented, or had Plaintiffs been informed of the facts that Defendants failed to disclose to Plaintiff, Plaintiffs would have sold their partnership interests before they became worthless and immediately instituted legal proceedings against Defendants that would have saved the deprivation of $3.8 million in attorneys' fees/costs and $5 million bond from the partnership assets to which they directly contributed.

276.   As a direct and proximate result of the Defendants' wrongful misrepresentations and omissions, Plaintiffs have suffered damages plus interests, costs, and attorneys' fees, the exact amount to be proven at the time of trial.

277.   These breaches of duty by Defendants to Plaintiffs constitutes intentional

misrepresentations that were direct and proximate causes of damage to Plaintiffs, who reasonably relied on such representations.

## NINTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION
### (By Plaintiffs Against CMB, NK, CMB Export, Hogan, and Lee)

278.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

279.    To the extent necessary, this cause of action is pled in the alternative.

280.    Plaintiffs' investments in CMB as part of their EB-5 visa applications constitute securities. *SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019).

281.    Defendants CMB, CMB Export, NK, Lee, and Hogan made misrepresentations of material facts to Plaintiffs and failed to disclose material facts to Plaintiffs in connection with their limited partnership interests.

282.    Defendants misrepresented several material facts, including, but not limited to, that Defendants did not have any notice of the Term Sheet/Participation Agreement prior to executing the Fourth Amendment to Intercreditor Agreement.

283.    Defendants also misrepresented the threat of default despite the Borrower's July 9, 2021 default and Lender's purchase of the Senior Loan in October 2021.

284.    For example, instead of notifying the Limited Partners of the notice of default in July of 2021 and their one-time opportunity to purchase the Senior Loan, on September 14, 2021, Hogan sent a misleading email to the Limited Partners explaining the Lenders were discussing amendment of the loan maturity date and "collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel," with the intent of preventing Plaintiffs from realizing Defendants' error in not negotiating a more reasonable maturity date or protections in the event of default.

285.    In or about April of 2022, after the Lender purchased the Senior Loan, and perhaps realizing the potential danger of foreclosure and/or believing they could pick up Colony's interest for pennies on the dollar (due to an ongoing lawsuit between the Lender and Colony), Hogan, Lee and Michael Platner from CMB contacted Colony and the

Lender about purchasing Colony's interest in the Senior Mezzanine Loan.

286.    According to the July 27, 2022, investor update that Hogan sent to Plaintiffs, the Lender notified CMB that it "would only entertain an offer from the Partnership that resolved the existing senior loan default."

287.    Hogan downplayed the need to purchase the existing senior loan default noting that "[w]hile any loan foreclosure would undoubtedly present a large threat to the Partnership, neither Reuben Brothers nor Colony Capital have initiated foreclosure actions to date, and Reuben Brothers has continued to fund the Borrower for construction draws and working capital as protective advances." Hogan went on to promote the success of the Project writing, "[f]ortunately, the Project has recently turned a corner," and that "since January, the hotel is back on track to ramp up." *See* **Exhibit 12.**

288.    The Defendants did not want to issue a capital call because they did not want the Limited Partners to know the amount of onerous interest the Lender was permitted to charge.

289.    On August 25, 2022, the Lender delivered to CMB notice of their planned UCC foreclosure sale against the Senior Mezzanine Loan collateral (NCPMB's 100% ownership of Next Century and, thus, the Project itself).

290.    On August 31, 2022, the Lender delivered to CMB a Notice of Default and Election to Sell Under Deed of Trust pertaining to the Senior Loan.

291.    On October 15, 2022, Hogan sent an email to Plaintiffs misrepresenting that the Lender engaged in predatory lending practices by concealing a Participation Agreement that (1) authorized the Lender to incur high fees and (2) prevented CMB from taking protective action (e.g., purchasing up the capital stack). Hogan falsely claimed that pursuing legal action related to the "secret" Participation Agreement "is in the Partnership's best interest." *See* **Exhibit 13.** Hogan, with CMB's permission, provided to the Limited Partners copies of the California and New York State Action complaints.

292.    Defendants were under a duty to disclose to Plaintiffs material facts, yet failed to disclose the following material facts, including that:

a. The July 14, 2020 e-mail provided CMB with notice of the Term Sheet/Participation Agreement that would impose onerous interest, essentially guaranteeing the impossibility of repayment of Plaintiff's investments;

b. The Borrower was in default; and

c. Defendants had no good faith basis for commencing legal proceedings against the Reuben entities.

293. This conduct and lack of action continued throughout the terms of the commitment of funds to the Project by the EB-5 investors and took place through the financial interests of Plaintiffs being wiped out by the foreclosure on the Project by Reuben Bros, and continue to this day as Defendants continue to request additional funds to fund litigation based on meritless claims of fraudulent concealment against the Reuben entities.

294. Defendants knew or should have known of the misrepresentations and/or omissions of material fact detailed herein.

295. Plaintiffs refrained from acting (selling their interests, demanding further litigation, instituting legal proceedings against Defendants for their egregious failings in managing the Partnership) based upon the aforementioned misrepresentations or omissions of material fact.

296. Plaintiffs relied on Defendants' misrepresentations and omissions of material fact and held, as opposed to disposing of or selling, partnership interests with CMB, pursuant to the terms of the Partnership Agreement.

297. Had Plaintiffs known the true information misrepresented, or had Plaintiffs been informed of the facts that Defendants failed to disclose to Plaintiff, Plaintiffs would have sold or disposed of their partnership interests before they became worthless and immediately instituted legal proceedings against Defendants that would at a minimum have saved the deprivation of $3.8 million in attorneys' fees and $5 million bond from the partnership assets they directly contributed.

298.    As a direct and proximate result of the Defendants' wrongful misrepresentations and omissions, Plaintiffs have suffered damages plus interests, costs, and attorneys' fees, the exact amount to be proved at the time of trial.

299.    The conduct described herein constitutes negligent misrepresentations that were direct and proximate causes of damage to Plaintiffs, who reasonably relied on such representations.

**DEMAND FOR JURY**

300.    Plaintiffs demand a jury trial for determination as to all causes of action as herein alleged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for relief against the Defendants as follows:

1.      For any and all economic damages according to proof which at this time are believed to be in excess of $317 million ($97 million in lost investments and $8.8 million in litigation fees/costs trebled pursuant to 18 U.S.C. § 1964(c));

2.      For costs of suit incurred herein;

3.      For any and all prejudgment interest, post judgment interest according to proof in an amount not less than $2 million;

4.      For attorney's fees and costs that are allowed by law;

5.      For punitive damages against Defendants in an amount to be determined according to proof at trial;

6.      For any and all contractual and equitable relief allowed by law;

7.      For general damages according to proof;

8.      For an accounting; and

9.      For such other and further relief as the Court deems just and proper.

53

Dated: April 30, 2025

Respectfully Submitted,
**LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.**

/s/ Keren Gesund
KEREN GESUND

/s/ Robert V. Cornish, Jr.
ROBERT V. CORNISH, JR. (*pro hac vice*)

*Attorneys for Plaintiffs*