**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**
Keren E. Gesund (SBN 253242)
Robert V. Cornish, Jr. (admitted *pro hac vice*)
680 South Cache Street, Suite 100, P.O. Box 12200
Jackson, WY 83001
Tel: (307) 264-0385
Email: keren@rcornishlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Shi Bai, *et al.*, | Case No. 2:24-CV-00807-DJC-DB |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO LEWIS BRISBOIS BISGAARD & SMITH LLP'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| CMB Export Infrastructure Investment Group 48, LP, a Delaware limited partnership; CMB Export LLC, California limited liability company; NK Immigration Services, LLC, an Illinois limited liability company; Neal Lee, an individual; Patrick Hogan, an individual; and LEWIS BRISBOIS BISGAARD & SMITH LLP, a California Limited Liability Partnership, | <u>Hearing:</u><br>Date: October 2, 2025<br>Time: 1:30 p.m.<br>Judge: Daniel J. Calabretta<br>Dept.: Courtroom 10 |
| Defendants. | |

# TABLE OF CONTENTS

I.    LB'S FAILURE TO MEET AND CONFER ............................................................. 1

II.   INTRODUCTION ........................................................................................ 1

III.  LEGAL ARGUMENT .................................................................................... 3

    A.    12(b)(6) Standard .............................................................................. 3

    B.    Plaintiffs Plead Viable Claims for RICO Violations................................... 4

        1.    Plaintiffs Plead LB and the CMB Defendants were Engaged in an
              Association-in-Fact Enterprise ................................................... 4

        2.    Plaintiffs Plead LB and the CMB Defendants Engaged in a
              Pattern of Racketeering Activity ................................................ 8

        3.    Plaintiffs were Harmed by the Enterprise .................................. 12

        4.    LB Fraudulently Obtained Fees from the Limited Partners .......... 15

    C.    Plaintiffs Plead a Viable Claim for Conspiracy to Violate RICO ............. 15

    D.    Plaintiffs Plead Colorable State Law Claims ....................................... 17

        1.    The Agent Immunity Rule Does Not Apply.................................. 17

            a.    Duty Based on Intended Beneficiary Representation ......... 17

            b.    Duty Based on Fiduciary Representation .......................... 20

        2.    Plaintiffs' Legal Malpractice Claim Withstands Dismissal.............. 20

        3.    Plaintiffs Plead Viable Claims for Aiding and Abetting Breach of
              Fiduciary Duty ..................................................................... 23

        4.    Plaintiffs Plead a Viable Claim for Conspiracy Against LB ............ 24

        5.    The Litigation Privilege Does Not Apply .................................... 25

IV.   CONCLUSION............................................................................................ 25

PLAINTIFFS' OPPOSITION TO DEFENDANT LEWIS BRISBOIS BISGAARD & SMITH LLP'S MOTION
TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Federal Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 3, 4

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) .............................................................................. 8, 9, 11

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014)........................................................................ 4, 8

*ESG Capital Partners, LP v. Stratos*,
No. 2:13-cv-01639 ODW(SHx), 2013 U.S. Dist. LEXIS 161294 (C.D. Cal. Nov. 12, 2013) .......................................................................................................... 17

*Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*,
905 F.3d 597 (9th Cir. 2018)............................................................................ 4

*Handeen v. Lemaire*,
112 F.3d 1339 (8th Cir. 1997) ...................................................................... 15

*Howard v. Am. Online Inc.*,
208 F. 3d 741 (9th Cir. 2000)........................................................................ 16

*In re Jamster Mktg. Litig.*,
No. 1751, 2009 U.S. Dist. LEXIS 43592 (S.D. Cal. May 22, 2009)............................ 5

*In re Juul Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) ................................................. 5, 11, 12

*In re Outlaw Lab., LP Litig.*,
No. 18-cv-840-GPC-BGS, 2020 U.S. Dist. LEXIS 71759 (S.D. Cal. Apr. 23, 2020) ........................................................................................................ 9, 15

*In re Takata Airbag Prods. Liab. Litig.*,
No. MDL No. 2599, 2015 U.S. Dist. LEXIS 176036 (S.D. Fla. Dec. 2, 2015). ............. 5

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008)............................................................................ 3

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005)................................................................ 6, 7, 13

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
No. 8:15-cv-02034-JVS-JCGx, 2020 U.S. Dist. LEXIS 236450 (C.D. Cal. Nov. 23, 2020) ........................................................................................................... 15

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007)...................................................................... 5, 6, 7

*Stochastic Decisions, Inc. v. DiDomenico*,
995 F.2d 1158 (2d Cir. 1993)........................................................................ 15

*Tan v. Quick Box, LLC*,
No. 3:20-cv-01082-H-DEB, 2021 U.S. Dist. LEXIS 67791 (S.D. Cal. Apr. 7, 2021)..... 5

PLAINTIFFS' OPPOSITION TO DEFENDANT LEWIS BRISBOIS BISGAARD & SMITH LLP'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

*United States v. Benny*,
  786 F.2d 1410 (9th Cir. 1986) .................................................................. 8

*United States v. Garlick*,
  240 F.3d 789 (9th Cir. 2001) .............................................................. 8, 11

*United States v. Green*,
  592 F.3d 1057 (9th Cir. 2010) ................................................................ 8

*United States v. Lothian*,
  976 F.2d 1257 (9th Cir. 1992) ................................................................ 4

*United States v. Stapleton*,
  293 F.3d 1111 (9th Cir. 2002) ................................................................ 4

*United States v. Woods*,
  335 F.3d 993 (9th Cir. 2003) .................................................................. 9

*Wieser v. Mr. Cooper Grp. Inc.*,
  No. 2:24-cv-01910-DJC-CSK, 2025 U.S. Dist. LEXIS 100227 (E.D. Cal. May 27,
  2025) ...................................................................................................... 1

**State Cases**

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
  225 Cal. App. 4th 1451 (2014) ............................................................. 23

*Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*,
  131 Cal. App. 4th 802 (2005) ............................................................... 24

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal. 4th 797 (2005) .......................................................................... 22

*Fremont Reorganizing Corp. v. Faigin*,
  198 Cal. App. 1153 (2011) .................................................................... 25

*Goodman v. Kennedy*,
  18 Cal. 3d 335 (1976) ........................................................................... 18

*Johnson v. Superior Court*,
  38 Cal. App. 4th 463 (1995) ........................................... 17, 18, 19, 20, 25

**Statutes**

18 U.S.C. § 1961 ...................................................................................... 8

18 U.S.C. § 1962 ...................................................................................... 4

18 U.S.C. § 1964(c) ................................................................................ 13

Cal. Code Civ. Proc. § 340.6(a) ............................................................. 22

PLAINTIFFS' OPPOSITION TO DEFENDANT LEWIS BRISBOIS BISGAARD & SMITH LLP'S MOTION
TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs, 194 Limited Partners of CMB Group 48 (hereinafter "Limited Partners" or "Plaintiffs"), hereby submit their Opposition to Defendant Lewis Brisbois' ("LB") Motion to Dismiss Plaintiffs' Second Amended Complaint (the "Motion").

## I.    LB'S FAILURE TO MEET AND CONFER

This Court's *Standing Order in Civil Cases* requires a "pre-filing meet and confer to discuss thoroughly the substance of the contemplated motion and any potential resolution." Further, "**A notice of motion shall contain a certification by counsel filing the motion that meet and confer efforts have been exhausted, with a very brief summary of meet and confer efforts. Failure to comply with this requirement will result in the motion being summarily denied without prejudice**." (bold in original).

LB admits that it did not meet and confer with Plaintiffs before moving to dismiss the Second Amended Complaint ("SAC"). Instead, on April 15, 2025, LB sent a letter threatening Rule 11 sanctions should Plaintiffs seek to replead their claims in the form of a Second Amended Complaint despite Judge Calabretta's March 28, 2025 Order granting Plaintiffs leave to amend *all* of their claims against LB. LB wrote: "in an effort to finally resolve this dispute between Lewis Brisbois and your clients, Lewis Brisbois is willing to waive any claim it has against you, personally, your law firm, and your clients for malicious prosecution, and any relief available to it under Rule 11 . . . in exchange for a voluntary dismissal of Lewis Brisbois with prejudice." A true and correct copy of this letter is attached to the Declaration of Keren E. Gesund as <u>Exhibit A</u>. The SAC was filed two weeks later, on April 30, 2025. Dkt. No. 69. Despite significant changes to the SAC, LB never sought to meet and confer to discuss the changes. Local Rule 110 suggests that LB's Motion be denied for failure to adhere to local rules as this Court has previously stated. *Wieser v. Mr. Cooper Grp. Inc.,* No. 2:24-cv-01910-DJC-CSK, 2025 U.S. Dist. LEXIS 100227 (E.D. Cal. May 27, 2025). Thus, LB's Motion should be denied.

## II.    INTRODUCTION

This matter involves claims arising from Defendants' malpractice, gross negligence and/or willful misconduct in negotiating and preparing the loan documents for

development of the Fairmont Century Plaza (the "Project") and subsequent conspiracy and cover-up of their malpractice through material omissions, misleading investor notices and the filing of sham litigation in California and New York (the "State Court Actions"). Plaintiffs relied on Defendants to safeguard their investments and immigration goals. Instead, Defendants' collective misconduct wiped out Plaintiffs' investments, squandered partnership assets on sham litigation known as such by Defendants and purposefully intended to lull Plaintiffs into inaction, and jeopardized their EB-5 visa prospects.

Plaintiffs' claims originate from actions concerning a series of agreements executed on September 1, 2020: (1) a Third Amended and Restated Mezzanine Loan and Security Agreement ("Third Amended Mezzanine Loan") to provide the Borrower (NCPMB, LLC) with up to another $275 million dollars in funding to the project, (2) a Participation Agreement with CDCF IV to become the Administrative Agent for the Senior Mezzanine Loan and establish priority over CDCF IV's interest in the loan (the "Participation Agreement"), and (3) the Fourth Amendment to Intercreditor Agreement with CMB in which CMB consented to the terms of the Third Amended Mezzanine Loan (collectively, the "Loan Documents"). Here, (a) the Loan Documents, (b) Defendants' concern regarding an arbitrarily short maturity date, and (c) Defendants' receipt of a notice of a one-time purchase option event were intentionally withheld from the Limited Partners. LB and CMB subsequently enacted a plan to conceal their bad acts from the Limited Partners through a series of misleading investor notices and lull the Limited Partners into inaction to protect their investments.

Had Plaintiffs been informed that Reuben Brothers, Ltd., and its administrative agent Motcomb Estates Ltd. (collectively, the "Lender") sought what Defendants admit was an arbitrarily short loan maturity deadline, funding of the project through onerous protective advances, and further restrictions of CMB's right to purchase up the stack, Plaintiffs would have had the opportunity to undertake protective corporate action or litigation to protect their interests in the Project. SAC ¶ 108. Had Plaintiffs been provided with accurate and contemporaneous notice of such risks, they would have demanded that

CMB reject further upsizing the Loan and requested either changes to the Third Amended Mezzanine Loan and Fourth Amendment to the Intercreditor Agreement or a new lender to protect their interests before the Lender seized control of the Project. *Id.*, ¶ 109.

Indeed, CMB's own pleadings (and later affidavit testimony) claim it would have never executed the Fourth Amendment to Intercreditor Agreement had the purportedly "secret" Participation Agreement and its terms been disclosed to CMB. SAC ¶ 112 (quoting Exhibit 2 at ¶ 18). Plaintiffs certainly would never have supported spending millions of dollars in partnership funds on lawsuits based on a "secret" Participation Agreement that was apparently disclosed. Plaintiffs learned of the issues with the Loan Documents, Defendants' concern regarding the short maturity date, notice of a one-time purchase option event, and Defendants' receipt of the Term Sheet (the precursor to the "secret" Participation Agreement) *after* the Defendants initiated the State Court Actions on October 14, 2022, and not from either one of the Defendants.

On June 3, 2024, Plaintiffs filed the instant action. The complaint was amended twice. On June 20, 2025, LB filed its Motion, alleging Plaintiffs fail to: adequately plead RICO claims against LB; state a claim for conspiracy to violate RICO; and adequately plead their state law claims against LB by failing to state a claim for malpractice, aiding and abetting breach of fiduciary duties, and civil conspiracy. LB further argues it is protected under California's agent immunity rule and litigation privilege.

## III. <u>LEGAL ARGUMENT</u>

### A. 12(b)(6) Standard

A court's inquiry under Rule 12(b)(6) "is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Pursuant to *Bell Atl. Corp. v. Twombly*, a plaintiff cannot merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Uncontroverted allegations in the complaint must be taken as true, and factual disputes are construed in the plaintiff's favor." *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018).

**B.    Plaintiffs Plead Viable Claims for RICO Violations**

To state a RICO claim, Plaintiffs must plausibly allege that each defendant acted, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern, (4) of racketeering activity. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)). Plaintiffs must connect the alleged racketeering activity with the conduct of an "enterprise" that affects interstate or foreign commerce. 18 U.S.C. § 1962(c).

The "scheme to defraud" element of mail and wire fraud is "treated like conspiracy in several respects." *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (quoting *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)). As a result, each member of the scheme does not need to make a separate misrepresentation. *Id.*

1.    *Plaintiffs Plead LB and the CMB Defendants were Engaged in an Association-in-Fact Enterprise*

The Ninth Circuit has held that concerted, fraudulent attorney-client efforts to withhold and misrepresent material evidence to third parties can form the basis of a RICO claim, regardless of whether that conduct occurred during the provision of routine legal representation. The SAC adequately alleges LB stepped out of its typical role of providing routine legal representation and crossed the line into concerted, fraudulent conduct with CMB by constructing misleading notices to be used in communications with the Limited Partners, covering up its own incompetence in the loan negotiation stage, downplaying a foreclosure threat, and asserting false representations in two sham lawsuits. LB asserts that Plaintiffs' SAC fails to meet this Court's mandate to allege that LB "acted outside a routine business relationship and [its] primary business activity" of providing legal representation. Mem. 6, ECF No. 74-1. LB is wrong. Plaintiffs' FAC pled that "the

enterprise's common purpose was to conceal misconduct of negligence by Defendants" through the filing of sham lawsuits. Order 12, ECF No. 68. This Court recognized that "[it] is at least possible that Plaintiffs could allege a common purpose on such allegations." *Id.* At issue was that Plaintiffs' RICO enterprise was "largely based on legal representation provided by Defendant [Lewis] Brisbois . . . a law firm [whose] primary business activity is naturally providing legal representation to clients which includes the filing of lawsuits." *Id.*, 13. Plaintiffs cannot "establish the existence of a common purpose based simply on the allegation that the primary business activities of a member of the enterprise were conducted fraudulently." *Id.*

The "common purpose" element of an association-in-fact enterprise does not itself have to be fraudulent. *In re Juul Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 598 (N.D. Cal. 2020). Plaintiffs must only demonstrate "a collaborative scheme to defraud" that is "distinct from the conduct of any individual defendant." *Id.* (quoting *In re: Takata Airbag Products Liab. Litig.*, 2015 U.S. Dist. LEXIS 176036, at *140 (S.D. Fla. Dec. 2, 2015). When defendants engage in business dealings, their common purpose is actionable when it exceeds "normal commercial dealings." *See Tan v. Quick Box, LLC*, 2021 U.S. Dist. LEXIS 67791, at *58 (S.D. Cal. Apr. 7, 2021) (finding a common purpose where entities collaborated in a deceptive marketing scheme). Plaintiffs must "distinguish ordinary business conduct from fraudulent conduct." *In re Jamster Mktg. Litig.*, 2009 U.S. Dist. LEXIS 43592, at *16 (S.D. Cal. May 22, 2009).

The Ninth Circuit's decision in *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) exemplifies when normal commercial dealings cross into the realm of fraudulent conduct. In *Odom*, Microsoft and Best Buy's business relationship–promoting each other's products and sharing customer data—formed a RICO enterprise with the common purpose to fraudulently increase Microsoft's Internet service subscribers. *Id.* at 552. Plaintiff pled that Microsoft agreed to promote Best Buy's online store via MSN, while Best Buy promoted Microsoft's products and MSN service. *Id.* at 543. Best Buy distributed Microsoft Internet Trial CDs and shared customers' credit card information with Microsoft,

5

PLAINTIFFS' OPPOSITION TO DEFENDANT LEWIS BRISBOIS BISGAARD & SMITH LLP'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

which allegedly activated unwanted accounts. *Id.* Best Buy employees misled customers, claiming CD scans were for inventory control, when they actually transferred personal data to Microsoft. *Id.* After the free trial, Microsoft billed customers for unrequested services. *Id.* The Ninth Circuit held that these coordinated actions went beyond routine business dealings and established a "common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means." *Id.* at 552.

As it concerns the provision of legal services, the Ninth Circuit in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.* held that legal representation can form the basis of a common purpose when attorneys and clients collaborate to mislead third parties through fraudulent means. 431 F.3d 353, 361 (9th Cir. 2005). The court found that DuPont, its law firms, and expert witnesses formed an "'association in fact" RICO enterprise by withholding and misrepresenting damaging test results during discovery to induce plaintiffs to settle product liability claims at a lower value. *Id.* at 361-62. The Ninth Circuit rejected the notion that litigation conduct immunizes collaborative efforts between attorneys and clients, holding that fraud during prior litigation proceedings can form the basis of a RICO claim. *Id.* at 365. LB's memorandum is fatally silent as to why the Ninth Circuit's established precedent of holding law firms liable under RICO law for fraudulent conduct in the provision of legal services does not apply to the facts of this case.

Plaintiffs' SAC alleges that LB, CMB, Lee, and Hogan formed a RICO enterprise in September of 2020 with a common purpose to conceal Defendants' negligence and mislead the Limited Partners through fraudulent actions beyond routine legal services. Specifically, LB collaborated with CMB to conceal predatory loan terms in the Loan Documents, failed to secure a right of first refusal in the Fourth Amendment to Intercreditor Agreement, and sent misleading investor notices from September 14, 2021, to July 27, 2022, downplaying the foreclosure threat and CMB's failure to purchase the Senior Loan after JPM's July 12, 2021 notice. SAC ¶¶ 135, 137-147. After the Lender's UCC foreclosure notice, LB and CMB sent misleading investor notices and filed sham lawsuits in New York and California, misrepresenting that the Lender concealed the

Participation Agreement when LB and CMB knew of it since July 2020. SAC ¶¶ 150-61, 196. By withholding critical information about the loan negotiations and the purchase-option events, Defendants prevented Plaintiffs from demanding protective actions such as rejecting the Fourth Amendment to Intercreditor Agreement or raising additional funds to purchase the senior loan. SAC ¶ 163. The lawsuits and false updates lulled Plaintiffs into believing that Defendants were completely blindsided by the destruction of CMB's interest in the Project and had legitimate bases for expending remaining limited partnership assets to pursue litigation against the Reuben entities. *Id*.

These actions mirror the deceptive enterprise in *Living Designs*, where attorneys and their client withheld evidence to mislead plaintiffs, and in *Odom*, where coordinated misrepresentations exceeded normal business conduct. While Best Buy's normal commercial dealings included promoting the products it sold (including Microsoft products), those dealings reached the point of fraudulent conduct when customers' information was shared to open accounts and billed for unrequested services without customers' knowledge or consent. Here, LB's typical duties to CMB include performing legal services, but they reached the point of a common purpose in a RICO enterprise when LB agreed to conceal CMB's fiduciary breaches and its own malpractice by advocating for spending millions in Limited Partner funds to finance baseless litigation by withholding and misrepresenting material evidence. LB's role—actively concealing loan terms, coordinating misleading notices, and pursuing baseless litigation—demonstrates a collaborative scheme to deceive Plaintiffs, preventing them from demanding protective actions or pursuing claims against Defendants. The withholding and misrepresentation of evidence that supported a common purpose in *Living Design* between attorney and client is exactly what supports a common purpose between LB and CMB. This caused the loss of Plaintiffs' investment, depleted Partnership assets, and exposed Plaintiffs to potential liability for the Lender's $5 million bond in the New York Action. SAC ¶¶ 163, 167.

The SAC thus pleads specific, coordinated actions by LB, CMB, Lee and Hogan that go beyond routine legal representation, establishing a common purpose to mislead

the Limited Partners through fraudulent means. Each member's direct knowledge and participation in the scheme, as alleged, negates the plausibility of independent business activities and satisfies the Court's mandate.

2. *Plaintiffs Plead LB and the CMB Defendants Engaged in a Pattern of Racketeering Activity*

The SAC details a fraudulent scheme by LB, CMB, Lee, and Hogan to mislead the Limited Partners through material misrepresentations and omissions, using mail and wire communications. LB argues that Plaintiffs' SAC fails to allege acts "even remotely approaching mail or wire fraud" or plausibly plead material false statements, omissions, or specific intent to defraud by LB. Mem. 10. LB's argument is not well-taken.

This Court previously found the FAC "extremely clear on the 'who, what, when, where, and how' of the misconduct alleged" but sought clarity on how mail or wire fraud was satisfied on at least two occasions. Order 16, 20-21. The SAC cures this, alleging multiple specific instances of fraudulent communications and litigation activities that constitute predicate RICO acts. RICO defines "racketeering activity" as any of the predicate acts listed in 18 U.S.C. § 1961(1). Those acts include mail and wire fraud, which are the acts plaintiffs claim defendants committed, agreed to, or supported other defendants committing. Mail and wire fraud are identical offenses except for the particular method used to disseminate the fraud. *Eclectic Props*., 751 F.3d at 997. The elements are (1) a scheme to defraud, (2) the use of the mails or wires to further that scheme, and (3) the specific intent to defraud. *Id*. The "scheme to defraud" element requires an "affirmative, material misrepresentation." *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) (quoting *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986)). But the misrepresentation does not need to be made through the mails or wires; rather, the use of the mails or wires only needs to be a "step in the plot." *United States v. Garlick*, 240 F.3d 789, 795 (9th Cir. 2001). The misrepresentation also does not need to be made to the RICO plaintiff, but instead may be made to a third-party. *See Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 661 (2008).

In the Ninth Circuit, litigation activities *can* constitute racketeering acts. In *In re Outlaw Lab., LP Litig.*, the court held that attorney demand letters with draft complaints could serve as predicate acts for RICO mail fraud. 2020 U.S. Dist. LEXIS 71759, at *9 (S.D. Cal. Apr. 23, 2020). There, counterclaimants alleged that Outlaw and its counsel, Tauler Smith LLP, formed a RICO enterprise to extort settlements from small convenience stores by threatening baseless litigation over Rhino product sales. *Id*. at *6-7. Tauler Smith collaborated with Outlaw to create the TriSteel product as a pretext for false advertising claims, drafted fraudulent demand letters and complaints, negotiated settlements, and retained proceeds—actions far exceeding routine legal services. *Id*. at *12-14. Tauler Smith argued that none of their demand letters contained misstatements. The court rejected the argument that mail fraud requires a materially false statement: "If a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial." *Id*. at *21 (citing *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003). The scheme need only be "reasonably calculated to deceive" with mail or wire use in furtherance. *Id*.

Litigation activities such as lawsuits and testimony do not need to be directed towards the Limited Partners to constitute racketeering acts. In *Bridge v. Phoenix Bond & Indem. Co.*, the Supreme Court held that misrepresentations, such as false certifications mailed to a county in a tax lien auction, constitute mail fraud predicate acts under 18 U.S.C. § 1961(1)(B), even if the plaintiff did not rely on them. 553 U.S. 639, 647-48, 661 (2008). In *Bridge*, false certifications to the county foreseeably caused plaintiffs to lose valuable liens, satisfying RICO's requirements. *Id*. at 658

Plaintiffs allege that in September of 2020, LB and CMB concocted a plan to send misleading investor notices to conceal critical information about the Loan Documents (executed on September 20, 2020) and the subsequent events that resulted in the complete loss of Plaintiffs' investments, and further misrepresented that said loss was due to a secret" Participation Agreement so that they could preserve their reputations, avoid the risk of ruin, and maintain control of partnership funds. SAC, ¶ 135.

Plaintiffs specifically plead the following communications by the enterprise:

143.    For example, instead of notifying the Limited Partners of the notice of default in July, 2021 and their one-time opportunity to purchase the Senior Loan, on September 14, 2021, Hogan sent a misleading email to the Limited Partners explaining the Lenders were discussing amendment of the loan maturity date and "collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel," with the intent of preventing Plaintiffs from realizing Defendants' error in not negotiating a more reasonable maturity date or obtaining any meaningful protections in the event of default.

145.    According to the July 27, 2022, investor update that Hogan sent to Plaintiffs, the Lender notified CMB that it "would only entertain an offer from the Partnership that resolved the existing senior loan default."

146.    Hogan downplayed the need to purchase the existing senior loan default noting that "[w]hile any loan foreclosure would undoubtedly present a large threat to the Partnership, neither Reuben Brothers nor Colony Capital have initiated foreclosure actions to date, and Reuben Brothers has continued to fund the Borrower for construction draws and working capital as protective advances." **Exhibit 12** at 2. Hogan went on to promote the success of the Project writing, "[f]ortunately, the Project has recently turned a corner," and that "since January [2022], the hotel is back on track to ramp up." *Id.* at 3.

150.    On October 15, 2022, Hogan sent an email to Plaintiffs misrepresenting that the Lender engaged in predatory lending practices by concealing a Participation Agreement that (1) authorized the Lender to incur high fees and (2) prevented CMB from taking protective action (e.g., purchasing up the capital stack). Hogan falsely claimed that pursuing legal action related to the "secret" Participation Agreement "is in the Partnership's best interest." *See* **Exhibit 13**. Hogan, with CMB's permission, provided to the Limited Partners copies of the California and New York State Complaints. On information and belief, CMB sent this correspondence after review, approval and acquiescence from LB.

152.    For its part, LB filed baseless lawsuits in California and New York, at Hogan's instruction, misrepresenting that the Lender concealed a Participation Agreement to mislead Plaintiffs and the Courts. LB also misrepresented to the courts in California and New York that the Lender prohibited CMB's ability to purchase up the capital stack, despite the Lender's offer to allow CMB to cure the senior loan default.

153.    During the litigation, LB, Hogan and Lee all misrepresented that they were unaware of the Participation Agreement. They further misrepresented that had they known of the Participation Agreement, they never would have agreed to the Fourth Amendment to Intercreditor Agreement and allowed the Lender into the capital stack.

154.    On February 6, 2023, Hogan and Lee both testified in the New York State Action. Both Hogan and Lee testified under oath that neither of them was aware of the "secret" Participation Agreement and it was the "secret" Participation Agreement that prevented CMB from buying up the capital stack to protect its interest.

155.    Hogan testified that the Participation Agreement "was completely hid [sic] from us. They hid it from me so that I wouldn't know that Reuben had worked on a deal with Colony to knock me out if I wanted to buy the Colony note." **Exhibit 5** at 26:13-16. "I signed the Fourth Amendment because they hid and they defrauded me." *Id.* at 27: 9-10.

156.    Lee testified that "[a] Participation Agreement was not disclosed to CMB." *Id.* at 73:11-2.

157.    LB and Hogan also asserted that the Participation Agreement prohibited CMB's ability to purchase up the capital stack.

158.    Hogan testified that when the Lender and Colony "executed the Participation Agreement, they stripped CMB of its right to purchase the senior loan." *Id.* at 18:19-22.

159.    But the reality is that LB and CMB never tried. The Lender and Colony testified that despite communicating with Michael Platner from LB, Hogan and Lee, regarding purchase of the Colony interest, CMB never made an offer. **Exhibit 10** at 118:7-18 and 127:22-128:23.

160.    By virtue of LB's receipt of the July 14, 2020 e-mail, LB knew this testimony was inaccurate and had an ethical duty under the New York Rules of Professional Conduct to correct it after it was presented to the tribunal. Yet LB sat back and did nothing, sustaining their scheme to defraud Plaintiffs.

161.    Even after revelation of the Term Sheet and dismissal of the New York Action, Hogan emailed Plaintiffs, on June 19, 2024, a Capital Call Notice to continue the baseless litigation. On information and belief, LB advised Hogan on how to explain the financial and procedural history and solicit funds from the Limited Partners, as evidenced by fact-specific recitations that only LB and its client would know.

SAC ¶¶ 143, 145, 146, 150, 152-161. LB argues Plaintiffs fail to plausibly allege how any of the notices were false or how they are attributable to LB. Mem. 9-10. While the scheme to defraud element requires an affirmative, material misrepresentation, the misrepresentation does not need to be made through the mails or wires; rather, the use of the mails or wires only needs to be a step in the plot. *In re Juul Labs*, 497 F. Supp. 3d at 595 (citing *United States v. Garlick*, 240 F.3d at 792); *see also Bridge*, 553 U.S. 639, at 661.

Nevertheless, as set forth above, Plaintiffs *do* plead how the enterprise sought to paint a rosier picture to lull the investors from taking action to protect their investments. Plaintiffs also plead how the enterprise made misleading statements through investor notices, legal pleadings, and testimony to blame the Lender for the investors' loss to lull

Limited Partners into inaction Plaintiffs plead that CMB sent notices to the Limited Partners based on the information they obtained from LB, from negotiating the loan documents to dealing with the purchase option event to pursuing sham litigation against the Lender.

LB's argument that the misleading lawsuits cannot constitute racketeering activity because the malicious prosecution action filed by the Lender against CMB was dismissed, is unavailing. Mem. 11. There is *no dispute* that the State Court Lawsuits (drafted and filed by LB) and testimony (which Lee and Hogan provided) misrepresented that CMB had no knowledge of a Participation Agreement that allegedly resulted in the loss of investor funds. These are steps designed to deceive the Limited Partners and courts, and qualify as predicate acts of mail and wire fraud under RICO. *See In re Juul Labs*, 497 F. Supp. 3d at 595. LB's misrepresentations, transmitted via mail or wire, were steps in a plot to shift blame to the Lender, conceal Defendants' negligence, and lull Plaintiffs into funding $3.8 million in sham litigation. SAC ¶¶ 135, 163. These are adequate acts to support a pattern of racketeering activity.

### 3. *Plaintiffs were Harmed by the Enterprise*

Defendants' predicate acts of sending misleading investor notices to conceal critical information about the Loan Documents (executed on September 20, 2020) and subsequent events that resulted in the complete loss of Plaintiffs' investments, and then filing lawsuits and providing testimony to misrepresent the cause of the loss as a "secret" Participation Agreement, proximately harmed Plaintiffs by solidifying the loss of their investment in the Project and depleting Partnership assets to the tune of $3.8 million in legal fees.

LB argues Plaintiffs "do not show that any alleged predicate acts by Lewis Brisbois proximately caused them any harm." Mem. 17. This argument misses the mark. This Court previously held that "[g]iven that Plaintiffs have not clearly alleged the predicate acts on which the RICO claims are based, the Court cannot determine whether Defendants are correct that Plaintiffs have failed to adequately allege that Defendants'

acts were the proximate cause of any harm suffered by Plaintiffs." Order 18.

Under section 1964(c), civil RICO plaintiffs must demonstrate causation, specifically that they were injured "by reason of" the alleged racketeering activity of the defendant. 18 U.S.C. § 1964(c).

> It is well settled that, to maintain a civil RICO claim predicated on mail [or wire] fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury. Although, in some cases, reliance may be a milepost on the road to causation, we have in the past declined to announce a black-letter rule that reliance is the only way plaintiffs can establish causation in a civil RICO claim predicated on mail or wire fraud.

*Living Designs*, 431 F.3d at 363 (citations and quotations omitted). Plaintiffs plead "The CMB entities . . . and LB formed the Enterprise and operated as an association-in-fact with the common purpose of concealing critical information about the [September 20, 2020] loan negotiations (including but not limited to the Fourth Amendment to Intercreditor Agreement, Term Sheet, Participation Agreement), the arbitrarily short maturity date, and subsequent events (including but not limited to the purchase option events). SAC ¶ 135.

When the Borrower predictably defaulted, "[r]ather than contact the Limited Partners to request assistance (in the way of a capital call or raise additional funds) . . . CMB, through Hogan, issued misleading investor updates to downplay the threat of foreclosure and lull the Limited Partners from discovering the malfeasance of CMB and LB. Upon information and belief, given the legal ramifications of CMB's actions, Hogan communicated with LB before sending each of the investor notices referenced in this Complaint." *Id.*, ¶ 142. "For example, instead of notifying the Limited Partners of the notice of default in July, 2021 and their one-time opportunity to purchase the Senior Loan, on September 14, 2021, Hogan sent a misleading email to the Limited Partners explaining the Lenders were discussing amendment of the loan maturity date and 'collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel,' with the intent of preventing Plaintiffs from realizing Defendants' error in not negotiating a more reasonable maturity date or obtaining any meaningful protections in the event of default." *Id.*, ¶ 143.

Plaintiffs had a second opportunity to purchase the senior loan and prevent the foreclosure in early 2022, when "Hogan, Lee and Michael Platner from CMB contacted Colony and the Lender about purchasing Colony's interest in the Senior Mezzanine Loan." *Id.*, ¶ 144. "According to the July 27, 2022, investor update that Hogan sent to Plaintiffs, the Lender notified CMB that it 'would only entertain an offer from the Partnership that resolved the existing senior loan default.'" *Id.*, ¶ 145. However, Hogan downplayed the need to purchase the existing senior loan default noting that while any loan foreclosure would undoubtedly present a large threat to the Partnership, neither the Lender nor Colony Capital have initiated foreclosure actions to date, and the Lender has continued to fund the Borrower for construction draws and working capital as protective advances. Hogan went on to promote the success of the Project writing, "[f]ortunately, the Project has recently turned a corner," and that "since January [2022], the hotel is back on track to ramp up." *Id.*, ¶ 146. CMB never initiated a capital call or sought alternate lending to purchase the senior loan.

By failing to purchase the senior loan, the Lender foreclosed on the Project resulting in the loss of the Plaintiffs' investment. By misrepresenting the cause of the loss as a "secret" Participation Agreement and pursuing sham litigation, Defendants further depleted Partnership assets to the tune of $3.8 million in legal fees. *Id.*, ¶ 166. This figure continues to grow. The Lender is also seeking to recover the $5 million bond in the New York Action that CMB posted as partial compensation for the damages the Lender sustained as a result of the preliminary injunction. *Id.*, ¶ 167.

LB asserts that its "legal fees were paid by Group 48, not Plaintiffs." Mem. 17-18. However, all funds used to pay LB were investor profits held over to cover LB's legal expenses. CMB's investor notice to the Limited Partners dated June 19, 2020, stated:

> [T]he general partner has decided it is in the best interest of the Partnership to maintain sufficient funds in the Partnership's account to pay for any possible future legal expenses to enforce the loan agreement or other extraordinary expenses . . . . Although there has been profit to the Partnership, at this time Group 48 will not make any distribution of those profits from the 2019 income so as to maintain such funds to pay these possibly extraordinary expenses.

Ex. 4 to SAC.

Predictably, LB also attempts to argue causation cannot be met here when "Plaintiffs had no right to manage litigation undertaken by Group 48." Mem. 17. This point is misguided because Plaintiffs are asserting CMB would not have commenced the litigation to begin with had LB not conspired and agreed to misrepresent its knowledge of the Participation Agreement by agreeing to file sham litigation proceedings. There is certainly a causal link between both Group 48's failure to give Plaintiffs notice of the Purchase Option Event and the loss of their investment, as well as the filing of the California and New York State Actions and the loss of $3.8 million in Partnership Assets.[1]

### 4. *LB Fraudulently Obtained Fees from the Limited Partners*

LB argues the "SAC is bereft of any allegations that any Plaintiff parted with any money based on any representations or nondisclosures about the Participation Agreement, or in reliance on any conduct by Lewis Brisbois." Mem. 13. LB is wrong. As set forth above, all funds used to pay LB were investor profits held over to cover LB's legal expenses. Ex. 4 to SAC. LB fraudulently obtained Plaintiffs' funds in violation of 18 U.S.C. § 2314 based on their misrepresentation of a "secret" Participation Agreement.[2]

### C. **Plaintiffs Plead a Viable Claim for Conspiracy to Violate RICO**

As set forth in detail above, Plaintiffs' SAC pleads that LB, CMB, Lee and Hogan formed a RICO enterprise with a common purpose to conceal Defendants' negligence and mislead the Limited Partners through fraudulent actions beyond routine legal services. LB argues "Plaintiffs' RICO conspiracy claim fails because they have failed to allege a viable claim under Section 1962(c), and they fail to plausibly allege a conspiracy.

---

[1] Other circuit courts and some California district courts have held that legal fees incurred in other lawsuits constitute injury for purposes of RICO damages. *See, e.g., Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993) ("[L]egal fees may constitute RICO damages when they are proximately caused by a RICO violation."); *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997) (finding attorneys' fees incurred as a result of fraudulent claims could constitute injury); *In re Outlaw Lab., LP Litig.*, 2020 U.S. Dist. LEXIS 71759, at *18 (finding injury where plaintiff paid attorney's fees responding to defendants fraudulent demand letters); *Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2020 U.S. Dist. LEXIS 236450, at *10 (C.D. Cal. Nov. 23, 2020) (determining legal fees spent defending "sham claims" were appropriately characterized as injury).

[2] Whether false testimony or witness tampering may be violations of Sections 1503 and 1512(b)(1), they are nevertheless predicate acts under RICO.

PLAINTIFFS' OPPOSITION TO DEFENDANT LEWIS BRISBOIS BISGAARD & SMITH LLP'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

Mem. 18. According to 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Thus, to state a claim for violation of subsection (d), a plaintiff must adequately allege "a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.,* 208 F. 3d 741, 751 (9th Cir. 2000).

LB collaborated with CMB to conceal predatory loan terms in the Loan Documents by sending misleading investor notices from September 14, 2021, to July 27, 2022, downplaying the foreclosure threat, and omitting CMB's opportunity to purchase the Senior Loan after JPM's July 12, 2021, notice. SAC ¶¶ 135, 137-147. After the Lender's UCC foreclosure notice, LB and CMB sent investor notices and initiated the sham New York and California State Actions, misrepresenting that the Lender concealed the Participation Agreement which LB and CMB knew of since July 2020. *Id.,* ¶¶ 150-61, 196.

By withholding critical information about the loan negotiations and the purchase-option events, Defendants prevented Plaintiffs from demanding protective actions, like rejecting the Fourth Amendment to Intercreditor Agreement or raising additional funds to purchase the senior loan. *Id.,* ¶ 163. The lawsuits and false updates lulled Plaintiffs into believing that Defendants were completely blindsided by the destruction of CMB's interest in the Project and had legitimate bases for expending the limited partnership assets left to pursue litigation against the Reuben entities. *Id*. In reality, Defendants' conduct amounted to assisting the Lenders in eviscerating CMB's interest in the Project.

By failing to purchase the senior loan, the Lender foreclosed on the Project resulting in the loss of the Plaintiffs' investment. By misrepresenting the cause of the loss as a "secret" Participation Agreement and pursuing sham litigation, Defendants depleted Partnership assets to the tune of $3.8 million in legal fees. SAC ¶ 166. This figure continues to grow. The Lender is also seeking to recover the $5 million bond in the New York Action that CMB posted as partial compensation for the damages the Lender sustained as a result of the preliminary injunction. SAC ¶ 167.

Notably, LB could not have signed off on the Loan Documents, refused to take

action during the Purchase Option Event or filed the California and New York State Actions without CMB's consent and approval. For these reasons, Plaintiffs state a viable claim for conspiracy to violate RICO.

### D. Plaintiffs Plead Colorable State Law Claims

Plaintiffs plead the following state law claims against LB: malpractice, aiding and abetting CMB's breach of fiduciary duties; and civil conspiracy.

#### 1. *The Agent Immunity Rule Does Not Apply*

The Agent Immunity Rule does not immunize LB's conduct. LB argues California's agent immunity rule immunizes them from liability for aiding and abetting or conspiracy theories. Mem. 22-24. However, "[t]he agent's-immunity rule does not apply 'where (1) the attorney has an independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain.'" *ESG Capital Partners, LP v. Stratos*, 2013 U.S. Dist. LEXIS 161294, at *9-10 (C.D. Cal. Nov. 12, 2013).

In *Johnson v. Superior Court,* the court considered whether an attorney hired to assist a general partner in preparing correspondence to the limited partners owed an independent duty to those limited partners. 38 Cal. App. 4th 463 (1995). The *Johnson* court articulated three theories upon which an attorney representing a partnership could owe a duty to the limited partners, two of which apply here.

#### a. Duty Based on Intended Beneficiary Representation

Under the *Goodman v. Kennedy* theory, an attorney can be liable to an intended beneficiary of his work even without any contractual privity relationship with the beneficiary:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Goodman v. Kennedy*, 18 Cal. 3d 335, 342-43 (1976) (quotation omitted). To be an intended beneficiary, the contracting party's intention must be to benefit the limited partners via the advice and services solicited from the attorney. *Johnson*, 38 Cal. App. 4th at 471. Here, LB's services were obtained to benefit the EB-5 investors.

In its Order, this Court held that under both *Goodman* and *Johnson*, Plaintiffs must show "[the] imposition of the duty carries out the <u>prime purpose</u> of the contract for services." Order 23. The Court ruled that, as pled in the FAC, "the specific objective of Group 48 was not to provide the limited partners with visas but to obtain and invest the partnership's funds, and [LB] was retained to assist the partnership to this end. More Importantly, Plaintiffs have also not plausibly alleged that the specific objective in retaining [LB] was to create a benefit for Plaintiffs." *Id*.

Plaintiffs' SAC addresses these concerns and pleads additional facts to establish that the prime purpose of LB's retention was to benefit the Limited Partners. The SAC quotes the Limited Partnership Agreement LB drafted, which proclaims that the "intended business" of Group 48 was to generate revenue and "structure the Partnership such that each Limited Partner, who is not a permanent resident of the United States, is able to apply for a visa pursuant to the EB-5 Immigrant Investor program." SAC ¶ 179. The Partnership was limited to *only* foreign investors seeking EB-5 visas and the Limited Partners were the *sole* financial contributors of CMB ($500,000 each plus a $50,000 syndication fee). *Id*., ¶ 180. The EB-5 Program requires each investor's contribution to create at least ten full-time U.S. jobs to qualify for a visa. *Id*., ¶ 183. CMB's method for creating ten full-time jobs per EB-5 investor was to invest the funds in the development of the Project, generating hundreds of construction jobs. Thus, the Loan Documents LB and CMB negotiated were for the sole purpose of generating jobs to satisfy the federal EB-5 requirements. In the New York Action, CMB, through Hogan, testified that CMB "enter[ed] into a mezzanine loan of this position so that we could then show job creation that this project was going to do," to comply with the federal EB-5 laws. *Id*., ¶ 185.

To comply with the EB-5 Program requirements, LB incorporated specific

provisions into the loan agreement between CMB and CPMB (the Borrower). For example, the agreement mandated that the "Loan structure must be in conformity with the requirements of the EB-5 Program in order to create jobs within the pre-approved targeted employment area, as defined by the USCIS and approved by the State of California." *Id.*, ¶ 181. LB further mandated the "Borrower [] submit to Lender the EB-5 Documentation, which evidences the use of the proceeds of the Loan in the amounts set forth in Section 4.1 (kk) hereof and for the purposes required by this Agreement." *Id.*, ¶ 182.

The Loan Documents LB and CMB drafted and the testimony CMB offered illustrate that LB was retained to benefit Plaintiffs to ensure compliance with the EB-5 Program to qualify for a visa. Plaintiffs were wholly dependent on LB's legal work in negotiating and securing the loan. LB's role extended beyond advising CMB; it crafted the legal framework that governed Plaintiffs' investments and visa eligibility. *Id.*, ¶ 184.

In *Johnson*, the court vacated the award of summary judgment to the lawyer and law firm. 38 Cal. App. 4th at 479. The Court determined that defendants performed legal services and rendered advice to the partnership and defendant's "undertaking . . . to represent the partnership, **generally**, imposed upon him an obligation of loyalty to the partnership **and to all partners**[.]" *Id.* (emphasis added). Similarly, the essence of LB's retention and the subsequent structuring of the Loan documents it orchestrated illustrate that LB performed services and rendered advice to the Partnership, which caused them to assume a duty of care and an obligation of loyalty to Plaintiffs as Limited Partners. The holding in *Johnson* explicitly repudiates LB's argument that it "did not owe any independent legal duties to Plaintiffs." Mem. 23. LB's knowledge of this purpose is further evidenced by its preparation of offering documents distributed to Plaintiffs, which detailed the Project's EB-5 compliance and induced Plaintiffs to invest based on the expectation that LB's legal work would protect their capital and visa prospects. The prime purpose of LB's transactional advice and litigation activities were to assist Plaintiffs obtain US residency. For these reasons, the agent immunity rule does not protect LB from liability.

b. Duty Based on Fiduciary Representation

In representing the Partnership, LB also owed a duty to Plaintiffs as they drafted loan documents, advised CMB, and pursued litigation to further CMB's and, consequently, the interests of Limited Partners. Where the general partner has fiduciary obligations to the limited partners, and the attorney knows it is providing advice to the general partner to discharge those fiduciary duties, then the attorney potentially assumes concomitant fiduciary duties as respects the limited partners. *Johnson*, 38 Cal. App. 4th at 472. In other words, "when an attorney undertakes to provide advice to a trustee, 'he in reality also assumes a relationship with the beneficiary akin to that between trustee and beneficiary.'" *Id.* This proposition "cannot apply in a situation in which the interests of the fiduciary and the beneficiary are adverse." *Id.* at 474.

Here, the General Partner owes fiduciary duties to the Limited Partners to "perform its duties in good faith, in a manner it reasonably believes to be in the best interest of the Partnership and its *Partners*, and with such care, including *reasonable inquiry*, as an ordinarily prudent person in a like position would use under similar circumstances." SAC ¶ 61 (italics added). More specifically, the General Partner's responsibility was to invest the Limited Partners' funds in compliance with the federal EB-5 Program to maximize their ability to obtain U.S. residency and a return of their investment. *Id.,* ¶ 59. CMB retained LB to assist it in discharging those duties. LB knew it was advising, drafting loan documents, advising CMB and pursuing litigation to further CMB and therefore the Limited Partners' interests. Based on the foregoing, LB owed independent fiduciary duties to the Limited Partners to protect their interests.

2. *Plaintiffs' Legal Malpractice Claim Withstands Dismissal*

LB owed Plaintiffs a duty because they prepared offering documents to induce their investments and negotiated the Loan Documents for their direct benefit. LB subsequently breached their duty to Plaintiffs by neglecting to take *any* action to safeguard CMB's junior interest after learning of the Participation Agreement, predatory loan terms, and the Loan's unreasonably short maturity date.

This Court ruled "[t]he question of whether a duty exists is the same one discussed above in *Goodman*." Order 27. As set forth above, Plaintiffs' SAC supplies additional facts establishing that LB owes an independent duty to the EB-5 Investor Plaintiffs. LB wrote in Article III of the LP Agreement that the "**intended business of the Partnership**" was, to: (a) generate revenue for the Partnership; and (b) "**structure the Partnership such that each Limited Partner, who is not a permanent resident of the United States, is able to apply for a visa pursuant the EB-5 Immigrant Investor Program**." (emphasis added). SAC ¶ 179. LB knew the Partnership was limited to foreign investors seeking EB-5 visas and that the Limited Partners were the sole financial contributors of CMB. *Id.*, ¶ 180.

To facilitate the Limited Partners' immigration objectives, LB ensured the Loan Documents satisfied the requirements of the EB-5 Program (requiring each investor's contribution to generate ten U.S. jobs). For example, the loan agreement mandated that the "Loan structure must be in conformity with the requirements of the EB-5 Program in order to create jobs within the pre-approved targeted employment area, as defined by the USCIS." SAC ¶ 181 (quoting Ex. 8 to SAC [Loan Agreement] at 8). It further required the "Borrower [] submit to Lender the EB-5 Documentation, which evidences the use of the proceeds of the Loan in the amounts set forth in Section 4.1 (kk) hereof and for the purposes required by this Agreement." *Id.*, ¶ 182 (quoting Ex. 8 to SAC at 11-12).

However, LB, in negotiating the Loan Documents, failed to conduct a reasonable inquiry into the Participation Agreement, neglected predatory loan terms, an unreasonably short maturity date, and neglected mechanisms to safeguard CMB's junior interest, directly harming Plaintiffs through the loss of their investment. SAC ¶ 188. To cover up their own malpractice, LB coordinated with Lee, Hogan, and CMB to conceal these failures through misleading investor notices to Plaintiffs, false pleadings and false testimony in the State Court Actions. SAC ¶¶ 190-196. LB and CMB concealed the Participation Agreement, a purchase option event, and LB advised CMB to pursue two factually defective lawsuits and an appeal, directly undermining the Limited Partners'

1 | interest.

2 | LB next argues "Plaintiffs' malpractice claim should have bene [sic] filed no later

3 | than July of 2022. Mem. 22. Plaintiffs' malpractice claim is timely. "An action against an

4 | attorney for a wrongful act or omission, other than for actual fraud . . . shall be commenced

5 | within one year after the plaintiff discovers, or through the use of reasonable diligence

6 | should have discovered, the facts constituting the wrongful act or omission, or four years

7 | from the date of the wrongful act or omission, whichever occurs first." Cal. Code Civ. Proc.

8 | § 340.6(a). The statute of limitations is tolled if "[t]he attorney continues to represent the

9 | plaintiff regarding the specific subject matter in which the alleged wrongful act or omission

10 | occurred" or if "[t]he attorney willfully conceals the facts constituting the wrongful act or

11 | omission when those facts are known to the attorney." *Id*.

12 | "A plaintiff has reason to discover a cause of action when he or she has reason at

13 | least to suspect a factual basis for its elements. Under the discovery rule, suspicion of

14 | one or more of the elements of a cause of action, coupled with knowledge of any

15 | remaining elements, will generally trigger the statute of limitations period. *Fox v. Ethicon*

16 | *Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806-07 (2005) (internal citations and quotations

17 | omitted).

18 | LB continues to represent CMB and by extension, its Limited Partners. Plaintiffs

19 | did not learn of LB's malpractice until the filings of the State Court Actions on October 14,

20 | 2022. It was not until March 27, 2023, that LB produced the Term Sheet forecasting the

21 | "secret" Participation Agreement and admitted in open court that it knew the July 9, 2021

22 | loan maturity date in the Third Amended and Restated Mezzanine Loan (the document

23 | LB and CMB admit to receiving) was unreasonable. Plaintiffs filed the instant action on

24 | March 14, 2024. Plaintiffs' claims are timely.

25 | As stated in section III.b above, Plaintiffs articulate the causal link between LB's

26 | acts and omissions and the monetary and equitable losses Plaintiffs sustained. As a result

27 | of LB's malpractice, Plaintiffs lost their investment, paid LB $3.8 million to pursue frivolous

28 | lawsuits, and were prevented from selling their partnership interests before they were

essentially worthless. SAC ¶¶ 191, 195, 197. Further, the Lender is seeking to recover the $5 million bond in the New York action that CMB posted as partial compensation for the damages the Lender sustained as a result of the improper preliminary injunction. *Id.*, ¶ 197. CMB could not have taken these actions without LB's advice and assistance. Plaintiffs plead viable claims for malpractice against LB.

### 3. *Plaintiffs Plead Viable Claims for Aiding and Abetting Breach of Fiduciary Duty*

This Court ruled that the Agent Immunity Rule precludes Plaintiffs' claim against LB for aiding and abetting breach of fiduciary duty. Order 26. However, "[a]iding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct. While aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Am. Master Lease LLC v. Idanta Partners, Ltd*., 225 Cal. App. 4th 1451, 1475-1476 (2014) (internal citations and quotations omitted).

LB aided and abetted CMB breach their duty of care to Plaintiffs by counseling the CMB defendants not to (i) inquire further upon receipt of the Term Sheet; (ii) advise Plaintiffs of the Term Sheet or CMB's failure to take action against it; (iii) request a copy of the Participation Agreement; (iv) insist on a right of first refusal or ability to purchase up the stack in the Fourth Amendment to Intercreditor Agreement; (v) request an extension of the Project's loan maturity date; (vi) object to construction financing through protective advances; and (vii) exercise its right under the Intercreditor Agreement to purchase the entire Senior Mezzanine Loan following a Purchase Option Event notice in July, 2021. SAC ¶ 224. LB further knowingly aided and abetted CMB's breach of fiduciary duty by misrepresenting the "secret" Participation Agreement caused the loss of investor funds and that pursuit of the California and New York State Actions were in the Limited Partner's best interest. *Id.*, ¶ 225.

LB's argument that "[i]t is plainly implausible that [LB] would have knowingly failed to build protections into the Intercreditor Agreement in an effort to aid and abet some breach of fiduciary duty" is a non-starter. Mem. 24. It is possible that the Defendants felt pressured to admit a new lender (perhaps akin to Reuben Bros.) into the stack to finance the Project, and agreed to overlook basic loan protections in order facilitate that new lender. This would be explored further during discovery. Plaintiffs plead a viable claim of aiding and abetting breach of fiduciary duties.

4. *Plaintiffs Plead a Viable Claim for Conspiracy Against LB*

LB can be held liable for civil conspiracy because it knew of CMB's failure to act upon disclosure of the Term Sheet and agreed to cover up same by supporting misleading investor notices and wasting millions in partnership asses to file frivolous litigation, directly damaging Plaintiffs. Notably, the only issue LB raises with respect to the conspiracy claim is that the litigation privilege bars it. Thus, if the court finds the privilege does not apply, Plaintiffs' claim should proceed. To maintain a claim of conspiracy, the plaintiff must allege "that the defendant had knowledge of and agreed to both the objective and the course of action that resulted in the injury, that there was a wrongful act committed pursuant to that agreement, and that there was resulting damage." *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823 (2005).

Plaintiffs claim LB committed malpractice and the General Partner of CMB grossly and/or intentionally breached its fiduciary duties of care to the Limited Partners in the preparation of the loan documents. SAC ¶¶ 175-198, 199-218. Each of the Defendants were united by a common interest in hiding their wrongful conduct in failing to act reasonably to protect the Plaintiffs' investment. *Id.*, ¶ 235. In furtherance of the common design, LB assisted CMB in drafting misleading investor notices, filing misleading actions in California and New York against the Lender, and providing false statements under oath in the legal actions.

The Limited Partners reasonably relied on LB and CMB to take protective actions to preserve their investment, reasonably believed LB and CMB's claims that things were

progressing, and reasonably believed LB's claims of legal recourse against the Lender when they received copies of LB's pleadings filed in the California and New York Actions. Petitioners plead a viable claim of conspiracy against LB.

> 5. *The Litigation Privilege Does Not Apply*

This Court ruled that "the litigation privilege does not apply to…an action by a former client against an attorney for breach of professional duties.'" Order 40 (quoting *Fremont Reorganizing Corp. v. Faigin*, 198 Cal. App. 1153, 1173-74 (2011)). Because Plaintiffs' FAC did not "plausibly allege[] facts showing that [LB] was Plaintiffs' attorney or otherwise owed a duty to Plaintiffs," the "exceptions to the litigation privilege [did] not apply to Plaintiffs." *Id*.

Plaintiffs' SAC pleads additional facts setting forth that LB was Plaintiffs' attorney or otherwise owed a duty to Plaintiffs. Plaintiffs' aiding and abetting and civil conspiracy claims stem from LB's malfeasance in drafting the Loan Documents and conspiring with CMB, Lee, and Hogan to conceal these failures through investor notices and sham lawsuits misrepresenting a "secret" Participation Agreement as the cause of Plaintiffs' investment losses. SAC ¶¶ 224-25, 235, 150-61. The Court in *Johnson* made it clear that a law firm's undertaking to represent a partnership generally imposes an obligation of loyalty to the partnership **and to all partners.** *See Johnson*, 38 Cal. App. 4th at 479. LB similarly undertook a duty to the Partnership and thus Plaintiffs as limited partners, which it breached. Based on the foregoing, the litigation privilege does not bar Plaintiffs' aiding and abetting and civil conspiracy claims.

## IV.    **CONCLUSION**

Based on the foregoing, LB's Motion to Dismiss the SAC should be denied as a matter of law.

Dated: July 25, 2025                  Respectfully Submitted,
                                                   **LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.**

                                                   */s/ Keren E. Gesund*
                                                   KEREN E. GESUND
                                                   *Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANT LEWIS BRISBOIS BISGAARD & SMITH LLP'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT