1  **LAW OFFICES OF ROBERT V. CORNISH, JR., PC**
2  Keren E. Gesund (SBN 253242)
   Robert V. Cornish, Jr. (admitted *pro hac vice*)
3  680 South Cache Street, Suite 100, P.O. Box 12200
   Jackson, WY 83001
4  Tel: (307) 264-0385
   Email: keren@rcornishlaw.com
5
6  *Attorneys for Plaintiffs*

7                  **UNITED STATES DISTRICT COURT**

8                  **EASTERN DISTRICT OF CALIFORNIA**

9

10

11  Shi Bai, *et al.*,                      Case No. 2:24-cv-00807-DJC-SCR

12              Plaintiffs,                  **PLAINTIFFS' OPPOSITION TO CMB**
                                             **DEFENDANTS' MOTION TO DISMISS**
13  v.                                       **PLAINTIFFS' SECOND AMENDED**
                                             **COMPLAINT**
14  CMB Export Infrastructure Investment
    Group 48, LP, a Delaware limited         Hearing:
15  partnership; CMB Export LLC, California   Date: October 2, 2025
    limited liability company; NK Immigration Time: 1:30 p.m.
16  Services, LLC, an Illinois limited liability Judge: Daniel J. Calabretta
    company; Neal Lee, an individual; Patrick Dept.: Courtroom 7
17  Hogan, an individual; and LEWIS
    BRISBOIS BISGAARD & SMITH LLP, a
18  California Limited Liability Partnership,

19

20              Defendants.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    LEGAL ARGUMENT ......................................................................... 3

    A.   This Court Has Personal Jurisdiction Over Defendant Lee Because He Purposefully Availed Himself of the Privileges That Would Derive From Affiliation with a Major California Real Estate Project .............................. 3

    B.   RICO Provides Nationwide Jurisdiction Over Lee............................... 6

    C.   The CMB Defendants' (12)(b)(6) Arguments Fail Because Plaintiffs Allege Plausible Claims for Relief ................................................................ 6

    D.   Plaintiffs Plead Viable and Plausible RICO Claims.................................... 7

        1.   Plaintiffs plead the CMB Defendants and LB were engaged in an association-in-fact enterprise. .................................................... 7

        2.   Plaintiffs Allege Each Defendant Directed the Affairs of The RICO Enterprise....................................................................... 9

        3.   Plaintiffs have Alleged a Pattern of Racketeering Activity ............ 10

            a.   Plaintiffs' SAC Identifies how CMB's Investor Notices and Sham Lawsuits Are Misleading. ........................................... 11

            b.   Defendants' Failure to Provide Material Information to the Limited Partners is Actionable. .......................................... 12

            c.   State Court Lawsuits ........................................................ 13

    4.   Plaintiffs Plead Defendants' Actions Were the But-for and Proximate Causes of Their Harm. ..................................................................................... 14

    E.   Plaintiffs' RICO Claims are not Duplicative of Plaintiffs' Breach of Contract Claim............................................................................................... 17

    F.   Plaintiffs Plead a Viable Claim for Conspiracy to Violate RICO ............... 17

    G.   Plaintiffs Plead Viable State Law Claims ................................................... 19

        1.   Plaintiffs Adequately Allege Breach of Fiduciary Duty Against All CMB Defendants........................................................................ 19

        2.   All CMB Defendants are Liable for Breaching their Fiduciary Duties to Plaintiffs. ........................................................................... 19

    H.   Plaintiffs Plead a Viable Claim for Conspiracy Against CMB. .................. 22

    I.   Plaintiffs State a Plausible  Breach of Contract Claim ............................. 23

III.   CONCLUSION.................................................................................. 24

i

## TABLE OF AUTHORITIES

**Federal Cases**

*Acres Bonusing, Inc v. Ramsey*,
  No. 19-cv-05418-WHO, 2022 U.S. Dist. LEXIS 211688 (N.D. Cal. Nov. 22, 2022) ... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 7

*AT&T v. Compagnie Bruxelles Lambert*,
  94 F.3d 586, 588 (9th Cir. 1996) ..................................................................... 4

*Aych v. Univ. of Ariz.*,
  No. 2:23-cv-07282-ODW (MARx), 2024 U.S. Dist. LEXIS 118455 (C.D. Cal., July
  5, 2024) ........................................................................................................... 6

*BCS Servs., Inc. v. Heartwood 88, LLC*,
  637 F.3d 750 (7th Cir. 2011) ......................................................................... 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 7

*Boon Global Ltd. v. United States Dist. Court (In re Boon Global, Ltd.)*,
  923 F.3d 643 (9th Cir. 2019) ........................................................................... 4

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ......................................................................................... 5

*Butcher's Union Local No. 498 v. SDC Inv., Inc.*,
  788 F.2d 535 (9th Cir. 1986) ........................................................................... 6

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ........................................................................... 7

*Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*,
  905 F.3d 597 (9th Cir. 2018) ........................................................................... 7

*Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
  972 F.3d 1101 (9th Cir. 2020) ......................................................................... 4

*Hope v. Otis Elevator Co.*,
  389 F. Supp. 2d 1235 (E.D. Cal. 2005) ........................................................... 6

*Howard v. Am. Online Inc.*,
  208 F. 3d 741 (9th Cir. 2000) ....................................................................... 18

*In re Jamster Mktg. Litig.*,
  No. 1751, 2009 U.S. Dist. LEXIS 43592 (S.D. Cal. May 22, 2009) ............... 8

*In re Juul Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*,
  497 F. Supp. 3d 552 (N.D. Cal. 2020) ............................................................. 9

*In re Monnig's Dep't Stores, Inc. v. Azad Oriental Rugs, Inc.*,
  929 F.2d 197 (5th Cir. 1991) ......................................................................... 13

*JW Gaming Dev., LLC v. James*,
  No. 3:18-cv-02669-WHO, 2020 U.S. Dist. LEXIS 60264 (N.D. Cal. Apr. 3, 2020) ..... 17

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008).................................................................... 6

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
  431 F.3d 353 (9th Cir. 2005)............................................................. 8, 14

*Med. Mut. of Ohio v. Abbvie Inc. (In re Testosterone Replacement Therapy Prods.*
  *Liab. Litig. Coordinated Pretrial Procdings)*,
  159 F. Supp. 3d 898 (N.D. Ill. 2016) .................................................. 15

*Medimpact Healthcare Sys. v. IQVIA Inc.*,
  No. 19cv1865-GPC(LL), 2020 U.S. Dist. LEXIS 155996 (S.D. Cal. Aug. 27, 2020) .. 11

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007)................................................................. 8

*Picot v. Weston*,
  780 F.3d 1206 (9th Cir. 2015)............................................................... 4

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ............................................................................. 9

*Rio Props., Inc. v. Rio Int'l Interlink*,
  284 F.3d 1007 (9th Cir. 2002)........................................................... 4, 7

*Tan v. Quick Box, LLC*,
  No. 3:20-cv-01082-H-DEB, 2021 U.S. Dist. LEXIS 67791 (S.D. Cal. Apr. 7, 2021)..... 8

*United States v. Shields*,
  844 F.3d 819 (9th Cir. 2016)......................................................... 12, 13

*Wagh v. Metris Direct, Inc.*,
  363 F.3d 821 (9th Cir. 2003)................................................................. 7

*Walter v. Drayson*,
  538 F.3d 1244 (9th Cir. 2008)............................................................... 9

**State Cases**

*Arnold v. Society for Sav. Bancorp*,
  678 A.2d 533 (Del. 1996).................................................................... 19

*Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*,
  131 Cal. App. 4th 802 (2005)............................................................... 22

*Forsythe v. ESC Fund Mgmt. Co. (U.S.)*,
  No. 1091-VCL, 2007 Del. Ch. LEXIS 140 (Del. Ch. Oct. 31, 2007) ............ 21

*Futang Ji v. Punta Gorda Acquisitions*,
  No. 21GDCV00974, 2023 Cal. Super. LEXIS 55007 (Cal. Super. Ct. Aug. 9,
  2023) .............................................................................................. 13, 23

*Gassis v. Corkery*,
  No. 8868-VCG, 2014 Del. Ch. LEXIS 122 (Del. Ch. July 21, 2014)........... 20

*Goodman v. Kennedy*,
  18 Cal. 3d 335 (1976).......................................................................... 23

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
   817 A.2d 160 (Del. 2002).......................................................................... 20

*In re Brandywine Volkswagen, Ltd.*,
   306 A.2d 24 (Del. Super. Ct. 1973)........................................................... 19

*In re SwervePay Acquisition, LLC*,
   No. 2021-0447-KSJM, 2022 Del. Ch. LEXIS 208 (Del. Ch. Aug. 26, 2022).............. 22

*In re USACafes, L.P. Litigation*,
   600 A.2d 43 (Del. Ch. 1991)..................................................................... 20

*Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*,
   No. 5502-CS, 2011 Del. Ch. LEXIS 116 (Del. Ch. Aug. 8, 2011) .............................. 20

*Zurich Am. Ins. Co. v. Syngenta Crop Prot., LLC*,
   No. N19C-05-108 MMJ CCLD, 2020 Del. Super. LEXIS 2867 (Del. Super. Ct. Aug.
   3, 2020) ................................................................................................ 11

**Statutes**

18 U.S.C. § 1962(c)..................................................................................... 7, 9

18 U.S.C. § 1964(c)...................................................................................... 14

**Rules**

Fed. R. Civ. P. 12(b)(2) ............................................................................... 4

1    Plaintiffs (hereinafter "Limited Partners" or "Plaintiffs"), 194 Limited Partners of

2    CMB Export Infrastructure Investment Group 48, LP ("CMB" or "Group 48"), of which at

3    least 38 are residents of California,[1] hereby submit their Opposition to the Motion to

4    Dismiss Plaintiffs' Second Amended Complaint (the "Motion") [ECF No. 76] filed by Group

5    48, CMB Export, LLC ("CMB Export"); NK Immigration Services, LLC ("NK"); Neal Lee

6    ("Lee") and Patrick Hogan ("Hogan") (collectively, the "CMB Defendants").

7    **I.    <u>INTRODUCTION</u>**

8    This matter involves claims arising from Defendants' gross negligence and willful

9    breaches of fiduciary duties and breach of contract in negotiating the loan documents for

10   development of the Fairmont Century Plaza (the "Project") and subsequent conspiracy

11   and cover-up of their malfeasance through material omissions, misleading investor

12   notices, and the filing of sham litigation in California and New York (the "State Court

13   Actions"). Plaintiffs relied on Defendants to safeguard their investments and immigration

14   objectives under the EB-5 program. Instead, Defendants' collective misconduct wiped out

15   Plaintiffs' $97 million investments and squandered partnership assets on sham litigation,

16   all in an effort to lull Plaintiffs into inaction.

17   More specifically, CMB failed to request and review a Participation Agreement,

18   thereby admitting Reuben Brothers, Ltd., and its administrative agent Motcomb Estates

19   Ltd. (collectively, the "Lender") into the capital stack; approved an arbitrarily short loan

20   maturity deadline; approved funding of the project through onerous protective advances,

21   and approved further restrictions of CMB's right to purchase up the stack. SAC ¶ 108. To

22   hide their malfeasance, CMB and its counsel Lewis Brisbois Bisgaard & Smith LLP ("LB")

23   conspired to omit material information from the Limited Partners, send misleading investor

24   notices, and file the State Court Actions representing the Lender had executed a "secret"

25   Participation Agreement.

26   The conspiracy fell apart when it was discovered that CMB and LB had received a

---

[1] Plaintiffs can provide a list of 38 California addresses to this Court if needed. Plaintiffs have already provided a copy to Defense counsel.

PLAINTIFFS' OPPOSITION TO CMB DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT

Term Sheet, the precursor to the Participation Agreement. SAC ¶ 122. The Supreme Court of New York, Appellate Division found "that CMB could not claim fraudulent concealment when the "Term Sheet shared with [CMB] disclosed that there would be a participation agreement with unspecified 'transfer restrictions,' yet [CMB], a sophisticated party, neither asked to see this agreement nor requested more information." SAC ¶ 124, Exhibit 15 to SAC at 5.

On August 19, 2025, the Superior Court of California dismissed CMB's claims relating to the alleged "secret" Participation Agreement due to collateral estoppel, noting it was CMB's duty to inquire about the Participation Agreement.[2] "As the court sees it, the lodestar finding by the NYAD [New York Appellate Division] is that the Motcomb defendants had no duty to speak . . . . Instead, CMB had a duty to inquire or ask about the purportedly concealed facts." Exhibit A to Gesund Decl. [Order entered August 19, 2025] at 15. By failing to request a copy of the Participation Agreement, CMB breached that duty.

On June 3, 2024, Plaintiffs filed the instant action. The complaint was amended twice. On June 30, 2025, the CMB Defendants filed their Motion, arguing lack of personal jurisdiction over Defendant Lee, failure to state claims for RICO violations, civil conspiracy, breach of fiduciary duty, and breach of contract. [3]

CMB argues it was transparent and kept the Limited Partners apprised of all risks and events but the SAC focuses on breaches exceeding expected investment risks, such as CMB's failure to exercise negotiated cure options or notify Plaintiffs of purchase opportunities. For example, CMB asserts that the Private Placement Memorandum (PPM) informed Limited Partners that the Intercreditor Agreement may (or may not) include an "ability to cure" or "ability to purchase the Construction Loan" upon the Developer's default. Mot. at 5-6. CMB misses the point. The SAC alleges CMB *did* obtain a cure option

---

[2] A true and correct copy of the Order is attached to the Declaration of Keren E. Gesund ("Gesund Decl."), filed concurrently herewith, as **Exhibit A**.

[3] CMB only seeks dismissal of claims not previously affirmed in the FAC.

PLAINTIFFS' OPPOSITION TO CMB DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT

but failed to exercise it. While CMB did mail the Limited Partners investor notices about the risk of foreclosure and ongoing litigation (Mot. at 9), the SAC alleges these notices omitted critical details, such as the July 2021 purchase option and misrepresented the Participation Agreement as "secret," thus setting the stage for the cover-up and sham litigation to follow.

CMB's arguments blaming the Limited Partners for failing to notice CMB's misrepresentations are misplaced. CMB owed the Limited Partners fiduciary duties, and case law is clear that a fiduciary cannot misrepresent facts to those it owes fiduciary duties to and subsequently fault them for not discovering their wrongdoing sooner.

The Limited Partners reasonably relied on the General Partner to act in the best interest of the Partnership—by generating revenue and "structure[ing] the Partnership such that each Limited Partner, who is not a permanent resident of the United States, is able to apply for a visa pursuant to the EB-5 Immigrant Investor program." SAC ¶ 179. CMB breached its duty to the Limited Partners by failing to request and review a Participation Agreement admitting the Lender into the capital stack; approving an arbitrarily short loan maturity deadline; approving funding of the project through onerous protective advances, approving further restrictions of CMB's right to purchase up the stack and then hiding its malfeasance by omitting important facts of the default, sending misleading investor notices and filing sham lawsuits. SAC ¶ 108. CMB cannot now blame the Limited Partners for not acting sooner and stopping lawsuits it pursued not for Plaintiffs and other investors but instead to illicitly protect itself with litigation it knew was sham from the start and intended only to lull investors into inaction. For these reasons, CMB's Motion should be denied in its entirety.

II.    **LEGAL ARGUMENT**

    A.    **This Court Has Personal Jurisdiction Over Defendant Lee Because He Purposefully Availed Himself of the Privileges That Would Derive From Affiliation with a Major California Real Estate Project**

Because this lawsuit directly arises out of Lee's targeting and negotiating with California entities to develop a California real estate project, this Court may exercise

3

specific jurisdiction over him. Rule 12(b)(2) allows a party to assert a lack of personal jurisdiction as a defense and request dismissal of the suit. Fed. R. Civ. P. 12(b)(2). "Although the defendant is the moving party on a motion to dismiss [for lack of personal jurisdiction], the plaintiff bears the burden of establishing that jurisdiction exists." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002). Facts presented by the plaintiff are taken as true for the purposes of a 12(b)(2) motion to dismiss, except where contradicted by an affidavit, and any "conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (citations omitted).

A three-part test controls whether non-residents have sufficient contacts to be subject to specific personal jurisdiction: "(1) the non-resident must purposefully avail himself of the privilege of conducting business in the forum; (2) the claim must arise out of the forum-related activities; and (3) 'the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.'" *Boon Global Ltd. v. United States Dist. Court (In re Boon Global, Ltd.)*, 923 F.3d 643, 651 (9th Cir. 2019) "The exact form of our jurisdictional inquiry depends on the nature of the claim at issue." *Picot v. Weston*, 780 F.3d 1206, 1211-12 (9th Cir. 2015). For claims sounding in contract, a purposeful availment test is used; for claims sounding in tort a purposeful direction test is used. *Id*. at 1212. "[B]oth purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020) (internal quotation marks omitted). "For claims sounding in tort, a corporate officer can be subject to jurisdiction based on his own sufficient individual contacts with the forum." *In re Boon Global,* 923 F.3d at 652.

The Supreme Court "emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior

business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) (internal quotations omitted). "It is these factors -- prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing -- that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* In *Burger King*, the defendant had no physical ties to Florida, did not maintain offices in Florida, and had never visited there. Nevertheless, the "franchise dispute grew directly out of 'a contract which had a *substantial* connection with that State.'" *Id.* (italics in original). Defendant "deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479-80 (internal quotations and citations omitted). The Supreme Court held that "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [] must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479.

This Court previously ruled that receipt of an email alone was not enough to establish personal jurisdiction, but the SAC adds details: Lee as the Vice President of Finance for CMB negotiated financing for the California Project, communicated with California-based parties including developer Michael Rosenfeld, approved the maturity date, received the Term Sheet, and coordinated concealment through the State Court Actions. SAC at ¶ 39. Defendant Lee did not provide an affidavit disputing any of the facts alleged in Plaintiffs' SAC. Like *Burger King*, Lee reached out beyond his resident state and negotiated with California entities to develop the California Project. He sought the "manifold benefits that would derive from affiliation" with this major California real estate Project. *Burger* King, 471 U.S. at 480.

Additionally, in *Hope v. Otis Elevator Co.* the Eastern District of California determined it had specific jurisdiction over a hotel operator when an elevator the plaintiff

used at the hotel in Hawaii malfunctioned, injuring plaintiff. 389 F. Supp. 2d 1235, 1239 (E.D. Cal. 2005). The Court held that the hotel operator's inferred association with several travel agents in California and targeted advertising on its web site constitute purposeful availment for specific jurisdiction. *Id.* Like the hotel operator in *Hope*, Lee was associated with a Project, developer, and LLC all located in California and sought to take advantage of the attractiveness of a California Project to attract investors. Based on the foregoing, exercising jurisdiction over Mr. Lee comports with fair play and substantial justice.

**B.    RICO Provides Nationwide Jurisdiction Over Lee**

Since Defendant Lee is part of a nationwide conspiracy, he should be subject to personal jurisdiction under RICO's process provision. RICO authorizes nationwide service and the exercise of jurisdiction over a defendant present anywhere in the United States where (1) the court has "personal jurisdiction over at least one of the participants" in the conspiracy and (2) 'there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Aych v. Univ. of Ariz.*, No. 2:23-cv-07282-ODW (MARx), 2024 U.S. Dist. LEXIS 118455, at *16 (C.D. Cal., July 5, 2024) (quoting *Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 539 (9th Cir. 1986)).

There is no dispute this Court has personal jurisdiction over the other participants of the conspiracy. CMB offers no alternatives. No other court would have personal jurisdiction over all the defendants, because the defendants are in California, Illinois, Delaware, or Texas.

**C.    The CMB Defendants' (12)(b)(6) Arguments Fail Because Plaintiffs Allege Plausible Claims for Relief**

Plaintiffs plausibly state each claim for relief. This Court's inquiry under Rule 12(b)(6) "is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Pursuant to *Bell Atl. Corp. v. Twombly*, a plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face." 550

U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Uncontroverted allegations in the complaint must be taken as true, and factual disputes are construed in the plaintiff's favor." *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018) (citing *Rio Props., Inc.*, 284 F.3d at 1019.)

### D.   Plaintiffs Plead Viable and Plausible RICO Claims

To state a RICO claim, Plaintiffs must plausibly allege that each defendant acted, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern, (4) of racketeering activity. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)). Plaintiffs must connect the alleged racketeering activity with the conduct of an "enterprise" that affects interstate or foreign commerce. 18 U.S.C. § 1962(c).

#### 1.   Plaintiffs plead the CMB Defendants and LB were engaged in an association-in-fact enterprise

Plaintiffs have adequately alleged an association-in-fact enterprise consisting of the CMB Defendants and LB for the common purpose of concealing the Defendants' loan-negotiation failures by issuing misleading investor notices and filing the State Court Actions. The CMB Defendants argue "the SAC . . . is merely rehashing the alleged wrongful acts without specifying 'a decision-making structure for the enterprise.'" Mot. at 13 (citing *Wagh v. Metris Direct, Inc.,* 363 F.3d 821, 831 (9th Cir. 2003)). The Ninth Circuit in *Wagh*, like this court, directed the plaintiffs to plead conduct independent from the entities' respective regular business practices. In other words, the CMB Defendants argue that Plaintiffs fail to distinguish between routine business activities between CMB and LB and the activities done in furtherance of the common purpose.

Plaintiffs plead the enterprise is distinct from the defendants' routine business activities, as it involves coordinated efforts to misrepresent and conceal the causes of the

7

investment loss. As argued in further detail in Plaintiffs' Opposition to LB's Motion to Dismiss Plaintiffs' SAC [ECF No. 79], when defendants engage in business dealings, their common purpose is actionable when it exceeds "normal commercial dealings." *See Tan v. Quick Box, LLC*, No. 3:20-cv-01082-H-DEB, 2021 U.S. Dist. LEXIS 67791, at *58 (S.D. Cal. Apr. 7, 2021) (finding a common purpose where entities collaborated in a deceptive marketing scheme). Plaintiffs must "distinguish ordinary business conduct from fraudulent conduct." *In re Jamster Mktg. Litig*., No. 1751, 2009 U.S. Dist. LEXIS 43592, at *16 (S.D. Cal. May 22, 2009).

In the Ninth Circuit, however, ordinary business conduct can be a necessary component that facilitates fraudulent conduct for RICO purposes. For example, when Best Buy employees misled customers by claiming CD scans were for inventory control when Best Buy was actually transferring personal data to Microsoft, resulting in a Microsoft bill for unrequested services, the Ninth Circuit held that these coordinated actions went beyond routine business dealings and established a "common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007).

Similarly, the Ninth Circuit in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.* held that legal representation can form the basis of a common purpose when attorneys and clients collaborate to mislead third parties through fraudulent means. 431 F.3d 353, 361 (9th Cir. 2005). The court found that DuPont, its law firms, and expert witnesses formed an "'association in fact" RICO enterprise by withholding and misrepresenting damaging test results during discovery to induce plaintiffs to settle product liability claims at a lower value. *Id*. at 361-62. The Ninth Circuit rejected the notion that litigation conduct immunizes collaborative efforts between attorneys and clients, holding that fraud during prior litigation proceedings can form the basis of a RICO claim. *Id.* at 365.

Plaintiffs' SAC similarly alleges conduct that crosses the line beyond routine legal misrepresentation and into the realm of concerted, fraudulent conduct. The SAC alleges that LB, CMB, Lee, and Hogan formed a RICO enterprise in September of 2020 with a

8

common purpose to conceal Defendants' negligence and mislead the Limited Partners through fraudulent actions beyond routine legal services.  Specifically, LB collaborated with CMB to conceal predatory loan terms in the Loan Documents by sending misleading investor notices from September 14, 2021, to July 27, 2022, intentionally downplaying the foreclosure threat and CMB's failure to purchase the Senior Loan after JPM's July 12, 2021 notice. SAC ¶¶ 135, 137-147. After the Lender's UCC foreclosure notice, LB and CMB sent investor notices and filed sham lawsuits in New York and California, misrepresenting that the Lender concealed the Participation Agreement when LB and CMB *both* knew of it since July 2020. SAC ¶¶ 150-61, 196.

The SAC thus pleads specific, coordinated actions by LB, CMB, Lee and Hogan that go beyond routine legal representation, all establishing a common purpose to mislead the Limited Partners through fraudulent means. Each member's direct knowledge and participation in the scheme, as alleged, negates the plausibility of independent business activities and satisfies the Court's mandate.

### 2. Plaintiffs Allege Each Defendant Directed the Affairs of The RICO Enterprise

Plaintiffs' SAC establishes how each defendant participated in the conduct of the enterprise's affair. "In order to 'participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (quoting 18 U.S.C. § 1962(c)). This requirement does not limit RICO liability "to those with primary responsibility for the enterprise's affairs," nor does it require a participant to exercise "significant control over or within an enterprise." *Id.* at 179 & n.4 (emphasis omitted). But "some part in directing the enterprise's affairs is required" and "[s]imply performing services for the enterprise," or failing to stop illegal activity, is not sufficient. *Id.* at 179; *Walter v. Drayson*, 538 F.3d 1244, 1248-49 (9th Cir. 2008). *See also In re Juul Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 594 (N.D. Cal. 2020).

Plaintiffs generally plead: "The CMB entities (including NK), Lee, Hogan and LB

formed the Enterprise and operated as an association-in-fact with the common purpose of concealing critical information about the prior loan negotiations (including but not limited to the Fourth Amendment to Intercreditor Agreement, Term Sheet, Participation Agreement) and subsequent events (including but not limited to the purchase option events) that resulted in the complete loss of Plaintiffs' investments. By misrepresenting the cause of the loss as a "secret" Participation Agreement, CMB and LB sought to preserve their reputations, avoid the risk of ruin, and maintain control of partnership funds. CMB referred millions of dollars in legal services to LB to initiate and perpetuate litigation that publicly marketed and portrayed CMB as an innocent, duped victim to purposely deflect the attention of the Limited Partners into inaction." SAC ¶ 135.  More specifically, Plaintiffs plead Lee received and failed to act on the Term Sheet (SAC ¶ 39), Hogan issued investor notices omitting key facts like the purchase option and loan maturity issues (SAC ¶¶ 138-47), and all collaborated with LB on the sham State Court Actions that falsely claimed the Participation Agreement was "secret" (SAC ¶¶ 150-61).

### 3.    Plaintiffs have Alleged a Pattern of Racketeering Activity

The SAC details a fraudulent scheme by LB, CMB, Lee, and Hogan to conceal their bad acts from the Limited Partners through a series of misleading investor notices and sham lawsuits. This Court previously found the FAC "extremely clear on the 'who, what, when, where, and how' of the misconduct alleged" but sought clarity on how mail or wire fraud was satisfied on at least two occasions. Order 16, 20-21, ECF No. 68. The SAC cures this, alleging multiple specific instances of fraudulent communications and litigation activities that constitute predicate RICO acts.

CMB's Motion focuses on the investor notices sent to the limited partners. Neither LB, in its Motion to Dismiss (ECF No. 74-1), nor CMB dispute that LB participated in the drafting or otherwise vetted the notices sent to the Limited Partners as alleged in the SAC (*see*, *e.g.*, SAC ¶¶ 142, 150). Instead, the CMB Defendants argue that the notices are not misleading. Mot. at 15. CMB further argues that Plaintiffs' claims related to omitted information is not actionable. *Id*. CMB is wrong on both counts.

*a.    Plaintiffs' SAC Identifies how CMB's Investor Notices and Sham Lawsuits Are Misleading*

CMB's concerns regarding Plaintiffs' allegations are more appropriately resolved through a motion for summary judgment. CMB argues that "when read objectively *in their entirety*, the notices clearly advised the Limited Partners of concerns with the Project." Mot. 15 (italics in original). Whether affirmative misrepresentations are "objectively honest" is not appropriate on a motion to dismiss. *Medimpact Healthcare Sys. v. IQVIA Inc.*, No. 19cv1865-GPC(LL), 2020 U.S. Dist. LEXIS 155996, *70 (S.D. Cal. Aug. 27, 2020); *Zurich Am. Ins. Co. v. Syngenta Crop Prot., LLC*, No. N19C-05-108 MMJ CCLD, 2020 Del. Super. LEXIS 2867, at *22-23 (Del. Super. Ct. Aug. 3, 2020) ("A misrepresentation is a question of fact when there is conflicting evidence and a question of law when the evidence is susceptible to only one interpretation."). Nevertheless, the investor notices and sham lawsuits evidence how the enterprise sought to conceal material information, paint a rosier picture, and later shift blame to the Lender in order to lull the investors from taking action to protect their investments.

Plaintiffs specifically plead the following communications by the enterprise:

143.    For example, instead of notifying the Limited Partners of the notice of default in July, 2021 and their one-time opportunity to purchase the Senior Loan, on September 14, 2021, Hogan sent a misleading email to the Limited Partners explaining the Lenders were discussing amendment of the loan maturity date and "collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel," with the intent of preventing Plaintiffs from realizing Defendants' error in not negotiating a more reasonable maturity date or obtaining any meaningful protections in the event of default.

145.    According to the July 27, 2022, investor update that Hogan sent to Plaintiffs, the Lender notified CMB that it "would only entertain an offer from the Partnership that resolved the existing senior loan default."

146.    Hogan downplayed the need to purchase the existing senior loan default noting that "[w]hile any loan foreclosure would undoubtedly present a large threat to the Partnership, neither Reuben Brothers nor Colony Capital have initiated foreclosure actions to date, and Reuben Brothers has continued to fund the Borrower for construction draws and working capital as protective advances. **Exhibit 12** at 2. Hogan went on to promote the success of the Project writing, "[f]ortunately, the Project has recently turned a corner," and that "since January [2022], the hotel is back on track to ramp up." *Id.* at 3.

150.    On October 15, 2022, Hogan sent an email to Plaintiffs

11

misrepresenting that the Lender engaged in predatory lending practices by concealing a Participation Agreement that (1) authorized the Lender to incur high fees and (2) prevented CMB from taking protective action (e.g., purchasing up the capital stack). Hogan falsely claimed that pursuing legal action related to the "secret" Participation Agreement "is in the Partnership's best interest." *See* **Exhibit 13**. Hogan, with CMB's permission, provided to the Limited Partners copies of the California and New York State Complaints. On information and belief, CMB sent this correspondence after review, approval and acquiescence from LB.

152.    For its part, LB filed baseless lawsuits in California and New York, at Hogan's instruction, misrepresenting that the Lender concealed a Participation Agreement to mislead Plaintiffs and the Courts. LB also misrepresented to the courts in California and New York that the Lender prohibited CMB's ability to purchase up the capital stack, despite the Lender's offer to allow CMB to cure the senior loan default.

SAC ¶¶ 143, 145, 146, 150, 152.

In furtherance of their claims, Hogan submitted an affidavit in the New York Action disclaiming all knowledge of the Participation Agreement. Hogan wrote that the Lender "fraudulently induced CMB to consent to its participation . . . by concealing from CMB the fact that it was simultaneously signing a secret side agreement with the original Senior Mezzanine lender."[4] Exhibit B to Gesund Decl. [Hogan Affidavit] at ¶ 14. That "CMB would never have consented to Reuben Brothers' participation . . . had Reuben Brothers or CDCF IV disclosed their side agreement to CMB." *Id*.

Defendants had an obligation to provide truthful information to the Limited Partners. These predicate acts of wire fraud are sufficient to constitute a pattern of racketeering activity for Plaintiffs' civil RICO claim.

> b.    *Defendants' Failure to Provide Material Information to the Limited Partners is Actionable*

Contrary to the CMB Defendants' assertion otherwise, omitted information is actionable where there is a duty to disclose. "[A] nondisclosure [] can support a [wire] fraud charge only when there exists an independent duty that has been breached by the person so charged." *United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016). "The relationship creating a duty to disclose may be a formal fiduciary relationship, or an

---

[4] A true and correct copy of Hogan's affidavit filed in the New York Action is attached to the Gesund Decl. as **Exhibit B**.

12

1    informal, trusting relationship in which one party acts for the benefit of another and

2    induces the trusting party to relax the care and vigilance which it would ordinarily

3    exercise." *Id.* at 823 (internal quotation marks omitted); *In re Monnig's Dep't Stores, Inc.*

4    *v. Azad Oriental Rugs, Inc.*, 929 F.2d 197, 201 (5th Cir. 1991) ("Confidential relationships

5    arise not only from technical fiduciary relationships, but also from partnerships, joint

6    ventures, and other informal relationships."). Here, the Court has already ruled that CMB

7    owed a fiduciary duty to the Limited Partners by virtue of the Limited Partnership

8    Agreement ("LPA"). Similarly, LB owed a duty of care to the Limited Partners as third-

9    party beneficiaries of the Loan Documents. *See Futang Ji v. Punta Gorda Acquisitions*,

10   No. 21GDCV00974, 2023 Cal. Super. LEXIS 55007, at *10-11 (Cal. Super. Ct. Aug. 9,

11   2023) (holding the *Goonewardene* factors support finding EB-5 investors as third-party

12   beneficiaries of the LLC's notes where the Plaintiffs would benefit from the promissory

13   notes and the entire reason for the LLC's existence is to act as the vehicle through which

14   Plaintiffs could lawfully invest in the Project). Thus, Defendants were required (but failed)

15   to notify the Limited Partners of the purchase option event.

16                              *c.    State Court Lawsuits*

17           The CMB Defendants do not dispute that the state court lawsuits contained

18   inaccurate information or that litigation activities, when combined with additional

19   misconduct, can constitute predicate acts for a RICO claim. Nor can they: case law in this

20   Circuit and others confirms that sham litigation plus "more" can constitute predicate acts

21   to support a RICO claim.[5] *See Acres Bonusing, Inc v. Ramsey*, No. 19-cv-05418-WHO,

22   2022 U.S. Dist. LEXIS 211688, at *31 (N.D. Cal. Nov. 22, 2022) (collecting cases) ("In the

23   wake of Kim, district courts from around the country have found that litigation activities

24   will not serve as predicate acts unless there are allegations of wrongdoing outside of the

---

[5] As explained in this Court's Order, the cases cited by Defendants to support their contention that "litigation activities" cannot be predicate acts to establish racketeering activity seek to prevent "a former defendant filing RICO actions in retaliation for litigation, re-litigation of issues already determined in a prior action, and the chilling effect on access to open courts if litigants could subject themselves to RICO liability by simply filing cases." Order at 17. However, "[n]one of these concerns are implicated . . . when the RICO claims are brought not by a defendant to the prior litigation, but by individuals whose interests were theoretically represented by the plaintiffs filing the earlier litigation." *Id.*

PLAINTIFFS' OPPOSITION TO CMB DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT

litigation, such as out-of-court activity or corruption."). The allegations concerning the state court lawsuits may lawfully be considered as evidence of a pattern of racketeering activity.

### 4. Plaintiffs Plead Defendants' Actions Were the But-for and Proximate Causes of Their Harm

Under 18 U.S.C. § 1964(c), civil RICO plaintiffs must demonstrate causation, specifically that they were injured "by reason of" the alleged racketeering activity of the defendant. 18 U.S.C. § 1964(c). "It is well settled that, to maintain a civil RICO claim predicated on mail [or wire] fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury. Although, in some cases, 'reliance may be a milepost on the road to causation,' we have in the past declined to announce a black-letter rule that reliance is the only way plaintiffs can establish causation in a civil RICO claim predicated on mail or wire fraud." *Living Designs*, 431 F.3d at 363 (internal citations omitted).

Defendants' predicate acts of sending misleading investor notices to conceal critical information about the Loan Documents (executed on September 20, 2020), failing to notify the Limited Partners of the purchase-option event, and then filing sham lawsuits with false testimony attributing the loss to a "secret" Participation Agreement, caused Plaintiffs to lose their investment in the Project and depleted Partnership assets to the tune of $3.8 million in legal fees.

The CMB Defendants argue Plaintiffs cannot attribute their lost investment to the enterprise's actions in dealing with the new Lender because the project was already in trouble before the new Lender "entered the picture;" that there was no "other viable alternative lender willing to invest" in the Project and that Plaintiffs had no right to demand changes to the Loan Documents or a new lender. Mot. at 16-17. Their arguments do not merit dismissal. A civil RICO plaintiff "doesn't have to prove a series of negatives; he doesn't have to offer evidence which positively excludes every other possible cause of the [injury]." *Med. Mut. of Ohio v. Abbvie Inc. (In re Testosterone Replacement Therapy*

14

*Prods. Liab. Litig. Coordinated Pretrial Procedings)*, 159 F. Supp. 3d 898, 915 (N.D. Ill. 2016) (quoting *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757 (7th Cir. 2011)). CMB is seeking to impose a pleading obligation against Plaintiffs that case law directly rejects.

Further, the CMB Defendants' Motion contradicts their pleadings in the State Court Actions. According to the complaint in the California State Action, "[b]ut for Reuben Bros.' and Motcomb's misconduct, the Project would have generated and would generate sufficient value to repay all three tiers of lenders." Exhibit 2 to SAC [Cal. Compl.] ¶ 10. In the operative Second Amended Complaint filed in the California State Action,[6] CMB pleads that "Defendants drafted the Participation Agreement with the intent of ensuring CMB's position would be wiped out" and that the "Participation Agreement is the lynchpin in Reuben Bros.', Motcomb's, and Rosenfeld's fraudulent scheme to destroy CMB's interest." Exhibit C to Gesund Decl. [SAC filed in Cal. State Action], ¶¶ 100, 14.

CMB further pled that had it been paying attention, it would have demanded changes to the Loan Documents or a new lender—that "CMB would not have executed the Fourth Amendment to Intercreditor Agreement had Reuben Bros., Motcomb, CDCF IV, or Rosenfeld, or any of them disclosed the terms of and the parties to the Participation Agreement to CMB prior to CMB's entry into the Fourth ICA on September 1, 2020." *Id.*, ¶ 21. CMB asserted it did receive oral representations from the Lender that the borrower would receive "an extension to the July 9, 2021 maturity date if the Project were performing" (*Id.* at ¶ 99) but failed to get those representations in writing. Even the California Court asked

> [W]hy didn't somebody build the extension into the loan? . . . we're sophisticated people. We have sophisticated lawyers. Let's build in – let's change the second extension clause. So that instead of X percent of the units sold - I don't know if they're condos or hotel, but X percent of units sold, and, you know, Y percent of the completion done. We're going to relax those a little bit . . .**[b]ut where is that in the contract . . . ?**

---

[6] A true and correct copy of the Second Amended Complaint filed in the California State Action is attached to the Gesund Decl. at **Exhibit C**.

SAC ¶ 95, Exhibit 10 [Transcript of Oral Argument held March 27, 2023 in the California State Action], at 30:22-31:13 (emphasis added). As a result of what CMB refers to as "the arbitrarily-short maturity date of July 9, 2021, the Borrower defaulted.

As a result of Defendants' coverup, Plaintiffs were unable to try to raise or obtain outside capital to preserve their investment, sell their interests before devaluation, or sue earlier to preserve assets. Plaintiffs' SAC states: "[r]ather than contact the Limited Partners to request assistance (in the way of a capital call or raise additional funds) . . . CMB [Group 48], through Hogan, issued misleading investor updates to downplay the threat of foreclosure and lull the Limited Partners from discovering the malfeasance of CMB and LB. . . . For example, instead of notifying the Limited Partners of the notice of default in July, 2021 and their one-time opportunity to purchase the Senior Loan, on September 14, 2021, Hogan sent a misleading email to the Limited Partners explaining the Lenders were discussing amendment of the loan maturity date and 'collectively stand committed to the completion of the Project and to the ongoing sale of the Century Plaza Hotel,' with the intent of preventing Plaintiffs from realizing Defendants' error in not negotiating a more reasonable maturity date or obtaining any meaningful protections in the event of default." SAC ¶¶ 142-143.

Plaintiffs had a second opportunity to purchase the senior loan and prevent the foreclosure in early 2022, when "Hogan, Lee and Michael Platner from CMB contacted Colony and the Lender about purchasing Colony's interest in the Senior Mezzanine Loan." *Id.*, ¶ 144. "According to the July 27, 2022 investor update that Hogan sent to Plaintiffs, the Lender notified CMB that it 'would only entertain an offer from the Partnership that resolved the existing senior loan default.'" *Id.*, ¶ 145. However, Hogan downplayed the need to purchase the existing senior loan default noting that while any loan foreclosure would undoubtedly present a large threat to the Partnership, neither the Lender nor Colony Capital have initiated foreclosure actions to date, and the Lender has continued to fund the Borrower for construction draws and working capital as protective advances. Hogan went on to promote the success of the Project writing, "[f]ortunately, the

16

Project has recently turned a corner," and that "since January [2022], the hotel is back on track to ramp up." *Id.*, ¶ 146. CMB *never* initiated a capital call or sought alternate lending to purchase the senior loan.

By failing to purchase the senior loan, the Lender foreclosed on the Project resulting in the loss of the Plaintiffs' investment. By misrepresenting the cause of the loss as a "secret" Participation Agreement and pursuing sham litigation, Defendants further depleted Partnership assets to the tune of $3.8 million in legal fees. *Id.*, ¶ 166. This figure continues to grow. The Lender is also seeking to recover the $5 million bond in the New York Action that CMB posted as partial compensation for the damages the Lender sustained as a result of the preliminary injunction. *Id.*, ¶ 167. For these reasons, Plaintiffs sufficiently allege that the Enterprise's conduct caused their losses.

E.    **Plaintiffs' RICO Claims are not Duplicative of Plaintiffs' Breach of Contract Claim**

Plaintiffs' RICO claims are not duplicative of their breach of contract claim because they address a conspiracy involving fraud to cover up their malfeasance. Plaintiffs allege CMB breached the LP Agreement by failing to "use commercially reasonable efforts" in negotiating the Loan Documents (SAC ¶ 243) and (2) CMB failed to attempt to raise capital to meet the reasonable needs of the Partnership (SAC ¶ 245). Plaintiffs' RICO violations assert that CMB and LB conspired together to hide their various, respective, breaches through omissions, misleading investor notices and sham lawsuits. To the extent there is any overlap of claims, no election of remedies is required prior to judgment unless there is "substantial prejudice" to the defendant. *JW Gaming Dev., LLC v. James*, No. 3:18-cv-02669-WHO, 2020 U.S. Dist. LEXIS 60264, at *6 (N.D. Cal. Apr. 3, 2020). "The doctrine is no longer strictly enforced in the federal courts." *Id.* at *6-7 (citation omitted).

F.    **Plaintiffs Plead a Viable Claim for Conspiracy to Violate RICO**

As set forth in detail above, Plaintiffs' SAC pleads that LB, CMB, Lee and Hogan formed a RICO enterprise with the common purpose to conceal Defendants' negligence

1  and mislead the Limited Partners through fraudulent actions beyond routine legal

2  services. The CMB Defendants argue "[b]ecause Plaintiffs' first cause of action for an

3  alleged violation of Section 1962(c) fails, the conspiracy claim must also fail." Mot. at 19

4  (internal quotations and citations omitted). According to § 1962(d), "[i]t shall be unlawful

5  for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of

6  this section." Thus, to state a claim for violation of subsection (d), a plaintiff must

7  adequately allege "a substantive violation of RICO or that the defendants agreed to

8  commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online*

9  *Inc.,* 208 F. 3d 741, 751 (9th Cir. 2000).

10  CMB collaborated with LB to conceal predatory loan terms in the Loan Documents

11  by sending misleading investor notices from September 14, 2021, to July 27, 2022,

12  downplaying the foreclosure threat, and omitting CMB's opportunity to purchase the

13  Senior Loan after JPM's July 12, 2021, notice. SAC ¶¶ 135, 137-147. After the Lender's

14  UCC foreclosure notice, CMB and LB sent investor notices and initiated the sham New

15  York and California State Actions, misrepresenting that the Lender concealed the

16  Participation Agreement which CMB and LB knew of since July 2020. *Id.,* ¶¶ 150-61, 196.

17  By withholding critical information about the loan negotiations and the purchase-

18  option events, Defendants prevented Plaintiffs from raising additional funds to purchase

19  the senior loan or taking other protective actions. *Id.,* ¶ 163. The lawsuits and false

20  updates lulled Plaintiffs into believing that Defendants were completely blindsided by the

21  destruction of CMB's interest in the Project and had legitimate bases for expending the

22  limited partnership assets left to pursue litigation against the Reuben entities. *Id*. In reality,

23  Defendants' conduct amounted to assisting the Lenders in eviscerating CMB's interest in

24  the Project.

25  By failing to purchase the senior loan, the Lender foreclosed on the Project

26  resulting in the loss of the Plaintiffs' $97 million investment. By misrepresenting the cause

27  of the loss as a "secret" Participation Agreement and pursuing sham litigation, Defendants

28  depleted Partnership assets to the tune of $3.8 million in legal fees. SAC ¶ 166. This

figure continues to grow. The Lender is also seeking to recover the $5 million bond in the New York Action that CMB posted as partial compensation for the damages the Lender sustained as a result of the preliminary injunction. SAC ¶ 167.

### G.    Plaintiffs Plead Viable State Law Claims

#### 1.    Plaintiffs Adequately Allege Breach of Fiduciary Duty Against All CMB Defendants

CMB argues Plaintiffs' claims for breach of fiduciary duty against anyone other than the co-general partners should be dismissed. CMB also argues that all claims should be dismissed as time-barred. CMB is wrong on both counts.

#### 2.    All CMB Defendants are Liable for Breaching their Fiduciary Duties to Plaintiffs

Plaintiffs' First Amended Complaint ("FAC") alleged CMB, CMB Export, NK, Lee and Hogan all had and breached fiduciary duties owed to the Limited Partners. FAC ¶¶ 156-164, ECF. No. 37. In moving to dismiss the FAC, CMB claimed "No Defendant other than the General Partner could possibly be liable." Mot. to Dismiss FAC at 28, ECF No. 42. This Court did not specifically rule on this issue, but found the LPA did not bar Plaintiffs' breach of fiduciary duty claim. Order at 29.

Delaware law supports liability against *all* CMB Defendants for the breach of fiduciary duty under partnership law and agency/alter ego principles. Group 48 as the Partnership and principal can be held liable for breach of fiduciary duty under agency principles for the conduct of its co-general partners. *See In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24, 27 (Del. Super. Ct. 1973) (holding the principal business liable for the tortious acts of its employees or agents); see also *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 539 (Del. 1996) ("It is certainly true that a principal is liable for wrongs committed by its agents acting in the course of their agency".). Moreover, Lee and Hogan each owe Plaintiffs fiduciary duties. Under Delaware law, members, officers, or directors of the governing fiduciary (in this case the general partner entity), owe fiduciary duties to the limited partnership and its investors. *See*, *e.g.*, *Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*, No. 5502-CS, 2011 Del. Ch. LEXIS 116, at *106 (Del. Ch. Aug. 8,

19

2011) (holding "our alternative entity law has treated a director of a corporation that is the general partner of a limited partnership as a fiduciary owing fiduciary duties to the limited partnership and its investors, i.e., limited partners."); *see also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002) (holding "where a corporate General Partner fails to comply with a contractual standard [of fiduciary duty] that supplants traditional fiduciary duties and the General Partner's failure is caused by its directors and controlling stockholder, the directors and controlling stockholders remain liable.")

The SAC allegations detailing Lee and Hogan's personal participation in the tortious, fraudulent conduct further permit holding them liable for breach of fiduciary duty. Under the "personal participation doctrine" corporate officers may be held liable in tort when they are "actively involved" in the commission of the tort in that they "directed, ordered, ratified, approved or consented to the tort." *Gassis v. Corkery*, No. 8868-VCG, 2014 Del. Ch. LEXIS 122, at *15 (Del. Ch. July 21, 2014); *see also In re USACafes, L.P. Litigation*, 600 A.2d 43, 48 (Del. Ch. 1991) (rejecting argument that directors of a corporate General Partner's duties do not extend to the limited partners or partnership and denying directors' motion to dismiss because the complaint alleges the directors personally participated in the General Partner's alleged breach).

Lee and Hogan are controlling persons of the co-general partners and personally participated substantially in the tortious conduct alleged throughout the SAC. Plaintiffs adequately allege that Group 48, Lee, and Hogan may be liable to Plaintiffs for breach of fiduciary duty.

        *a.     The Discovery Rule Tolls Plaintiffs' Breach of Fiduciary Duty Claims*

This Court previously ruled that "Plaintiffs have alleged that some CMB Defendants engaged in concealment of tortious conduct" with "the first act of concealment alleged" to be "receipt of the term sheet '[o]n or about July 14, 2020.'" Order 29. "Thus, while this concealment tolls the limitation period for some of the alleged breaches of duty (*i.e.*, those concerning Defendants' alleged failure to investigate the Participation Agreement and

1    defend against the terms of the Participation Agreement), the Court cannot determine

2    whether this applies to the other alleged breaches." *Id*.

3         Plaintiffs' SAC clarifies that the CMB Defendants' breaches started from the 2020

4    loan negotiations. SAC ¶ 204. Plaintiffs were not and could not have been aware of

5    (1) CMB Defendants' colossal failure to take protective measures upon receipt of the July

6    14, 2020 e-mail providing notice of the Term Sheet/Participation Agreement and onerous

7    interest/borrowing provisions that essentially guaranteed impossibility of repayment of

8    Plaintiff's investments; (2) that there was an issue with the loan maturity date; [7] and

9    (3) that JP Morgan Chase had sent notice to LB and CMB on July 12, 2021 of CMB's right

10   to purchase the Senior Loan until CMB filed the State Court Actions on October 14, 2022

11   acknowledging receipt of the purchase-option notice and identifying the maturity date as

12   "arbitrarily short." SAC ¶ 216. Plaintiffs learned about the Term Sheet when CMB

13   discussed it at the March 27, 2023 hearing in the California State Action. *Id*. SAC Plaintiffs'

14   Complaint was filed on March 14, 2024. *See* ECF. No. 1. Plaintiffs' claims are timely under

15   Delaware's three-year statute of limitations.

16        CMB argues "Plaintiffs knew by as early as March 2020 that their investments were

17   at serious risk of total loss, with little to no recourse" because Hogan notified them on

18   March 25, 2020 that Covid-19 caused problems with the construction and financing of the

19   Project. Motion 24. Thus, CMB Defendants argue, Plaintiffs could have discovered "these

20   issues sooner and cannot be fairly described as blameless." Mot. at 24.

21        First, Limited Partners may rely on their fiduciary to act in the best interest of the

22   Partnership. The doctrine of equitable tolling "stops the statute from running while a

23   plaintiff has reasonably relied upon the competence and good faith of a fiduciary."

24   *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, No. 1091-VCL, 2007 Del. Ch. LEXIS 140, at

25   *45-46 (Del. Ch. Oct. 31, 2007) (citations omitted). No evidence of actual concealment is

26   necessary, "but the statute is only tolled until the investor 'knew or had reason to know of

27

28   [7] On March 27, 2023, CMB admitted in court that there had been a verbal agreement to extend the loan maturity date that was never put in writing. SAC ¶¶ 92-95.

PLAINTIFFS' OPPOSITION TO CMB DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT

the facts constituting the wrong.'" *Id*. Hogan provided a solution to the financing problem—a new Lender who would join the capital stack. Plaintiffs had no reason to suspect that CMB and LB would bungle the loan negotiations until they admitted it later in their State Court pleadings.

Second, it is unclear how Plaintiffs could have discovered, by March 25, 2020: the undisclosed Term Sheet (provided to CMB nearly 4 months later on July 14, 2020), the unrequested Participation Agreement executed on September 20, 2020; the undisclosed Purchase Option notice JPM sent to CMB on July 12, 2021; that the maturity date was considered, by CMB, to be "unreasonably short," etc. The earliest Plaintiffs could have learned of the purchase-option even was October 14, 2022. The earliest Plaintiffs could have learned about CMB's bungling of the loan-maturity deadline and receipt of the Term Sheet and failure to take protective action related thereto was when the March 27, 2023 hearing transcript came out. Based on the foregoing, Plaintiffs' claims are timely in light of Defendants' concealment endeavors.

### H.    Plaintiffs Plead a Viable Claim for Conspiracy Against CMB

The CMB Defendants, together with LB, are liable for civil conspiracy. To maintain a claim of conspiracy, the plaintiff must allege "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *In re SwervePay Acquisition, LLC*, No. 2021-0447-KSJM, 2022 Del. Ch. LEXIS 208, at *30 (Del. Ch. Aug. 26, 2022).

Plaintiffs claim LB and the CMB Defendants sought to conceal their bad acts related to the preparation of the loan documents by omitting material information, drafting misleading investor notices, filing misleading actions in California and New York against the Lender, and providing false statements under oath in the legal actions.

The Limited Partners reasonably relied on LB and CMB to take protective actions to preserve their investment, reasonably believed LB and CMB's claims that things were progressing, and reasonably believed LB's claims of legal recourse against the Lender when they received copies of LB's pleadings filed in the California and New York Actions.

22

Through their combined malpractice and breach of fiduciary duties, Defendants admitted a predatory lender into the stack which (according to LB and CMB) orchestrated the takeover of the Project, wiping out the Limited Partners' investment.

Agent immunity does not bar Plaintiffs' civil conspiracy claim. CMB relies on Delaware law in support of its conspiracy claim but reverts to California's agent immunity law to dismiss it. Apparently, Delaware does not have an equivalent standard. *See Sample v. Morgan*, 935 A.2d 1046, 1060-1061 (Del. Ch. 2007).[8] LB, as agents of CMB, a Delaware limited partnership, would be subject to Delaware law.

Even if California law applies, the Agent Immunity Rule does not immunize LB's conduct. As set forth in further detail in Plaintiffs' Opposition to LB's Motion to Dismiss SAC (ECF No. 79), Plaintiffs are intended beneficiaries of LB's conduct under *Goodman v. Kennedy*, 18 Cal. 3d 335, 342-43 (1976). S*ee also Futang Ji v. Punta Gorda Acquisitions*, 2023 Cal. Super. LEXIS 55007, at *10-11 (holding the *Goonewardene* factors support finding EB-5 investors as third-party beneficiaries of the LLC's notes where the Plaintiffs would benefit from the promissory notes and the entire reason for the LLC's existence is to act as the vehicle through which Plaintiffs could lawfully invest in the Project).

Further, Plaintiffs are fiduciaries under *Johnson v. Superior Court*, 38 Cal. App. 4th 463 (1995), because, as pled, the General Partner (that has fiduciary obligations to the Limited Partners) had LB review all Loan Documents and investor notices before sending them to the Limited Partners. LB knew it was providing advice to the General Partner to discharge those fiduciary duties to the Limited Partners. LB owed a duty to the Limited Partners. Based on the foregoing, Plaintiffs plead a viable claim for civil conspiracy.

I.    **Plaintiffs State a Plausible  Breach of Contract Claim**

Plaintiffs' SAC adds the following new claim for breach of contract against the

---

[8] "According to the moving defendants, case law in some other jurisdictions says that lawyers cannot be sued simply for performing services for a client if all that the lawyers get out of those services is a fee. That is, if the only benefit of the lawyer's actions is getting a fee for the work he did, this doctrine supposedly gives the lawyer a free pass from being held civilly responsible for his actions to those who would sue their clients."

General Partners NK and CMB Export: that CMB failed to use "commercially reasonable efforts" in negotiating the loan documents. CMB argues "there is no obligation in the LPA that *required* CMB Export or NK Immigration to 'use commercially reasonable efforts' in negotiating any loan documents with the" Lender. Mot at 25 (italics in original).

According to CMB, Article VI.A.3. of the LPA does not require the General Partners to use commercially reasonable efforts in negotiating any loans with the Lender because it only says that "the General Partner shall have full, exclusive, and complete discretion, power and authority, to manage, control, administer, and operate the business and affairs of the Partnership . . . including, without limitation, for Partnership purposes, the power . . . to use commercially reasonable efforts to meet the objectives of the Partnership." CMB appears to argue that this provision means the General Partners have the option, but not the requirement, to use commercially reasonable efforts.

However, Article IV.C.3 of the LPA explicitly states: "<u>Investments</u>. The Partnership *shall* use commercially reasonable efforts to advance and accomplish the Partnership's business and purpose as set forth in Article III of this Agreement." (italics added). Clearly, the LPA requires the General Partners to fulfill their duties using "commercially reasonable efforts" in negotiating the Loan Documents. Defendants breached their duties by acting unreasonably in failing to address the predatory terms contained in the Term Sheet and subsequent Participation Agreement, the unreasonably short maturity date, and CMB's ability to purchase up the stack. SAC ¶¶ 243-244. Plaintiffs plead a viable claim for breach of contract.

## III.    **CONCLUSION**

For the aforementioned reasons, Plaintiffs respectfully request that the CMB Defendants' Motion to Dismiss the Second Amended Complaint be denied in its entirety, or in the alternative, if Defendants' Motion is granted, that Plaintiffs be granted leave to file a Third Amended Complaint.

Dated: August 29, 2025        Respectfully Submitted,
**LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.**

*/s/ Keren Gesund*
KEREN GESUND
*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO CMB DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT